FILED
**United States Court of Appeals**
**Tenth Circuit**

**May 7, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| KHALFAN KHAMIS MOHAMED, | |
| Plaintiff - Appellee, | |
| v. | No. 22-1453 |
| JONES; HUDDLESTON; OSAGIE; BRUSH; ESPINOZA; MILLER; MURTON; ARMIJO, | |
| Defendants - Appellants. | |

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-02516-RBJ-MDB)**

_____

Lowell V. Sturgill, Jr., Attorney, Civil Division (Brian M. Boynton, Acting Assistant Attorney General; Cole Finegan, U.S. Attorney; and Barbara L. Herwig, Attorney, Civil Division, with him on the briefs) Department of Justice, Washington, D.C., for the Defendants - Appellants.

Khalfan Khamis Mohamed, filed a brief pro se.

Madeline Brooke Dobkin, Student Intern Attorney (Matthew Cushing, Counsel of Record; Jenna King and Reagan McDonnell, Student Intern Attorneys, with her on the brief) University of Colorado Law School Appellate Advocacy Practicum, Boulder, Colorado, for Plaintiff - Appellee.

_____

Before **TYMKOVICH**, **MATHESON**, and **BACHARACH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Federal Bureau of Prisons ("BOP") officials beat prisoner Khalfan Khamis Mohamed while other officials watched. Mr. Mohamed brought Eighth Amendment excessive force and failure to intervene claims against several BOP officials, contending that *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), provided him a cause of action. The BOP defendants moved to dismiss, arguing *Bivens* does not extend to Mr. Mohamed's claims. The district court denied their motion.

The BOP defendants seek interlocutory review. We dismiss for lack of jurisdiction.

## I. **BACKGROUND**

### A. *Factual Background*[1]

Mr. Mohamed, incarcerated at the United States Administrative Maximum Penitentiary in Florence, Colorado, went on a hunger strike. BOP officials temporarily removed him from his cell. As they escorted him back, Officers David Brush, Joseph Miller, and Cody Espinoza beat him. Lieutenants Joseph Armijo and Dennis Murton and Physician's Assistant ("PA") Anthony Osagie watched and did

---

[1] Because this appeal is from a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we take the facts alleged in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Citizen Ctr. v. Gessler*, 770 F.3d 900, 916 (10th Cir. 2014).

2

not intervene as Mr. Mohamed cried out for help and limped in pain.  Lieutenant Murton also instructed the others "on how to beat [Mr. Mohamed]."  App., Vol. II at 167.

Officer Brush then removed almost everything from Mr. Mohamed's cell, including thousands of pages of documents Mr. Mohamed had written over 20 years, seven books, a "few shorter works," legal and religious materials, cosmetic items, writing and postage materials, toiletries, and his drinking water cup.  *Id.* at 170-71.  Mr. Mohamed later recovered some of these items.  He experienced severe depression and post-traumatic stress disorder from the loss of his work product.

After the beating, Nurse Kelly Jones performed a medical assessment of Mr. Mohamed.  Although Mr. Mohamed had visible injuries and complained of broken bones and severe pain, Nurse Jones did not provide any treatment.  He also refused multiple times to examine Mr. Mohamed for symptoms related to the hunger strike.  Nurse Roger Huddleston eventually performed a hunger-strike assessment but refused several times to treat Mr. Mohamed's beating-related injuries.

PA Osagie told Mr. Mohamed to end the hunger strike and not tell other staff about his pain if he wanted to receive treatment for his beating-related injuries.  PA Osagie also forced Mr. Mohamed to eat and to endure painful leg cuffs.

Mr. Mohamed eventually received some treatment for his physical injuries, including a broken ankle, but he continues to experience pain and other physical symptoms from the beating.

## B. *Procedural Background*

### 1. **Mr. Mohamed's Claims**

Mr. Mohamed sued Officers Brush, Miller, and Espinoza; Lieutenants Armijo and Murton; PA Osagie; and Nurses Jones and Huddleston in their individual and official capacities.  Relying on *Bivens*, he brought Eighth Amendment excessive force claims against Officers Brush, Miller, and Espinoza; Eighth Amendment failure to intervene claims against Lieutenants Armijo and Murton and PA Osagie; a First Amendment claim against Officer Brush for confiscating his property; and Eighth Amendment deliberate indifference to medical needs claims against PA Osagie and Nurses Jones and Huddleston.  He also brought five claims against the United States under the Federal Tort Claims Act ("FTCA").

### 2. **Motions to Dismiss**

The BOP defendants and the United States filed motions to dismiss.  As relevant on appeal, the BOP defendants argued the excessive force and failure to intervene claims should be dismissed for lack of a *Bivens* remedy and that PA Osagie was entitled to qualified immunity on the failure to intervene claim.[2]  Officers Brush,

---

[2] The Defendants sought dismissal of the First Amendment, deliberate indifference, and two of the FTCA claims on various grounds.  The district court dismissed the First Amendment claim and the two FTCA claims, but it denied dismissal of the deliberate indifference claims, finding Mr. Mohamed stated a claim and the BOP defendants lacked qualified immunity.  The United States did not seek dismissal of the other three FTCA claims, all for battery.

Miller, and Espinoza and Lieutenants Armijo and Murton did not argue they were entitled to qualified immunity for the excessive force or failure to intervene claims.

The motions were referred to a magistrate judge, who recommended the excessive force and failure to intervene claims not be dismissed because *Bivens* provided a remedy and PA Osagie was not eligible for qualified immunity on the failure to intervene claim.  The BOP defendants timely objected.  The district court adopted the magistrate judge's report and recommendation in its entirety.

3. **Motion for Reconsideration**

The BOP defendants then moved to reconsider under Federal Rule of Civil Procedure 59(e), arguing intervening Supreme Court precedent, *Egbert v. Boule*, 142 S. Ct. 1793 (2022), foreclosed a *Bivens* remedy for excessive force and failure to intervene claims.  They also alerted the district court to *Silva v. United States*, 45 F.4th 1134 (10th Cir. 2022), in which we held that no *Bivens* remedy is available for Eighth Amendment excessive force claims when the BOP's Administrative Remedy Program provides an alternative remedial scheme.  The district court denied the motion.

4. **Appeal**

The BOP defendants appealed, arguing only that the excessive force and failure to intervene claims should be dismissed for lack of a *Bivens* remedy.  Despite raising a potential qualified immunity challenge to the failure to intervene claim against PA Osagie in the docketing statement, the BOP defendants did not make a

qualified immunity argument in their opening brief.[3]  They argue we have interlocutory appellate jurisdiction under the collateral order doctrine to consider the district court's *Bivens* extension.

## C. *Legal Background*

We must decide whether the district court's order extending *Bivens* to Mr. Mohamed's Eighth Amendment excessive force and failure to intervene claims qualifies for interlocutory review under the collateral order doctrine.  In the following legal background discussion, we first provide an overview of the collateral order and *Bivens* doctrines and show the Supreme Court has often and increasingly refused to expand either.  Second, we turn to the few Supreme Court decisions that resolved *Bivens* or related issues on interlocutory appeal.  None of them was an interlocutory appeal where the only issue was whether a *Bivens* claim exists.  Third, we review the two circuit court cases that have addressed whether *Bivens* extension orders may be appealed under the collateral order doctrine.  Both said no.

### 1. **The Collateral Order and *Bivens* Doctrines**

#### a. *Collateral order doctrine*

##### i. Final judgment rule – 28 U.S.C. § 1291

Federal appellate jurisdiction is generally limited to appeals from "final" district court orders, 28 U.S.C. § 1291, and orders certified for interlocutory appeal,

---

[3] The BOP defendants also abandoned their qualified immunity arguments on the deliberate indifference claims.

*id.* § 1292(b).  Section 1291 provides that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."  This final judgment rule "preserv[es] respect for trial judges, reduc[es] the ability of litigants to harass each other, and enhanc[es] the efficient administration of justice."  *United States v. Martinez-Haro*, 645 F.3d 1228, 1231 (10th Cir. 2011) (citing *Flanagan v. United States*, 465 U.S. 259, 263-64 (1984)).

  ii. *Cohen* rationale and test

  In 1949, the Supreme Court recognized the collateral order doctrine in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949).  The collateral order doctrine allows for immediate appeal of some non-final orders under § 1291.  *See Will v. Hallock*, 546 U.S. 345, 349 (2006); *Osage Tribal Council ex rel. Osage Tribe of Indians v. U.S. Dep't of Lab.*, 187 F.3d 1174, 1179 (10th Cir. 1999).  The doctrine gives § 1291's finality requirement a "practical rather than a technical construction."  *Cohen*, 337 U.S. at 546.  Appealable collateral orders "are said to be 'too important to be denied review and too independent of the cause itself' to justify waiting out the rest of the adjudication."  *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 664 (10th Cir. 2018) (quoting *Cohen*, 337 U.S. at 546).

  For orders to be appealed before final judgment, they must (1) be "conclusive"; (2) "resolve important questions separate from the merits"; and (3) be "effectively unreviewable on appeal from . . . final judgment."  *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quotations omitted); *see Cohen*, 337 U.S. at 545-47.  These are referred to as the "*Cohen* factors."  *See, e.g.*, *Osage Tribal*

*Council*, 187 F.3d at 1180.  For the third factor, "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'"  *Mohawk*, 558 U.S. at 107 (quoting *Will*, 546 U.S. at 352-53).

In applying the *Cohen* test, courts consider "the entire category to which a claim belongs" instead of "engag[ing] in an individualized jurisdictional inquiry" that would ask whether "the litigation at hand might be speeded, or a particular injustice averted."  *Id.* (alterations and quotations omitted).

### iii.  *Cohen*'s limited scope

"[T]he Supreme Court has issued increasingly emphatic instructions that the class of cases capable of satisfying this 'stringent' test should be understood as 'small,' 'modest,' and 'narrow.'"  *United States v. Wampler*, 624 F.3d 1330, 1334 (10th Cir. 2010) (quoting *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995); *Will*, 546 U.S. at 350; *Mohawk*, 558 U.S. at 113).

The types of orders that fall under the collateral order doctrine "require only two hands to count."  *Belya v. Kapral*, 45 F.4th 621, 629 n.5 (2d Cir. 2022), *cert. denied sub nom. Synod of Bishops of the Russian Orthodox Church Outside of Russ. v. Belya*, 143 S. Ct. 2609 (2023).  The first and larger category includes "constitutionally based immunities," *Los Lobos Renewable Power*, 885 F.3d at 664—orders denying qualified, absolute, tribal, Eleventh Amendment, or another

immunity.[4]  The second category includes mostly orders that would be moot

following final judgment.[5]  The Supreme Court has declined to extend collateral

order treatment to a wide variety of other orders.[6]

---

[4] *Will*, 546 U.S. at 350 (collecting cases); *Osage Tribal Council*, 187 F.3d at 1179 (denials of tribal sovereign immunity); *Osborn v. Haley*, 549 U.S. 225, 238 (2007) (denials of immunity under the Westfall Act); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) (denials of Eleventh Amendment immunity); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (denials of qualified immunity, to the extent they turn on an issue of law); *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (denials of absolute Presidential immunity); *Helstoski v. Meanor*, 442 U.S. 500, 508 (1979) (denials of Speech or Debate Clause immunity in a criminal case); *Abney v. United States*, 431 U.S. 651, 662 (1977) (adverse double jeopardy orders); *Nixon*, 457 U.S. at 742 (describing *Abney* as addressing a "claim of immunity under [the] Double Jeopardy Clause").

[5] *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 n.1 (2022) (prisoner-transport orders under the All Writs Act); *Sell v. United States*, 539 U.S. 166, 177 (2003) (orders permitting the government to force a defendant to take antipsychotic drugs to render him competent to stand trial); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10-12 (1983) (stay orders when their sole purpose and effect is to surrender jurisdiction of federal suit to state court); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 715 (1996) (same); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170-72 (1974) (orders allocating the costs of providing notice to class members); *Stack v. Boyle*, 342 U.S. 1, 6 (1951) (orders denying motions to reduce bail); *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 688-89 (1950) (orders imposing an attachment of a vessel in admiralty).

[6] *Microsoft Corp. v. Baker*, 582 U.S. 23, 26 (2017) (stipulated-to voluntary dismissals with prejudice of orders denying class certification); *Mohawk*, 558 U.S. at 103 (orders to disclose confidential materials based on waiver of attorney-client privilege); *Will*, 546 U.S. at 347 (refusals to apply FTCA judgment bar); *Cunningham v. Hamilton County*, 527 U.S. 198, 200 (1999) (attorney sanctions under Federal Rule of Civil Procedure 37(a)(4)); *Johnson v. Jones*, 515 U.S. 304, 307 (1995) (denials of qualified immunity at summary judgment based on fact-related disputes); *Swint*, 514 U.S. at 38 (denials of motions for summary judgment on non-qualified-immunity issue without pendent jurisdiction); *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (denials of motions to dismiss an indictment for violation of Federal Rule of Criminal Procedure 6(e)); *Lauro Lines*

b.  Bivens *doctrine*

In 42 U.S.C. § 1983, Congress created a damages action for deprivation of federal rights by officials acting under color of state law.[7]  But "Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government."  *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017).  In 1971, the Supreme Court in *Bivens* "recognized for the first time an implied private action for damages against federal officers alleged to have violated a

---

*s.r.l. v. Chasser*, 490 U.S. 495, 496 (1989) (denials of motions to dismiss damages actions based on contractual forum-selection clauses); *Van Cauwenberghe v. Biard*, 486 U.S. 517, 527 (1988) (denials of immunity from civil process); *id.* (denials of *forum non conveniens* dismissal); *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 278 (1988) (denials of *Colorado River* motions); *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 372, 377 (1987) (orders granting permissive intervention but denying intervention as of right); *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 426 (1985) (orders disqualifying counsel in a civil case); *Flanagan*, 465 U.S. at 260 (orders disqualifying defense counsel in a criminal prosecution); *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 264 (1982) (denials of motion to dismiss indictment for prosecutorial vindictiveness); *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 369-70 (1981) (denials of motions to disqualify counsel for the opposing party in a civil case); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (orders denying class certification), *superseded by* F.R.C.P. 23(f); *United States v. MacDonald*, 435 U.S. 850, 861 (1978) (denials of speedy trial motions).

[7] Section 1983 provides:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quotations omitted). It held that officials acting under color of federal law may be liable for money damages for using excessive force in conducting a warrantless search and arrest in violation of the Fourth Amendment. *Bivens*, 403 U.S. at 397; *Abbasi*, 582 U.S. at 130-31.

The Supreme Court has since "recognized . . . an implied cause of action in [only] two cases involving other constitutional violations," both in the decade after *Bivens*. *Abbasi*, 582 U.S. at 131. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court allowed a *Bivens* claim against a Member of Congress for a congressional staffer's Fifth Amendment Due Process gender discrimination claim. In *Carlson v. Green*, 446 U.S. 14 (1980), the Court said a prisoner could sue federal prison officials under *Bivens* for inadequate medical care in violation of the Eighth Amendment. After these two cases, "the arguments for recognizing implied causes of action for damages began to lose their force." *Abbasi*, 582 U.S. at 132. Indeed, the Supreme Court has not done so since then.

"[E]xpanding the *Bivens* remedy is now a disfavored judicial activity." *Id.* at 135 (quotations omitted). "[A]lmost any difference between the case at hand and the three [*Bivens*] precedents can justify rejecting a cause of action." *Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1355 (10th Cir. 2024), *petition for rehr'g denied* (Apr. 5, 2024). A court may also deny a *Bivens* remedy when "the Government already has provided alternative remedies that protect plaintiffs." *Silva*, 45 F.4th at 1141 (quoting *Egbert*, 142 S. Ct. at 1804). We recently declined to extend *Bivens*

11

to an Eighth Amendment excessive force claim in *Silva*, *id.*, and to a Fourth

Amendment excessive force claim against Deputy U.S. Marshals in *Logsdon*,

91 F.4th at 1355-56.

2.  **Relevant Supreme Court Cases**

Several Supreme Court cases have addressed *Bivens* extension orders or

related issues on interlocutory appeal, but none have allowed interlocutory appellate

review for a *Bivens*-only appeal.

a.  Hartman v. Moore*, 547 U.S. 250 (2006)*

In *Hartman*, the plaintiff brought "a *Bivens* action against criminal

investigators for inducing prosecution in retaliation for speech."  547 U.S. at 252.

The defendants, federal officials sued in their individual capacities, moved for

summary judgment based on qualified immunity "because the underlying criminal

charges were supported by probable cause."  *Id.* at 255.  The district court denied the

motion, and the D.C. Circuit affirmed on interlocutory appeal.  *Id.*

The defendants petitioned for certiorari, arguing that (1) the complaint had to

allege an absence of probable cause to state a *Bivens* claim and (2) they were entitled

to qualified immunity.  *See* Pet. for Certiorari at *I, *Hartman*, 547 U.S. 250

(No. 04-1495), 2005 WL 1123566.  The parties disputed whether the Supreme Court

had interlocutory jurisdiction to consider the elements of a *Bivens* claim.  *Compare*

Br. for Resp. at *36-39, *Hartman*, 547 U.S. 250 (No. 04-1495), 2005 WL 2653949,

*with* Reply Br. for Pets. at *14-15, *Hartman*, 547 U.S. 250 (No. 04-1495), 2005 WL

3118783.  The Court had previously recognized that the collateral order doctrine

12

permits interlocutory appeal of denials of qualified immunity, *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), but it had not discussed jurisdiction over *Bivens* issues on interlocutory appeal.

The Court resolved the case without reaching qualified immunity, holding that "want of probable cause must be alleged and proven" to "state[] an actionable violation" under the *Bivens* theory presented. *Hartman*, 547 U.S. at 252. It justified resolving only the *Bivens* issue because it "d[id] not go beyond a definition of an element of the tort, [which was] directly implicated by the defense of qualified immunity and properly before [the Court] on interlocutory appeal." *Id.* at 257 n.5.

b.  Wilkie v. Robbins*, 551 U.S. 537 (2007)*

In *Wilkie*, the plaintiff brought a *Bivens* claim for violations of his Fifth Amendment rights. 551 U.S. at 548. The federal defendants moved for dismissal and summary judgment based on qualified immunity, and the district court denied both motions. *Id.* On interlocutory appeal, this court held we had jurisdiction under the collateral order doctrine to consider the summary judgment denial because it was premised on a denial of qualified immunity, and we affirmed. *Robbins v. Wilkie*, 433 F.3d 755, 761-64 (10th Cir. 2006), *rev'd and remanded*, 551 U.S. 537, *vacated*, 497 F.3d 1122 (10th Cir. 2007) (mem.).

The Supreme Court granted certiorari, held it had interlocutory jurisdiction, and reversed. It held that *Bivens* did not give the plaintiff a cause of action and "there [wa]s no reason to enquire further into . . . the asserted defense of qualified immunity." 551 U.S. at 567. The Court justified addressing the *Bivens* issue on

interlocutory review based on *Hartman*'s "reasoning"—that "the definition of an element of the asserted cause of action was 'directly implicated by the defense of qualified immunity and properly before [it] on interlocutory appeal'"—"applie[d] to the recognition of the entire cause of action." *Id.* at 549 n.4 (quoting *Hartman*, 547 U.S. at 257 n.5).[8]

    c.  Will v. Hallock*, 546 U.S. 345 (2006)*

Although *Will* did not concern a *Bivens* extension order, its discussion of whether a district court's order refusing to apply the FTCA's judgment bar was appealable under the collateral order doctrine is relevant here. The plaintiff in *Will* brought an FTCA claim against the United States and, in a separate action, a *Bivens* claim against U.S. Customs Service agents for damage to her property from a search. 546 U.S. at 347-48. The district court dismissed the first suit. In the second proceeding, the agents sought to enforce the FTCA's judgment bar, which precludes "any action by the [plaintiff], by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim" if a court enters "judgment in an action under [the FTCA]." 28 U.S.C. § 2676; *see Will*, 546 U.S. at 348. The district court denied the motion. *Will*, 546 U.S. at 348-49. The

---

[8] The Court commented on these decisions in *Iqbal*, where it similarly looked to *Hartman* to hold that "the sufficiency of respondent's pleadings [wa]s both 'inextricably intertwined with'" "and 'directly implicated by' the qualified-immunity defense." 556 U.S. at 673 (first quoting *Swint*, 514 U.S. at 51, then quoting *Hartman*, 551 U.S. at 257 n.5). The *Iqbal* Court assumed without deciding that the respondent's First Amendment claim was actionable as a *Bivens* claim and did not discuss *Bivens* in its jurisdictional analysis. *Id.* at 675.

Second Circuit "affirmed, after first finding jurisdiction under the collateral order doctrine." *Id.* at 349.

The Supreme Court vacated the Second Circuit's decision for lack of appellate jurisdiction, holding that orders "refus[ing] to apply the [FTCA's] judgment bar" are not appealable under the collateral order doctrine. *Id.* at 347, 349.  The Court relied on the third *Cohen* factor—whether the order would be "effectively unreviewable" absent immediate appeal. *Id.* at 351; *see id.* at 351-54.  It said no, explaining that "effectively unreviewable" cannot include "any order denying a claim of right to prevail without trial" because "this generalization is too easy to be sound and, if accepted, would leave . . . § 1291 in tatters." *Id.* at 351.  The Court instead clarified that "only some orders denying an asserted right to avoid the burdens of trial" are "effectively" unreviewable. *Id.* (quotations omitted).  It noted it had previously allowed collateral order review when "some particular value of a high order was marshaled in support of the interest in avoiding trial:  honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interest, and mitigating the government's advantage over the individual." *Id.* at 352-53.

The Court then reasoned that the FTCA's judgment bar did not implicate any unique public interest and was "essential[ly] procedural," *id.* at 354, with "no . . . greater importance than the typical defense of claim preclusion," *id.* at 355.  It also anticipated in dicta the issue raised here, suggesting that an interlocutory appeal of a *Bivens* extension order would not fit the *Cohen* test:

15

> It is not the preservation of initiative but the avoidance of litigation for its own sake that supports the judgment bar, and **if simply abbreviating litigation troublesome to Government employees were important enough for *Cohen* treatment, collateral order appeal would be a matter of right whenever . . . a federal officer lost [a motion to dismiss] on a Bivens action**, or a state official was in that position in a case under 42 U.S.C. § 1983, or *Ex parte Young*, 209 U.S. 123 (1908).  In effect, 28 U.S.C. § 1291 would fade out whenever the Government or an official lost an early round that could have stopped the fight.

*Id.* at 353-54 (emphasis added) (the "*Will* dicta").

### 3.  **Other Circuit Courts**

Two other circuits have considered the issue we face here—whether district court orders extending *Bivens* are immediately appealable under the collateral order doctrine when a defendant fails to raise or abandons qualified immunity as a basis for appellate jurisdiction.  Both held the collateral order doctrine does not extend to *Bivens*-only appeals.  *Himmelreich v. Fed. BOP*, 5 F.4th 653 (6th Cir. 2021); *Graber v. Doe II*, 59 F.4th 603 (3d Cir. 2023), *cert denied sub nom. Boresky v. Graber*, 144 S. Ct. 681 (2024) (mem.).[9]

a.  Himmelreich v. Federal BOP*, 5 F.4th 653 (6th Cir. 2021)*

*Himmelreich* was an interlocutory appeal from a *Bivens* extension order where the federal defendant failed to timely raise qualified immunity.  5 F.4th at 659.  The Sixth Circuit held that "[w]here a defendant has not appealed the denial of qualified

---

[9] The Ninth and Eleventh Circuits are currently considering the same issue. *Garraway v. Ciufo*, No. 23-15482 (9th Cir.); *Fleming v. FCI Tallahassee Warden*, No. 23-10252 (11th Cir.).

immunity, the appellate court does not have jurisdiction under the collateral order doctrine to address an underlying claim." *Id.* at 661. It first distinguished *Hartman* and *Wilkie* because in those cases, "the appellate courts already had jurisdiction over the appeals challenging the district courts' denial of qualified immunity" and the *Bivens* issue was "directly implicated by [the] . . . denial of qualified immunity." *Id.* at 660.

The court then analyzed the *Cohen* factors. It assumed the first two factors were met and concluded the third—"effectively unreviewable"—was not. *Id.* at 661-62. It reasoned that the possibility of reversing a *Bivens* extension on interlocutory appeal "does not grant defendants an entitlement not to stand trial." *Id.* at 662. It characterized *Will* as holding that the "order allowing the *Bivens* claim to proceed [without enforcing the FTCA's judgment bar] was not effectively unreviewable because the government did not have an absolute right to avoid trial." *Id.* at 663. It quoted the *Will* dicta and concluded that "*Will* does not recognize an absolute right for [the defendant] to avoid trial." *Id.*

b. Graber v. Doe II*, 59 F.4th 603 (3d Cir. 2023)*

In *Graber*, the Third Circuit held it could not review a *Bivens* extension under the collateral order doctrine when the federal defendant had waived his challenge to the district court's Rule 12(b)(6) qualified immunity ruling. 59 F.4th at 607-08.

The court determined that a *Bivens* extension order did not meet the third *Cohen* factor. *Id.* at 608. First, it reasoned that *Bivens* "is not an immunity doctrine," *id.* at 609, and although the "effectively unreviewable" standard is not

limited to immunity doctrines, it encompasses only rights that would be "irretrievably lost" or "moot following a final judgment," *id.* at 608 n.9 (quotations omitted). Because *Bivens* claims do "not become moot following a final judgment," they are not "effectively unreviewable." *Id.* Second, the court found the *Will* dicta "highly persuasive." *Id.* at 609 & n.10 (quotations omitted). Third, "[t]he availability of" certified appeals under § 1292(b) "counsel[ed] against" allowing the appeal under § 1291. *Id.* at 610 n.14.[10]

The Supreme Court denied certiorari. *Boresky v. Graber*, 144 S. Ct. 681 (2024) (mem.).

## II. **DISCUSSION**

The BOP defendants bear the burden of establishing our appellate jurisdiction. *Cummings v. Dean*, 913 F.3d 1227, 1235 (10th Cir. 2019). They must convince us to create an exception to § 1291's final judgment rule for all district court orders extending a *Bivens* remedy—something that neither the Supreme Court nor any circuit court has done before. Although the BOP defendants' arguments are not meritless, they have not met their burden. We conclude they have not shown that

---

[10] Judge Hardiman dissented. He argued that "immunity is neither sufficient nor necessary" to satisfy the third *Cohen* factor. 59 F.4th at 611 (Hardiman, J., dissenting). He characterized the *Will* dicta as "drive-by dictum" and contended that *Bivens* extension orders are more important than the FTCA's judgment bar and are not "'essential[ly] procedural.'" *Id.* at 612 (quoting *Will*, 546 U.S. at 354). Judge Hardiman would have found *Bivens* extension orders meet the third *Cohen* factor because "they imperil a 'particular value of a high order' and 'substantial public interest'"—namely, separation of powers. *Id.* at 614 (quoting *Will*, 546 U.S. at 352-53).

*Bivens* extension orders are effectively unreviewable after final judgment[11] and

therefore have not satisfied the third *Cohen* factor.[12]  We base our holding on the

following considerations:

    A.   The BOP defendants have a heavy burden to show expansion of the
        collateral order doctrine is warranted.

        1.   The exception to finality is narrow.

        2.   Other avenues exist for interlocutory review.

        3.   Congress and the Supreme Court prefer rulemaking to judicial
            expansion of the doctrine.

---

[11] The parties seem to agree that *Bivens* extension orders are reviewable after final judgment, but they disagree about whether they are effectively unreviewable. As Mr. Mohamed notes, "the Supreme Court itself has reviewed the availability of a *Bivens* remedy after trial."  Suppl. Aplee. Br. at 24 (citing *FDIC v. Meyer*, 510 U.S. 471, 474-75, 486 (1994)).  In that case, the plaintiff brought a *Bivens* claim and prevailed at trial, *Meyer*, 510 U.S. at 474, and the Supreme Court rejected the *Bivens* extension on appeal from final judgment, *id.* at 486.  The Court also rejected a *Bivens* extension after final judgment in *Egbert*.  142. S. Ct. at 1802.

    Both *Meyer* and *Egbert* show that, like district court denials of qualified immunity, *Bivens* extension orders are not "unreviewable" on appeal from final judgment.  The question remains whether they implicate public interests that make them "effectively unreviewable" under the third *Cohen* factor.

[12] We are also not convinced the second *Cohen* factor—whether the *Bivens* extension question is separate from the merits—is met.  "The Supreme Court has repeatedly cautioned that the collateral-order doctrine requires 'complete separation' from the merits."  *Kell v. Benzon*, 925 F.3d 448, 455 (10th Cir. 2019) (quotations omitted).  And "[t]he question of whether the plaintiff has a cognizable cause of action (and what that cause of action might be) is not a question separate from the merits; it *is* the merits."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1134 (D.C. Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)); *see also Cohen*, 337 U.S. at 546-47 (finding an order "appealable because it [wa]s a final disposition of a claimed right which is *not an ingredient of the cause of action* and does not require consideration with it" (emphasis added)).

B. The BOP defendants have failed to meet their heavy burden.

   1. *Bivens* extension orders are different from denials of qualified
      immunity.

   2. Separation of powers concerns about *Bivens* extension orders do not
      necessarily satisfy the third *Cohen* factor, and expanding the
      collateral order doctrine raises separation of powers concerns of its
      own.

   3. The *Will* dicta counsels against applying the collateral order doctrine
      to *Bivens* extension orders.

C. The Supreme Court has never treated a *Bivens* extension order as an
   independent basis for collateral order review.

D. We are reluctant to create a circuit split.

### A. ***The Heavy Burden to Warrant Collateral Order Doctrine Expansion***

As the following discussion shows, the BOP defendants have a heavy burden
to convince us that judicial expansion of the collateral order doctrine is warranted.

### 1. ***Cohen*'s Narrow Exception**

We must heed the Supreme Court's "increasingly emphatic instructions that
the class of cases capable of satisfying th[e] 'stringent' [*Cohen*] test should be
understood as 'small,' 'modest,' and 'narrow.'" *Wampler*, 624 F.3d at 1334 (quoting
*Digit. Equip.*, 511 U.S. at 868; *Swint*, 514 U.S. at 42; *Will*, 546 U.S. at 350; *Mohawk*,
558 U.S. at 113); *see also Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1033
(10th Cir. 2022) ("Immediate appeals under the collateral order doctrine are
disfavored; they 'are the exception, not the rule.'" (quoting *Johnson v. Jones*,
515 U.S. 304, 309 (1995))), *cert. denied*, 143 S. Ct. 2608 (2023) (mem.).

In *Will*, the Court reiterated that it "ha[s] meant what [it] ha[s] said." 546 U.S. at 350. A few years after *Will*, the *Mohawk* Court again declined to expand the collateral order doctrine and emphasized the need to keep the doctrine exceptionally narrow. 558 U.S. at 113. *Mohawk* commentators sounded the death knell for *Cohen* expansion. *See* Erwin Chemerinsky, *Court Keeps Tight Limits on Interlocutory Review*, 46 Trial 52, 54 (2010) ("[*Mohawk*] shows that little, if anything, will be found to fit within the collateral order exception that the Court recognized in *Cohen*."); James E. Pfander, Iqbal*, Bivens*, *and the Role of Judge-Made Law in Constitutional Litigation*, 114 Penn. St. L. Rev. 1387, 1404 (2010) ("[T]he Court [in *Mohawk*] . . . suggested that it would no longer adopt judge-made expansions of the collateral order doctrine.").

In the 15 years since *Mohawk*, only once has the Court applied the collateral order doctrine to a new situation, one entirely unlike a *Bivens* extension order. *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 n.1 (2022) (extending the collateral order doctrine to prisoner transport orders under the All Writs Act); *see also supra* notes 4-6. The 5-4 decision provided only minimal analysis in a footnote and drew sharp dissents. *See Shoop*, 142 S. Ct. at 2047-48 (Breyer, J., dissenting); *id.* at 2050-51 (Gorsuch, J., dissenting).

2. **Alternatives**

Federal defendants have alternative means to pursue interlocutory review of a district court's *Bivens* extension order without seeking to expand the collateral order

doctrine. These options—qualified immunity interlocutory appeals and 28 U.S.C. § 1292(b)—reinforce the Supreme Court's call for a narrow collateral order doctrine.

Federal defendants may combine a challenge to a *Bivens* extension order with an interlocutory challenge to a denial of qualified immunity. As we said in *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853 (10th Cir. 2016), "[T]he court has jurisdiction over the question of whether a *Bivens* remedy exists [when] it [i]s sufficiently implicated by the qualified immunity defense." *Id.* at 856 (citing *Wilkie*, 551 U.S. at 549 n.4). Here, PA Osagie initially appealed the denial of qualified immunity in addition to the *Bivens* extension component of the district court's order, but he abandoned that argument. The BOP defendants could still raise qualified immunity at summary judgment and appeal any denial of that issue along with a challenge to a *Bivens* extension.

The BOP defendants argue that having to tether *Bivens* extension challenges to interlocutory appeals of qualified immunity denials "would incentivize defendants to raise qualified-immunity arguments that are unlikely to succeed on appeal solely to provide jurisdiction for a stronger appeal concerning the allowance of a *Bivens* remedy." Suppl. Aplt. Reply Br. at 3-4. This concern is overblown, as the plethora of interlocutory appeals of qualified immunity denials indicates.[13] And if the

---

[13] About 40 percent of all circuit court qualified immunity appeals from 2004 to 2015 (excluding 2009) were interlocutory from denials of qualified immunity. Alexander A. Reinert, *Asymmetric Review of Qualified Immunity Appeals*, 20 J. Empirical Legal Stud. 4, 6 n.8, 22 & n.48, 57 (2023).

government defendant decides a non-frivolous qualified immunity defense is not possible in a given case, it may pursue an appeal under § 1292(b).

In § 1292(b), Congress provided for interlocutory review of a district court order "not otherwise appealable" when there are "controlling question[s] of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  The Supreme Court has repeatedly pointed to § 1292(b) as a reason to limit expansion of the collateral order doctrine.  In *Van Cauwenberghe v. Biard*, 486 U.S. 517 (1988), for example, the Court said, "Our conclusion that the denial of a motion to dismiss on the ground of *forum non conveniens* is not appealable under § 1291 is fortified by the availability of interlocutory review pursuant to 28 U.S.C. § 1292(b)."  *Id.* at 529; *see also Digit. Equip.*, 511 U.S. at 883 ("In preserving the strict limitations on review as of right under § 1291, our holding should cause no dismay, for the law is not without its safety valve[:] . . . § 1292(b) of Title 28."); *Mohawk*, 558 U.S. at 114 ("We expect that the combination of standard postjudgment appeals, § 1292(b) appeals, mandamus, and contempt appeals will continue to provide adequate protection to litigants . . . .").[14]

---

[14] As the dissent notes, § 1292(b) applies to non-appealable orders, Dissent at 12 n.8, but that is our point—one reason to deny *Cohen* review to a *Bivens* extension order is that § 1292(b) is an interlocutory alternative.  The dissent ignores the Supreme Court's repeated invocation of § 1292(b) as a reason to reject *Cohen* treatment.  And given the Supreme Court's refusals to recognize new *Bivens* claims, federal defendants should not have trouble showing a "substantial ground for difference of opinion" when a district court has extended *Bivens* in a given case.

Adding yet another avenue for interlocutory review "risks additional, and unnecessary, appellate court work" that might "turn[] out to be unnecessary" if these alternatives are used or the litigation is simply allowed to continue. *Johnson*, 515 U.S. at 309.[15]

3. **Rulemaking Preference**

In 1990, Congress enacted "legislation designating rulemaking, 'not expansion by court decision,' as the preferred means for determining whether and when prejudgment orders should be immediately appealable," which adds "special force" to the Court's "admonition" to keep the collateral order doctrine narrow and selective. *Mohawk*, 558 U.S. at 113 (quoting *Swint*, 514 U.S. at 48).

The collateral order doctrine's history leading to congressional action is instructive. *Cohen* expansion mostly began "in the early 1960s, . . . culminating in the 1985 decision of *Mitchell*," which extended the doctrine to include denials of qualified immunity. Lloyd C. Anderson, *The Collateral Order Doctrine: A New "Serbonian Bog" and Four Proposals for Reform*, 46 Drake L. Rev. 539, 540 (1998). *Mitchell* was seen as "something of a departure from established doctrine." Pfander,

---

[15] We also note that *Bivens* claims are often accompanied—as in this case—by FTCA claims. Because we apply the FTCA's judgment bar to claims within the same action, *Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 859 (10th Cir. 2005), resolution of an FTCA claim in the district court may obviate the need for appeal of a related *Bivens* claim. Because we "must apply the collateral order doctrine with an eye towards preserving judicial economy and avoiding the harassment and cost of a succession of separate appeals from the various rulings in a single case," *Tucker*, 36 F.4th at 1034 (quotations omitted), this is yet another reason to decline to extend the collateral order doctrine here.

*supra*, at 1397.  Concerns mounted about doctrinal inconsistency and the "congestion, delay, and expense" involved in litigating further expansions. Anderson, *supra*, at 540-51; Bryan Lammon, *Finality, Appealability, and the Scope of Interlocutory Review*, 93 Wash. L. Rev. 1809, 1842 n.180 (2018) (calling the collateral order doctrine "the most maligned rule of federal appellate jurisdiction").

In response, Congress created a Federal Courts Study Committee to consider the issue.  Anderson, *supra*, at 540-41.  The Committee recommended the Supreme Court define the collateral order doctrine using rulemaking instead of applying *Cohen* on a case-by-case basis.  Staff of Fed. Cts. Study Comm., Jud. Conf. of the U.S., Report of the Federal Courts Study Committee 95 (1990).

Based on the Committee's recommendation, Anderson, *supra*, at 541, Congress recognized rulemaking as the preferred process to define the collateral order doctrine.  First, in 1990, it amended the Rules Enabling Act to authorize the Supreme Court to adopt rules "defin[ing] when . . . a district court [order] is final for the purposes of appeal under section 1291."  Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 315, 104 Stat. 5104, 5115 (codified at 28 U.S.C. § 2072(c)).  Second, in 1992, it empowered the Court to "prescribe rules, in accordance with section 2072 . . . , to provide for an [interlocutory] appeal . . . that is not otherwise provided for under [§ 1292]."  Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 101, 106 Stat. 4506, 4506 (codified at 28 U.S.C. § 1292(e)); *see also Mohawk*, 558 U.S. at 113-14.

The Supreme Court declared that Congress's choice to prefer rulemaking to judicial decision in this area "warrant[s] the Judiciary's full respect." *Mohawk*, 558 U.S. at 114 (alterations omitted) (quoting *Swint*, 514 U.S. at 48). In *Wampler*, we said that "[o]ut of deference to the rubric Congress has created, . . . any request for expansion of the *Cohen* doctrine should be directed to the rules committee, not this court." 624 F.3d at 1338. The *Mohawk* Court suggested that rulemaking may be the only way to expand the collateral order doctrine: "Any further avenue for immediate appeal[s]"—beyond "standard postjudgment appeals, § 1292(b) appeals, mandamus, and contempt appeals"—"should be furnished, if at all, through rulemaking, with the opportunity for full airing it provides." 558 U.S. at 114.[16] It described case-by-case expansion of *Cohen* as "the blunt, categorical instrument of § 1291 collateral order appeal." *Id.* at 112 (quotations omitted).

Justice Thomas's *Mohawk* concurrence underscored that "Congress, which holds the constitutional reins in this area, has determined that such value judgments are better left to the 'collective experience of bench and bar' and the 'opportunity for full airing' that rulemaking provides." *Id.* at 118-19 (Thomas, J., concurring in part) (quoting *Mohawk*, 558 U.S. at 114 (majority opinion)). He also observed that courts make case-by-case determinations and are not positioned to "subordinate the realities

---

[16] *See also Microsoft Corp.*, 582 U.S. at 39-40 (denying *Cohen* treatment because decisions about finality "are to come from rulemaking, . . . not judicial decisions in particular controversies or inventive litigation ploys"). *But see Shoop*, 142 S. Ct. at 2043 n.1 (expanding the collateral order doctrine through judicial decision).

of each case . . . to generalized conclusions about the 'likely' costs and benefits of allowing an exception to the final judgment rule in an entire 'class of cases.'" *Id.* at 118.

Here, the BOP defendants ask us to write another exception into § 1291 in tension with a congressional enactment and in conflict with the expressed preference of two constitutional branches—Congress and the Supreme Court—for rulemaking over case-by-case creations of *Cohen* exceptions.  We decline to do so.

### B. *The BOP Defendants Have Failed to Meet Their Burden*

The BOP defendants have not shown that *Bivens* extension orders are effectively unreviewable—the third *Cohen* factor.  As noted above, "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Id.* at 107 (majority opinion) (quoting *Will*, 546 U.S. at 352-53).  *Will* explained that prior Supreme Court cases had "marshaled" values including "honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interest, and mitigating the government's advantage over the individual."  546 U.S. at 352-53.

The BOP defendants invoke two of those values.  First, they argue that interlocutory appeals of *Bivens* extension orders, like appeals of qualified immunity denials, would serve government efficiency and initiative.  Second, they contend such appeals would reduce separation of powers concerns.  We are not persuaded and adhere to the *Will* dicta.

1. ***Bivens*, Qualified Immunity, Efficiency, and Initiative**

The BOP defendants argue we should expand *Cohen* because "*Bivens*-extension orders raise similar concerns for collateral-order purposes" as "orders denying qualified immunity": "'preserving the efficiency of government . . . and the initiative of its officials.'"  Suppl. Aplt. Reply Br. at 4-5 (quoting *Will*, 546 U.S. at 352).  But the differences between a qualified immunity affirmative defense and a *Bivens* claim undermine this argument.

a.  *Efficiency*

The BOP defendants' argument that we should allow immediate appeal of the *Bivens* extension order to promote government efficiency proves too much.  They contend that subjecting them to trial would waste resources.  But that is far from clear.

First, expanding the collateral order doctrine to *Bivens* extension orders would undermine the efficiency rationale underlying the final judgment rule:  "Permitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration and encroaches upon the prerogatives of district court judges, who play a special role in managing ongoing litigation."  *Mohawk*, 558 U.S. at 106 (quotations omitted).

Second, and relatedly, the BOP defendants' argument seems premised on an assumption that the district court improvidently extended *Bivens* to cover Mr. Mohamed's claims and that prompt reversal therefore should be available.  But the relative merits of the issue proposed for interlocutory review should not affect the collateral order doctrine analysis.  As the Supreme Court instructed in *Mohawk*, courts applying the *Cohen* test should not "engage in an individualized jurisdictional inquiry" with an eye toward

28

whether "the litigation at hand might be speeded, or a particular injustice averted." *Id.* at 107 (alterations and quotations omitted). Thus, even if the BOP defendants are correct that the district court erred in extending *Bivens*, that is not a valid reason to expand *Cohen* and compromise § 1291's avoidance of piecemeal appeals.

Third, the BOP defendants' argument could be deployed to seek interlocutory review of Rule 12(b)(6) dismissals of many types of claims against federal officials. The Supreme Court has warned us not to accept such arguments. *See Digit. Equip.*, 511 U.S. at 873 (noting that failure to state a claim is insufficient for *Cohen* treatment).

Fourth and finally, qualified immunity adequately "preserv[es] the efficiency of government," *Will*, 546 U.S. at 352, when a *Bivens* claim is brought against a federal official.

b. *Preservation of initiative*

*Bivens* extension orders do not implicate the same interest in preserving the initiative of government officials as qualified immunity because *Bivens*'s structure and purpose differ from qualified immunity's.

i. <u>Structure</u>

*Bivens* is more analogous to § 1983 than to qualified immunity. When the Supreme Court decided *Bivens*, it created a claim for constitutional violations by federal officials. The Court "ha[s] described *Bivens* as a 'more limited' 'federal analog' to § 1983." *Hernandez v. Mesa* ("*Hernandez II*"), 140 S. Ct. 735, 747 (2020) (quoting *Hartman*, 547 U.S. at 254 n.2). Both *Bivens* and § 1983 enable a plaintiff to sue a federal or state official, respectively, for a constitutional violation. The *Bivens* Court explained

that its implied cause of action derived from "the right of every individual to claim the protection of the laws, whenever he receives an injury."  403 U.S. at 397 (quoting *Marbury v. Madison*, 1 Cranch 137, 163 (1803)).  And unlike a *Bivens* claim, qualified immunity is an affirmative defense that may be asserted against either a *Bivens* or a § 1983 claim.  *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

ii.  <u>Purpose</u>

*Bivens* and qualified immunity serve distinct purposes.  Qualified immunity's underlying rationale is to preserve officer initiative by protecting officials from liability and trial.  As the Supreme Court said in *Mitchell*, "The conception animating the qualified immunity doctrine . . . is that where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences," including "the general costs of subjecting officials to the risks of trial."  472 U.S. at 525-26 (quotations omitted).

In *Will*, the Court explained that qualified immunity appeals fit the collateral order doctrine because "the burden of trial is unjustified" where "the action was reasonable in light of the law as it was," and that "[t]he nub of qualified immunity is the need to induce officials to show reasonable initiative when the relevant law is not clearly established."  546 U.S. at 353 (quotations omitted).

In short, qualified immunity enables both *Bivens* and § 1983 defendants to do their jobs without unduly second-guessing their exposure to liability or trial.  It gives

government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

By contrast, "[t]he purpose of *Bivens* is to deter individual federal officers . . . from committing constitutional violations." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001). Like § 1983, *Bivens* gives plaintiffs a chance to vindicate their constitutional rights.

The BOP defendants argue that the risk of erroneous *Bivens* extension orders will sap their initiative unless they can challenge allowance of *Bivens* claims through an immediate appeal. *See* Aplt. Br. at 7 ("[E]xtending *Bivens* remedies to new contexts . . . entail[s] . . . 'the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" (quoting *Egbert*, 142 S. Ct. at 1807)). But federal defendants already have the qualified immunity defense, which addresses those very concerns.

In *Anderson v. Creighton*, 483 U.S. 635 (1987), the Supreme Court said its "cases have accommodated . . . conflicting concerns" about constitutional violations by government officials and "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties . . . by generally providing government officials performing discretionary functions with a qualified immunity." *Id.* at 638. And as the Sixth Circuit said, "To the extent that defendants are concerned about litigating meritless cases, qualified immunity more than adequately protects government officials from the burdens of litigation." *Himmelreich*, 5 F.4th at 662.

2.  **Separation of Powers**

The BOP defendants argue that "recognizing a *Bivens* claim places great stress on the separation of powers." Aplt. Br. at 35 (quoting *Egbert*, 142 S. Ct. at 1807 n.3).[17]  Their abstract invocation of separation of powers falls short of what the Supreme Court requires to create a new category of interlocutory appeals in light of the countervailing considerations we identify here, including that expanding the collateral order doctrine in the face of § 1291's final judgment rule raises separation of powers concerns.

In *Will*, the Supreme Court made clear that "honoring the separation of powers," 546 U.S. at 352, does not mean that every kind of district court order that raises a separation of powers issue is effectively unreviewable after final judgment under the third *Cohen* factor. *Will* discussed *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), as its primary example of sufficiently weighty separation of powers concerns to justify interlocutory review. *Will*, 546 U.S. at 352.

A review of *Nixon* is instructive. A discharged Air Force employee sued former President Nixon seeking damages for official acts of alleged retaliation against the plaintiff, who "embarrass[ed] . . . his superiors" when he testified before

---

[17] In *Egbert*, the district court "declined to extend a *Bivens* remedy to" the plaintiff's First and Fourth Amendment *Bivens* claims, "and entered judgment." 142 S. Ct. at 1802. The plaintiff appealed, the court of appeals reversed, and the Supreme Court reversed, holding the district court properly declined to recognize a *Bivens* claim. *Id.* The appeals were not interlocutory, so the Court did not address whether separation of powers concerns called for expansion of the collateral order doctrine.

Congress about Defense Department cost overruns. 457 U.S. at 733-34. The district court denied a motion for summary judgment, ruling that the former president was not entitled to absolute immunity. *Id.* at 740-41. The court of appeals refused to apply the collateral order doctrine and "dismissed summarily." *Id.* at 741. The Supreme Court disagreed, exercised interlocutory review, and held the former president was entitled to absolute immunity from damages liability. *Id.* at 758. The Court said the collateral order doctrine applied because the case involved "absolute immunity," a "serious and unsettled question," and "the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers." *Id.* at 742-43 (quotations omitted). Further, the denial of absolute immunity "raise[d] unique risks to the effective functioning of government" "[b]ecause of the singular importance of the President's duties." *Id.* at 751.[18]

*Will* said the *Nixon* Court allowed an immediate appeal because of "the compelling public ends rooted in the separation of powers that would be compromised by failing to allow immediate appeal." 546 U.S. at 352 (citations, alterations, and quotations omitted). Although *Will* left open the possibility of

---

[18] In *United States v. Nixon*, 418 U.S. 683 (1974), a precursor to *Nixon v. Fitzgerald*, the Court reviewed on interlocutory appeal the district court's denial of the president's motion invoking executive privilege to quash a grand jury subpoena to produce tape recordings. *Id.* at 686-87. The Court explained that, in this "unique setting," the lack of immediate review would "require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling," which "would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government." *Id.* at 691-92.

finding a "compelling" separation of powers concern in future cases, *id.*, it counseled against "the lawyer's temptation to generalize," *id.* at 350.  We follow this advice because using a generalized separation of powers rationale to expand the collateral order doctrine would defy the Supreme Court's repeated and increasingly stringent directives to limit *Cohen* expansion.  It would risk ever-increasing judge-made categories for interlocutory appellate review.

 *Bivens* extension orders do not raise separation of powers concerns commensurate with denials of presidential immunity intruding on "essential Presidential prerogatives," *Nixon*, 457 U.S. at 743, or posing "unique risks to the effective functioning of government," *id.* at 751.  Nor do they trigger an exigent need for interlocutory review to resolve a "constitutional confrontation between two branches of the Government."  *United States v. Nixon*, 418 U.S. 683, 691-92 (1974).[19]

 When plaintiffs ask courts to recognize new *Bivens* claims, the separation of powers concern is whether Congress or the judiciary should provide the answer. *See, e.g.*, *Egbert*, 142 S. Ct. at 1802-04, 1806-07; *Big Cats of Serenity Springs*, 843 F.3d at 860.  This concern may explain in part why the Court has recognized only three types of *Bivens* claims, *Hernandez II*, 140 S. Ct. at 741, has been reluctant

---

 [19] *Will* did not say that separation of powers concerns always justify interlocutory review.  And it discussed presidential immunity as its only example where separation of powers supported a *Cohen* exception.  The Court did not extend this rationale to qualified immunity, *see* 546 U.S. at 352-53, and suggested *Bivens*-related dismissals would not be immediately appealable, *id.* at 353-54.

to recognize others, *id.*, and has even signaled the demise of the *Bivens* doctrine altogether, *Egbert*, 142 S. Ct. at 1803.  Even so, the Court has not jettisoned *Bivens*, which means courts, including the district court here, are obligated to determine whether a plaintiff has stated a *Bivens* claim.[20]  But doing so does not impede the legislative branch, which could eliminate or authorize the *Bivens* claim as it sees fit.

In sum, the Supreme Court has recognized that district court orders implicating separation of powers may be candidates for interlocutory review, but that is as far as it goes.  *See Kelly v. Great Seneca Fin. Corp.*, 447 F.3d 944, 948-49 (6th Cir. 2006) ("Absolute Presidential immunity protects a substantial public interest in the separation of powers," but "[t]he Supreme Court did not say that denials of all forms of absolute immunity . . . were immediately appealable.").  The BOP defendants' claim, presented in three briefs, is that *Bivens* extension orders implicate generalized concerns about "separation of powers."[21]  That is insufficient to meet their burden to show why *Bivens* extension orders should receive the same consideration for interlocutory review as orders denying presidential immunity—the only cases in

---

[20] Relying largely on Justice Gorsuch's concurrence in *Egbert*, the dissent would hold that *Bivens* is dead.  Dissent at 1-6.  We prefer an express holding from a Supreme Court majority.

[21] *See* Aplt. Br. at 1 ("[E]xtending *Bivens* remedies . . . would contravene the separation of powers."); *id.* at 7, 33, 35, 37; Aplt. Reply Br. at 2, 18, 19; Suppl. Aplt. Reply Br. at 3, 11, 13-14, 17.

which the Court has expanded the collateral order doctrine based on separation of powers concerns.[22]

Further, the BOP defendants overlook a countervailing consideration. The collateral order doctrine is a judicially created exception to Congress's final judgment rule embodied in § 1291. *See Mohawk*, 558 U.S. at 113; Dissent at 2 n.2 ("[F]ederal courts are courts of limited jurisdiction. They possess only the power authorized by Constitution and statute, which is not to be expanded by judicial decree." (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). Their requested expansion of the collateral order doctrine to a new class of cases thus raises the separation of powers concern of how far courts should go in carving out exceptions to the congressionally enacted final judgment rule.

\* \* \* \*

We will not overread *Will* and extend the collateral order doctrine to any class of cases that touch on separation of powers concerns. Nor will we ignore the competing separation of powers concern of creating a categorical exception to the final judgment rule for *Bivens* extension orders in the face of Congress's clear preference for finality in § 1291 and for rulemaking in §§ 2072(c) and 1292(e). The

---

[22] The BOP defendants argue that "[i]nterlocutory orders denying qualified immunity, and those allowing non-statutory *Bivens* remedies, both contravene the separation of powers." Suppl. Aplt. Reply Br. at 3; *see also id.* at 5. But again, *Will* never characterized qualified immunity as invoking separation of powers concerns, *see* 546 U.S. at 352-53, and we show above that *Bivens* and qualified immunity differ in structure and purpose.

foregoing may explain why the *Will* Court stopped short of saying that separation of powers concerns always call for a *Cohen* interlocutory appeal, and why it then cautioned against extending *Cohen* to *Bivens* extension orders, a matter we turn to next.

3.  ***Will* Dicta**

 *Will* not only indicated separation of powers concerns may not be sufficient to warrant interlocutory review, but it also cautioned against expanding the collateral order doctrine to *Bivens* extension orders. *Will* stated that "if simply abbreviating litigation troublesome to Government employees were important enough for *Cohen* treatment, collateral order appeal would be a matter of right whenever . . . a federal officer lost [a motion to dismiss] on a *Bivens* action." 546 U.S. at 353-54. We are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1079 (10th Cir. 2018) (quotations omitted).[23]

 The BOP defendants quote Judge Hardiman's characterization of *Will*'s statement as "'at most' . . . non-binding 'drive by dictum.'" Aplt. Br. at 39 (quoting *Graber*, 59 F.4th at 612 (Hardiman, J., dissenting)). We give the *Will* Court more credit for its statement. After recognizing, as it had before, that the *Cohen* doctrine is

---

[23] We seem to bind ourselves more strongly to Supreme Court dicta than the Third Circuit. *See Graber*, 59 F.4th at 609 n.10 (explaining that that court takes Supreme Court dicta as "highly persuasive" (quotations omitted)).

narrow; after warning about generalizations concerning trial burdens; and after

identifying high-order values that might support interlocutory review, the *Will* Court

expressed concern about expanding the collateral order doctrine "as a matter of right

whenever . . . a federal officer lost [a motion to dismiss] on a *Bivens* action,"

546 U.S. at 353-54, as the BOP defendants did here.  We see this passage as a

thoughtful observation meant to be taken seriously, hardly as "drive-by dictum."

And we understand it as constraining us from creating a collateral order doctrine

exception for *Bivens* exception orders.

## C.  *Supreme Court Precedent*

The BOP defendants contend that in *Hartman* and *Wilkie*, the Supreme Court

recognized *Bivens* extension orders as a separate category of cases "immediately

appealable . . . in their own right."  Aplt. Br. at 35; *see also* Suppl. Aplt. Reply Br.

at 2.[24]  We disagree.  Both cases were interlocutory appeals that tied *Bivens* extension

issues to qualified immunity.

---

[24] The BOP defendants mistakenly argue that "the Supreme Court addressed
. . . a *Bivens* extension on an interlocutory appeal . . . in *Hernandez* [*II*]."  Aplt. Br.
at 35.  In that case, the district court granted the government defendants' motions to
dismiss and for summary judgment.  *See Hernandez v. United States*, 757 F.3d 249,
257 n.5 (5th Cir. 2014), *on reh'g en banc*, 785 F.3d 117 (5th Cir. 2015), *vacated and
remanded sub nom. Hernandez v. Mesa* ("*Hernandez I*"), 582 U.S. 548 (2017) (per
curiam), *on remand*, 885 F.3d 811 (5th Cir. 2018) (en banc), *aff'd*, *Hernandez II*,
140 S. Ct. 735; *Hernandez II*, 140 S. Ct. at 740 ("The District Court granted [the
government defendants'] motion to dismiss, and the Court of Appeals for the Fifth
Circuit sitting en banc has twice affirmed this dismissal.").  The plaintiffs appealed
from final judgment under § 1291 without the need for the collateral order doctrine.
Although *Hernandez I* said that "*Bivens* question[s] [are] 'antecedent' to"
qualified immunity questions, 582 U.S. at 553 (quoting *Wood v. Moss*, 572 U.S.

In *Hartman*, the petition for certiorari expressly raised qualified immunity and linked it to the *Bivens* extension issue.  *See* Pet. for Certiorari at *I, *Hartman*, 547 U.S. 250 (No. 04-1495), 2005 WL 1123566.  The Court explained it had jurisdiction to consider the *Bivens* claim because the qualified immunity analysis "directly implicated" it.  *Hartman*, 547 U.S. at 257 n.5.

In *Wilkie*, the Court said that whether a *Bivens* remedy exists can be addressed as part of a qualified immunity appeal, 551 U.S. at 549 n.4, not, as the BOP defendants contend, that a *Bivens* issue "presented alone and not in conjunction with a qualified-immunity appeal" would be reviewable under the collateral order doctrine, Suppl. Aplt. Reply Br. at 1.

In sum, when qualified immunity is at issue on interlocutory appeal, *Bivens* extension order issues may be resolved as "directly implicated by the defense of qualified immunity."  *Wilkie*, 551 U.S. at 549 n.4 (quoting *Hartman*, 547 U.S. at 257 n.5).  The BOP defendants contend otherwise, Suppl. Aplt. Reply Br. at 2, but they ignore that this court and other circuit courts have interpreted *Wilkie* this way.  In *Big Cats of Serenity Springs*, we said, "[T]he court has jurisdiction over the question of whether a *Bivens* remedy exists [when] it [i]s sufficiently implicated by the qualified immunity defense."  843 F.3d at 856 (citing *Wilkie*, 551 U.S. at 549

---

744, 757 (2014)), neither that case nor *Hernandez II* had anything to do with the collateral order doctrine.

n.4).[25]  Here, the *Bivens* issue is not "directly implicated by the defense of qualified immunity."  *Wilkie*, 551 U.S. at 549 n.4 (quoting *Hartman*, 547 U.S. at 257 n.5).  Only one BOP defendant raised qualified immunity before the district court and waived that issue in this appeal.

The BOP defendants counter that "it would make no sense to hold that" *Bivens* extension orders are "immediately appealable only when conjoined with a qualified-immunity appeal."  Suppl. Aplt. Reply Br. at 3.  They explain that when the Supreme Court reviewed *Bivens* extension orders in *Hartman* and *Wilkie*, it could not have attached the *Bivens* issue to qualified immunity using pendent jurisdiction[26] because that jurisdictional basis is disfavored.  *Id.*; *see Cummings*, 913 F.3d at 1235 (providing background on pendent jurisdiction).  Thus, they argue, "[T]he Court is

---

[25] *See also Pettibone v. Russell*, 59 F.4th 449, 453 (9th Cir. 2023) ("*Wilkie* establishe[d] that, in an interlocutory appeal from a denial of qualified immunity, [an appellate court] necessarily ha[s] jurisdiction to decide whether an underlying *Bivens* cause of action exists."); *id.* at 453-54 (collecting similar holdings from the Third, Fourth, Fifth, Sixth, Seventh, Eighth, and D.C. Circuits).

[26] Pendent jurisdiction allows a court to review "otherwise nonfinal and nonappealable lower court decision[s] that overlap[] with an appealable decision" in "two scenarios:  (1) when the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or (2) where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one."  *Cummings*, 913 F.3d at 1235 (quotations omitted).  We have exercised pendent jurisdiction in interlocutory appeals from a district court's denial of qualified immunity.  *See, e.g.*, *Crowson v. Washington County*, 983 F.3d 1166, 1174, 1192 (10th Cir. 2020); *Moore v. City of Wynnewood*, 57 F.3d 924, 927, 928-31 (10th Cir. 1995).

best understood as having considered [*Bivens*] extension orders . . . as immediately appealable collateral orders in their own right."  Suppl. Aplt. Reply Br. at 1.

We need not resolve whether pendent jurisdiction was the basis for the Supreme Court's decisions.  We agree with the Sixth Circuit's statement in *Himmelreich* that "[w]hatever the basis for" the Court's decisions in *Hartman* and *Wilkie*, "there was a predicate denial of qualified immunity," and without such a predicate, review of a *Bivens* extension order is unavailable.  5 F.4th at 661.

The Court has never held that *Bivens* extensions are independently appealable under the collateral order doctrine.  We decline to break new ground.

## D. *Circuit Split*

Finally, the BOP defendants ask us to create a circuit split.  Aplt. Br. at 36. We are "reluctant" "to go against the tide," particularly when multiple circuits "are aligned together."  *United States v. Thomas*, 939 F.3d 1121, 1130-31 (10th Cir. 2019).  We see "no good reason to create a circuit split," *id.* at 1134, here.

\*     \*     \*     \*

The Supreme Court in *Will* recognized separation of powers as a "substantial public interest" that may justify interlocutory appellate review, but not always.  We have identified countervailing considerations:  the *Cohen* exception to finality is narrow; *Bivens* defendants have other avenues for interlocutory review, including immediate appeals of qualified immunity denials; Congress and the Supreme Court favor rulemaking over judicial expansion of the collateral order doctrine; *Bivens* claims do not implicate the efficiency and government initiative interests underlying

41

allowance of interlocutory appeals of qualified immunity denials; expanding the doctrine puts stress on separation of powers; binding *Will* dicta discourages a *Cohen* exception for *Bivens* extension orders; and Tenth Circuit case law cautions against creating circuit splits.  We do not think the BOP defendants overcome these considerations.

### III. **CONCLUSION**

We dismiss the appeal for lack of appellate jurisdiction.

22-1453, *Mohamed v. Jones*

**TYMKOVICH**, Circuit Judge, dissenting.

Because I conclude that *Bivens* claims are no longer judicially cognizable, and that we have jurisdiction to review (and foreclose) interlocutory rulings recognizing *Bivens* claims under the collateral order doctrine, I respectfully dissent.

## I.    *Bivens* **Doctrine**

"Marley was dead, to begin with.  There is no doubt whatever about that."

Charles Dickens, *A Christmas Carol*

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 391 (1971), the Supreme Court authorized a damages action against federal officials for alleged violations of the Fourth Amendment.

This act of judicial adventurism "has not worn well."  *Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1355 (10th Cir. 2024), *petition for rehr'g denied* (Apr. 5, 2024). "Although the Court recognized causes of action under *Bivens* in two subsequent cases . . . it is on course to treating *Bivens* as a relic of the 20th century."[1]  *Id.*  The Majority agrees with this trend.  Maj. at 35 (The Court "has even signaled the demise of *Bivens* doctrine altogether" but "has not jettisoned" it.).  I, however, believe the Court has relegated it to the dustbin.

---

[1] The Court last authorized a *Bivens* remedy in 1980, and "[o]ver the past 42 years" it has "declined 11 times to imply a similar cause of action for other alleged constitutional violations."  *Egbert v. Boule*, 596 U.S. 482, 486 (2022) (listing cases).  The Court's refusal in *Egbert* makes twelve.

The Court's abrogation of *Bivens* sprang from its recognition that the "judicial creation of a cause of action is an extraordinary act that places great stress on the separation of powers." *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 636 (2021) (plurality opinion). As it explained:

> Now long past "the heady days in which this Court assumed common-law powers to create causes of action," we have come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power. At bottom, creating a cause of action is a legislative endeavor . . . . Unsurprisingly, Congress is far more competent than the Judiciary to weigh such policy considerations. And the Judiciary's authority to do so at all is, at best, uncertain.

*Egbert v. Boule*, 596 U.S. 482, 486 (2022) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring)) (internal quotations and citations omitted).[2]

The abrogative process has been "gradual, but relentless."[3] *Logsdon*, 91 F.4th at 1355. Through a series of decisions tracing their lineage back to Chief Justice Burger's dissent in *Bivens* itself, 403 U.S. at 411, the Court has methodically defanged the doctrine

---

[2] In contrast to common-law courts, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted).

[3] While the abrogative process may have been gradual, the Court's hostility to *Bivens* has increased exponentially in recent years: going from "it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today," *Ziglar v. Abassi*, 582 U.S. 120, 134 (2017), to "if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. at 502.

by placing additional hurdles in the way of *Bivens* claims.  In *Egbert*, the Court

summarized the evolution of *Bivens*'s analytical framework:

> To inform a court's analysis of a proposed *Bivens* claim, our
> cases have framed the inquiry as proceeding in two steps.
> First, we ask whether the case presents "a new *Bivens*
> context"—*i.e.*, is it "meaningful[ly]" different from the three
> cases in which the Court has implied a damages action.
> Second, if a claim arises in a new context, a *Bivens* remedy is
> unavailable if there are "special factors" indicating that the
> Judiciary is at least arguably less equipped than Congress to
> "weigh the costs and benefits of allowing a damages action to
> proceed."  If there is even a single reason to pause before
> applying *Bivens* in a new context, a court may not recognize a
> *Bivens* remedy.

596 U.S. at 492 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 136, 140 (2017)) (alteration in

original) (internal quotation and citations omitted).

But even this restrictive two-step framework caused problems.  *See Id*. at 502

("What distinguishes the first step from the second?  What makes a context 'new' or a

factor 'special'?  And, most fundamentally, on what authority may courts recognize new

causes of action even under these standards?") (Gorsuch, J., concurring).  These problems

persisted because none of the Court's changes addressed *Bivens*'s fundamental flaw: it is

a constitutionally impermissible extrajudicial act placing "great stress on the separation

of powers."  *Nestlé*, 593 U.S. at 636.

The "special factors" analysis prescribed under the Court's two-step framework

illustrates this conundrum.  Under the first step, courts were required to ask whether the

case presented a "new *Bivens* context."  *Ziglar*, 582 U.S. at 139–140.  And a "new

context arises when there are potential special factors that previous *Bivens* cases did not

consider." *Egbert*, 596 U.S. at 492 (citing *Ziglar*, 582 U.S. at 140). But the second step *also* requires courts to consider whether "special factors indicat[e] that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id*. (internal quotations omitted).

Given that both steps mandate consideration of "special factors," it was "hard to see the difference between the analyses conducted in the two steps." *Logsdon*, 91 F.4th at 1356. Recognizing this, the Court explained that the steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492. *See also Logsdon*, 91 F.4th at 1356–57 ("If there was any doubt concerning whether the 'special factors' in [the first step] were somehow different from the 'special factors' to be considered in the second step, that doubt was dissipated [in] *Egbert*[.]").

With that insight, the Court distilled the inquiry to its constitutional essence and established the controlling *Bivens* test: "A court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 496 (emphasis in original); *and see Logsdon*, 91 F.4th at 1355 (adopting this test).

In my view, *Egbert*'s single question test dealt *Bivens* a coup de grâce. *See, e.g.*, *Egbert*, 596 U.S. at 503 ("It seems to me that to ask the question is to answer it.") (Gorsuch, J., concurring). As Justice Gorsuch observed:

> If the costs and benefits do not justify a new *Bivens* action on facts so analogous to *Bivens* itself, it's hard to see how they ever could. And if the only question is whether a court is

4

> "better equipped" than Congress to weigh the value of a new
> cause of action, surely the right answer will always be no.
> Doubtless, these are the lessons the Court seeks to convey.  I
> would only take the next step and acknowledge explicitly
> what the Court leaves barely implicit.

*Id*. at 504.

The lesson I take away is that the "right answer" to whether to recognize a *Bivens* cause of action "will always be no."  *Id*.  As I read it, *Egbert*'s test is *always* self-defeating because underlying *every Bivens* case are two "rational reason[s]" to "think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed."  *Id*. at 496 (emphasis in original and internal quotations omitted).

The first is the Court's increased appreciation for "the tension between" judicially created causes of action and "the Constitution's separation of legislative and judicial power."  *Hernandez v. Mesa*, 589 U.S. 93, 100 (2020).  The second is a court's inability to "predict the systemwide consequences of recognizing a cause of action under *Bivens*. *That uncertainty alone is a special factor that forecloses relief*."  *Egbert*, 596 U.S. at 493 (internal citations omitted and emphasis added).  Indeed, these twin factors preclude relief even "when the facts are virtually the same" as those of *Bivens*, or the two cases to which the Court extended its cause of action, *Carlson v. Green*, 446 U.S. 14 (1980), and *Davis v. Passman*, 442 U.S. 228 (1979).  *Logsdon*, 91 F.4th at 1355.  *See, e.g.*, *Egbert*, 596 U.S. at 504 ("If the costs and benefits do not justify a new *Bivens* action on facts so analogous to *Bivens* itself, it's hard to see how they ever could.") (Gorsuch, J., concurring).

If even the *Bivens*, *Carlson*, and *Davis* fact patterns are no longer judicially cognizable, then the question after *Egbert* is not whether an order impermissibly "exten[ds]" *Bivens*, Maj. at 20, it is whether to "recogniz[e] a cause of action under *Bivens*" at all.  *Egbert*, 596 U.S. at 491.  And because the twin special factors are present in *every Bivens* case, drumming up others amounts to illusory pretext.  Maj. at 35 (The Court "has even signaled the demise of the *Bivens* doctrine altogether . . . . "); *Logsdon*, 91 F.4th at 1355 (cognizable *Bivens* claims "appear[] to comprise a null set."); *Silva v. United States*, 45 F.4th 1134, 1140 (10th Cir. 2022) ("[W]e are left in no doubt that expanding *Bivens* is not just a disfavored judicial activity, it is an action that is impermissible in virtually all circumstances.") (internal quotations and citations omitted).

To arrive at *Bivens*'s death is to return to its congenital defect: "recognizing a *Bivens* cause of action is an extraordinary act that places great stress on the separation of powers[.]"  *Egbert*, 596 U.S. at 498 n.3 (internal quotations omitted).  Armed with this understanding, I next consider whether district court rulings recognizing *Bivens* claims are immediately reviewable collateral orders.

## II.    *Bivens* Rulings and the Collateral Order Doctrine

### A.  The Collateral Order Doctrine

We have jurisdiction over "appeals from all final decisions of the district courts." 28 U.S.C. § 1291.  But what constitutes a final decision?

A final decision is generally one that concludes the litigation.  *Will v. Hallock*, 546 U.S. 345, 349 (2006).  This means that a district court's denial of a motion to dismiss is generally not a final decision because it does not end the litigation.  *Cf.* 28 U.S.C. § 1291.

But the "collateral order doctrine accommodates a small class of rulings, not concluding the litigation, but conclusively resolving claims of right separable from, and collateral to, rights asserted in the action." *Will*, 546 U.S. at 349 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)) (internal quotations omitted). *See also* Edward H. Cooper, 15A Fed. Prac. & Proc. Juris. (Wright & Miller) § 3911 (3d ed. updated Apr. 2023) ("The only finality required is that the district court has made its final determination of the matter in question.").

These interlocutory rulings are immediately appealable when they: "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Will*, 546 U.S. at 349 (internal quotations omitted). This so called "*Cohen* test" permits immediate review of rulings "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen*, 337 U.S. at 546.

### B.  *Application of the* **Cohen** *Test*

I would hold that orders recognizing *Bivens* claims are "final" under § 1291 and the collateral order doctrine, rendering them immediately appealable. *See Graber v. Doe II*, 59 F.4th 603, 611 (3rd Cir. 2023) (Hardiman, J., dissenting), *cert. denied sub nom. Boresky v. Graber*, 144 S. Ct. 681 (2024).

Because the third factor is the fulcrum of the analysis, I discuss *Cohen*'s factors in reverse order.[4]

### 1.  *Factor 3 – Effectively Unreviewable on Appeal from Final Judgment*

"[W]hen asking whether an order is effectively unreviewable if review is to be left until later," what "counts" is whether the delay "imperil[s] a substantial public interest." *Will*, 546 U.S. at 353.  *See also Cohen*, 337 U.S. at 546 (an order is effectively unreviewable when it presents an issue "too important to be denied review . . . until the whole case is adjudicated.").  The "separation of powers" is a "substantial public interest." *Will,* 546 U.S. at 352–53.[5]

A substantial public interest is imperiled if its delayed vindication results in the "very harm" sought to be avoided.  *Sell v. United States*, 539 U.S. 166, 176–77 (2003).

---

[4] As the Majority acknowledged, the other two Circuits to have considered this issue both assumed without deciding that a *Bivens* ruling satisfies the first and second *Cohen* factors.  *Himmelreich v. Fed. Bureau of Prisons*, 5 F.4th 653 (6th Cir. 2021) (predating *Egbert*); *Graber*, 59 F.4th at 610.

[5] Although *Will* contains passing dictum concerning the interlocutory reviewability of *Bivens* authorizations, it predated *Egbert* by 16 years.  Since deciding *Will*, the Court has "come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power[.]" *Egbert*, 596 U.S. at 491 (internal quotations omitted).  And it has acknowledged that "recognizing a *Bivens* cause of action 'is an extraordinary act that places great stress on the separation of powers[.]'" *Id.* at 498 n.3 (quoting *Nestlé*, 593 U.S. at 636).  This modern conception of *Bivens* is consistent with *Will*'s acknowledgement that "honoring the separation of powers" is a "particular value of a high order" warranting interlocutory review.  *Will*, 546 U.S. at 346.  *See also Graber*, 59 F.4th 612–13 (Hardiman, J., dissenting) ("The defense that no *Bivens* cause of action lies is just like qualified immunity" in that it is "timely from the moment an official is served with a complaint.") (quoting *Will*, 546 U.S. at 346).

Recognizing a claim premised on an "impermissible" intrusion by "the federal courts," *Helstocki v. Meanor*, 442 U.S. 500, 505–06 (1979), irreparably harms every branch of government, the litigants, and the public. It irreparably harms the judiciary and the claimants by "hold[ing] out [a] kind of false hope, and in the process invit[ing] still more protracted litigation destined to yield nothing." *Egbert*, 596 U.S. at 504 (Gorsuch, J., concurring). It irreparably harms the legislature by "arrogating legislative power" and upsetting "the careful balance of interests struck by the lawmakers." *Hernandez*, 589 U.S. at 100; *see also Egbert*, 596 U.S. at 492 ("a court likely cannot predict the systemwide consequences of recognizing a cause of action under *Bivens*.") (internal quotations omitted). It irreparably harms the executive branch, both abstractly by impairing government functioning, interfering with executive autonomy, and chilling high-level policy making, and tangibly by imposing "time and administrative costs attendant upon intrusions resulting from the discovery and trial process." *Ziglar*, 582 U.S. at 134, 141–42. Finally, its zombie existence harms the public writ large because, absent its *formal* abrogation, Congress has no incentive to legislate in the space. Instead, potential claimants are left with a brain-dead cause of action sustained by life support.

Because the judicial process *itself* is the injury, these harms are a bell that cannot be unrung later in the litigation. *See, e.g.*, *Egbert*, 596 U.S. at 496, 498 n.3 (*Bivens* so imperils the "separation of powers," and so "impair[s] governmental interests," that courts have a responsibility to *sua sponte* "evaluate any grounds that counsel against *Bivens* relief"—even those not raised by the parties.). *See also Nixon v. Fitzgerald*, 457

U.S. 731, 743 (1982) (Courts should show "special solicitude" toward "threatened breach[es]" of the "separation of powers.").[6]

While the Majority acknowledges that "district court orders implicating separation of powers concerns may be candidates for interlocutory review," Maj. at 36, it resists finding so here by concluding that the "[s]eparation of powers concerns about *Bivens* extension orders do not necessarily satisfy the third *Cohen* factor[.]" *Id.* at 20. Rather, the Majority argues, "separation of powers" concerns sufficient to satisfy *Cohen*'s third factor are effectively limited to orders "denying presidential immunity[.]" *Id.* at 35 (discussing *Nixon*, 457 U.S. at 742–43).

I take the Court at its word. It said that "*recognizing* a *Bivens* cause of action is an extraordinary act that places *great stress* on the separation of powers." *Egbert*, 596 U.S. at 498 n.3 (emphasis added and internal quotations omitted). And it said that "honoring the *separation of powers*"—not presidential immunity alone—is a "particular value of a high order" warranting interlocutory review. *Will*, 546 U.S. at 346 (emphasis added). Taken together, these edicts plainly support jurisdiction for *Bivens*-recognizing orders.

This does not mean that every "class of case[] that touch[es] on separation of powers concerns" warrants *Cohen* treatment. Maj. at 37. As the Majority illustrates, the collateral order doctrine itself implicates "competing separation of powers concern[s]"

---

[6] Compare less weighty interests warranting interlocutory review under the collateral order doctrine, including *Cohen*, 337 U.S. at 546–47 (order rejecting the applicability of security laws enacted after the initiation of derivative shareholder suits) and *Praxis Properties, Inc. v. Colonial Sav. Bank, S.L.A.*, 947 F.2d 49, 61 (3d Cir. 1991) (orders denying requests for a litigation stay).

such that its membership class must be "stringent[ly] protected. Maj. at 37, 21. I agree with those concerns, as far as they go.[7] But here we must determine the greater harm: recognizing *Bivens* claims or modestly expanding the collateral order doctrine.

*Bivens*-authorizing orders warrant *Cohen* treatment because "*Bivens*, *Davis*, and *Carlson* represent the *only* instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 582 U.S. at 131 (emphasis added). Put another way, "*Bivens* actions are [a] very limited" category of case posing unique Constitutional harms. *Graber*, 59 F.4th at 609. The collateral order doctrine does not rise to this level. *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1033 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2608 (2023) ("Immediate appeals under the collateral order doctrine are disfavored . . . because 'too many interlocutory appeals can cause harm.'") (quoting *Johnson v. Jones*, 515 U.S. 304, 309 (1995)).

At bottom, courts *may* recognize new collaterally appealable orders. *See, e.g.*, *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, F.3d 659, 668 (10th Cir. 2018) (extending the collateral order doctrine to decisions not to apply state anti-SLAPP statutes); *Tucker*, 36 F.4th at 1033 ("Immediate appeals under the collateral order doctrine . . . 'are the exception, not the rule[.]'") (quoting *Johnson*, 515 U.S. at 309). In fact, the Court recognized a new collateral order in a footnote only thirteen days after deciding *Egbert*. *Shoop v. Twyford,* 596 U.S. 811, 817 n.1 (2022) (extending the

---

[7] *See Los Lobos*, 885 F.3d at 667 ("Whatever the merits of discarding *Cohen*, the Court did not take that path in *Mohawk*, and we may not blaze it here.") (discussing *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 114–119 (2009) (Thomas, J., concurring in part and concurring in the judgment)) (internal citations omitted).

collateral order doctrine to prisoner transport orders under the All Writs Act).  What courts *cannot* do after *Egbert*, however, is recognize *Bivens* claims.

"[R]ecognizing a *Bivens* cause of action is an extraordinary act that places great stress on the separation of powers[.]"  *Egbert*, 596 U.S. at 498 n.3 (internal quotations omitted).  Any delay in foreclosing this judicial intrusion into the legislature's domain imperils a weighty public interest in the separation of powers and should be vindicated at the earliest possible opportunity.  For these reasons, I would hold that *Bivens*-recognizing orders are "effectively unreviewable" under the third *Cohen* factor. [8]

---

[8] The Majority also argues that "alternative means to pursue interlocutory review" counsels against reviewing *Bivens*-recognizing orders under the collateral order doctrine.  Maj. at 22.  But the existence of "possible alternate means of vindication" does not "defeat collateral order jurisdiction."  *Los Lobos*, 885 F.3d at 667.

For example, the "discretionary availability" of interlocutory review under 28 U.S.C. § 1292(b) does not bar collateral recognition of orders authorizing *Bivens* claims.  Section 1292(b) applies only to orders "not otherwise appealable" whereas § 1291 *conveys* appellate jurisdiction over "all final decisions of the district courts[.]"  Since § 1292(b) applies only to non-appealable orders, it does not limit the appealability of collateral *final* orders (which are appealable) under § 1291.  *Will*, 546 U.S. at 350 (The collateral order doctrine is "not [] an exception" to § 1291," but a "practical construction of it.").  *See also Graber*, 59 F.4th at 617 n.3 (Hardiman, J., dissenting) ("Courts have tools other than the collateral order doctrine to facilitate interlocutory appeals of important legal issues . . . [their existence] does not forbid us from recognizing new collateral orders[.]").

Independently, the order before us would not satisfy § 1292(b) because it only applies to questions on which there is "substantial ground for difference of opinion."  As I explained above, there is no "substantial ground" to dispute the permissibility of orders recognizing *Bivens* claims.

Nor does Fed. R. Civ. P. 54(b)'s appellate certification procedure limit collateral recognition.  "The collateral order doctrine and Rule 54(b) apply to entirely distinct types of orders: the doctrine applies only to orders *completely separate* from the merits of the claims for relief, and the Rule applies only to orders that *resolve* the merits of one or more of those claims.  Rule 54(b), therefore, does not limit review of orders that are

## 2. *Factors 2 & 1*

*Cohen*'s second factor asks whether the challenged order resolves "an important issue completely separate from the merits." *Will*, 546 U.S. at 349. The fact question in any *Bivens* claim is whether the defendant violated the claimant's constitutional rights, while the legal *Bivens* question is whether the claimant can sue at all. *But see Egbert*, 596 U.S. at 504 ("[T]he right answer will always be no") (Gorsuch, J., concurring).

Liability for a claim and the cognizability of a cause of action are completely separate questions. And it is axiomatic that the existence of a cause of action—and so the ability to sue—is an "important question" to a lawsuit. Thus, answering the *Bivens* question resolves an important question completely separate from the merits, and so satisfies *Cohen*'s second factor. *See Los Lobos*, 885 F.3d at 667 (*Cohen* recognized an order that was "a prerequisite to the cause of action itself.").

Finally, *Cohen*'s first factor asks whether the challenged ruling conclusively determines the disputed question. *Will*, 546 U.S. at 350. A decision authorizing a *Bivens* cause of action conclusively determines the judicial cognizability of that claim. But-for

---

appealable under the collateral order doctrine." 10 Daniel R. Coquillette, Gregory P. Joseph, Georgene M. Vairo & Chilton Davis Varner, Moore's Federal Practice, § 54.27[2](c) (3d ed. 2024) (emphasis in original). *See, e.g.*, *Valley Ranch Dev. Co. v. F.D.I.C.*, 960 F.2d 550, 555–56 (5th Cir. 1992) (Stating that because the district court's order "is immediately appealable as a collateral order[,] [a] rule 54(b) judgment is not necessary."); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1118 (7th Cir. 1979) ("We hold that, despite the refusal of the trial court to enter judgment pursuant to Rule 54(b), we have jurisdiction to review the order . . . as a collateral order."); *Crowder v. Housing Auth. of City of Atlanta*, 908 F.2d 843, 845–846 (11th Cir. 1990) ("[T]he absence of a Rule 54(b) determination does not mean that a decision of the district court is not a collateral order within the meaning of *Cohen*.").

13

the court's *legal* conclusion that the cause of action exists, there can be no claim. *See Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 884 (6th Cir. 2021) ("[I]f there is no cause of action, courts should stop there."); *Vanderklock v. United States*, 868 F.3d 189, 197 (3d Cir. 2017) (The existence of a *Bivens* claim is a "threshold question of law[.]"). The authorization of a *Bivens* claim thus satisfies *Cohen*'s first factor.

*    *    *    *

The collateral order doctrine means nothing if it does not accommodate immediate review of orders authorizing causes of action that have been abrogated by virtue of the grave constitutional harms they inflict. Certainly, this is a "small class of rulings" too "important to be denied review" falling within the doctrine's ambit. *Will*, 546 U.S. at 349. Accordingly, I conclude that orders recognizing *Bivens* claims are "final" under § 1291 and the collateral order doctrine, and so would permit their immediate appellate review.

### III.    The District Court's *Bivens* Ruling

Having addressed appellate jurisdiction, I turn to the district court's ruling.

The district court erred because it focused almost exclusively on whether Mr. Mohamed's *Bivens* claims presented a new context. But after *Egbert* "[a] court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 496 (internal quotations omitted). *See also Logsdon*, 91 F.4th at 1358 ("[W]e conclude our analysis should focus on that single question.").

14

Myriad rational reasons suggest that Congress is better suited to weigh the costs and benefits of permitting Mr. Mohamed's *Bivens* claims.  Ever present is the Court's increased appreciation for "the tension between" judicially created causes of action and "the Constitution's separation of legislative and judicial power."  *Hernandez*, 589 U.S. at 100.  As is the court's inability to "predict the systemwide consequences of recognizing a cause of action under *Bivens*."  *Egbert*, 596 U.S. at 493 (internal quotations omitted).  The existence of these special factors alone "counsel against *Bivens* relief."  *Id.* at 498 n.3.

Of course, other "special factors" also warrant dismissal, as they always will.  For example, the Appellants represent a "new category of defendants."  *Logsdon*, 91 F.4th at 1358.  Although the *Carlson* defendants were BOP employees, there they were BOP *medical* officials who allegedly provided inadequate medical care.  446 U.S. at 54 n.1.  Here, the defendants are BOP *prison guards*.  *See Logsdon*, 91 F.4th at 1358 (Agents of the U.S. Marshals Service presented a different category of defendant than agents of the Federal Bureau of Narcotics).  Not only are these positions categorically different, but prison guards and prison medical officials also have different duties and perform different functions—*i.e.*, one's primary responsibility is to provide medical care and the other's is to oversee security.[9]  *Id.* ("Of particular relevance here is a duty of the USMS that was not a factor considered in *Bivens*.").

---

[9] One of the named BOP Officers—Anthony Osagie—is alleged to be a "medical provider" in addition to being a correctional officer.  Even though Officer Osagie is alleged to have a medical role, Mr. Mohamed's *Bivens* claims against him are not for inadequate medical care, like the claims in *Carlson*.  446 U.S. at 54 n.1.  Instead, Officer

And independently, "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." *Egbert*, 596 U.S. at 493. In *Silva*, we concluded that the BOP's Administrative Remedy Program is an alternative remedial structure. 45 F.4th at 1141 ("[T]he availability of the BOP's Administrative Remedy Program offers an independently sufficient ground to foreclose [an Eighth amendment excessive force] *Bivens* claim."). That program was available to Mr. Mohamed. In fact, he utilized it. Its existence alone is enough to foreclose his *Bivens* claims.[10] *Id.*

\* \* \* \*

For these reasons, I conclude that Mr. Mohamed's *Bivens* claims are not judicially cognizable. The district court erred when it failed to dismiss them.

## IV.    Conclusion

*Bivens* claims are contrary to the constitutional separation of judicial and legislative powers. Recognizing this, the Court created a self-defeating test in *Egbert*— effectively tolling *Bivens*'s death knell. The consequence is that neither Mr. Mohamed, nor any other claimant, has viable *Bivens* claims.

---

Osagie is alleged to have violated the Eighth Amendment by failing to stop Mr. Mohamed's alleged battery. For this reason, Mr. Mohamed's *Bivens* claim would reach a "new category of defendant" because the conduct under scrutiny is related to his duties as a correctional officer—not those of a medical provider.

[10] The existence of the Civil Rights of Institutionalized Persons Act, the Prison Litigation Reform Act, and the Prison Rape Elimination Act is another special factor counseling against Mr. Mohamed's *Bivens* claims. *Ziglar*, 582 U.S. at 148 (The existence of "legislative action suggesting that Congress does not want a damages remedy" is yet another "special factor" counseling against recognizing a *Bivens* claim.).

16

Moreover, because I would recognize *Bivens* authorizing orders as "final" under § 1291 and the collateral order doctrine, I would reach the merits, vacate the district court's order, and remand with instructions to dismiss those claims.

For these reasons, I respectfully dissent.