No. 22-1453

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

KHALFAN KHAMIS MOHAMED, *et al.*,

Plaintiff-Appellee,

v.

JONES, *et al.*,

Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

The Honorable R. Brooke Jackson, United States District Judge
Civil No. 1:20-cv-2516
_____

**APPENDIX
VOLUME II (Pages 156-335)**

BRIAN M. BOYNTON
 *Acting Assistant Attorney General*

BARBARA L. HERWIG
 (202) 514-5425
LOWELL V. STURGILL JR.
 (202) 514-3427
 *Attorneys, Civil Division*
 *Appellate Staff, Room 7527*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue, N.W.*
 *Washington, D.C. 20530*

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet ...........................................................................App.1

Complaint (Aug. 20, 2020), Dkt. 1 ............................................................App.15


## VOLUME II

Amended Complaint (June 22, 2021), Dkt. 64 ........................................App.156

Motion to Dismiss Second Amended Complaint
   (July 22, 2021), Dkt. 71 ........................................................................App.237

Order (May 18, 2022), Dkt. 120 ..............................................................App.297

Order Referring Motion (June 21, 2022), Dkt. Entry 130 ......................App.310

Notice of Supplemental Authorities re: Motion for
   Reconsideration re: 120 Order (Aug. 3, 2022), Dkt. 139 ...................App.311

Order Denying 128 Motion for Reconsideration
   (Oct. 24, 2022), Dkt. 150.......................................................................App.314

Notice of Appeal (Dec. 22, 2022), Dkt. 156 ...........................................App.333

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. ___20-cv-02516-RBJ-KMT___

(To be supplied by the court)

___Khalfan Khamis Mohamed___, Plaintiff

v.

___Jones, Nurse, Ind. and off. capacities___

___Huddleston, Nurse, Ind. and off. capacities___

___Osagie, Physc. Asst., Ind. and off. capaces, as to delib. indiff. claim.___

___Brush, Officer, Ind. and off. capces. as to 1st. Amend.___, Defendant(s). See attached

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JUN -1 2021**

**JEFFREY P. COLWELL**
CLERK

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

## PRISONER COMPLAINT

| NOTICE |
| --- |
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. |
| **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

1

## A.   PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Khalfan Khamis Mohamed, Reg.#44623-054, U.S.P.,MAX P O Box 8500,

(Name, prisoner identification number, and complete mailing address)

Florence ,CO 81226-8500

(Other names by which you have been known)

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

____   Pretrial detainee
____   Civilly committed detainee
____   Immigration detainee
____   Convicted and sentenced state prisoner
✓   Convicted and sentenced federal prisoner
____   Other: *(Please explain)* _____

## B.   DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: Jones,Nurse ,not known _____

(Name, job title, and complete mailing address)

_____

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? ✓ Yes ____ No *(check one)*. Briefly explain:

He was on duty and employed by the BOP at the ADX

in all relevant times.

Defendant 1 is being sued in his/her ✓ individual and/or ✓ official capacity.

**2**

DEFENDANTS

Espinoza, officer, Ind. capacity.

Miller, Officer, Ind. Capacity.

Murton, Lieutenant, Ind. Capacity.

Armijo, Lieutenant, Ind. Capacity.

Unite States of America.

NOTE 1: Defendants and their capacities: In this Second Amended complaint, nine defendants are named: the three medical staff: Jones, Huddleston and Osagie in the three deliberate indifference claims, are each respectively, sued under both, official and individual capacities. However, Osagie in the "failure to entervine" claim is only sued on his individual capacity.

The rest of the individual staff-defendants, with exception to officer Brush, in the First Amendment claim, are each sued on individual capacity, respectively. However, Brush is sued on both, official and individual capacities in the First Amendment claim.

As for relief: I am only seeking compensatory relief on individual defendants on their individual capacities. I'm not suing the U. States through Bivens, for damages based on alleged wrongs of its employees. However, I use Bivens in seeking injunctive reliefs, on the 3-medical claims claims 8-through 10, and claim seven; first amendment claim.

The U. states is a defendant in the last five claims: tort claims...

Defendant 2:  Huddleston, Nurse, not known

         (Name, job title, and complete mailing address)

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? ✔ Yes ___ No (*check one*). Briefly explain:

He was on duty and employed by the BOP at the ADX in all relevant times.

Defendant 2 is being sued in his/her ✔ individual and/or ✔ official capacity.

Defendant 3:  Osagie, Physician's Assistant, not known

         (Name, job title, and complete mailing address)

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? ✔ Yes ___ No (*check one*). Briefly explain:

He was on duty and employed by the BOP at the ADX in all relevant times

Defendant 3 is being sued in his/her ✔ individual and/or ✔ official capacity.


## C.   JURISDICTION

*Indicate the federal legal basis for your claim(s): (check all that apply)*

___   42 U.S.C. § 1983 (state, county, and municipal defendants)

✔   *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (federal defendants)

___   Other: (*please identify*) 28 U.S.C § 1346 (b); 1346 (b)(2); 1331.

Injunctive Relief : 28 U.S.C, § 2283 & 2284, and Rule 65 of F.R.Civ.Proc. The U.S. waives Sovereign immunity under 28 §§ 2671-2680.

2

4.

Defendant 4 : Brush, officer, not known.
Ind. and off. capacities as to the first Amendment claim.
He was on duty and employed by the BOP at the ADx
in all relevant times.


Defendant 5 : Espinoza, officer, not known.
Ind. capacity.
He was on duty and employed by the BOP at the ADx
in all relevant times.


Defendant 6 : Miller, officer, not known.
Ind. capacity.
He was on duty and employed by the BOP at the ADx
in all relevant times.


Defendant 7 : Murton, Lieutenant, not known.
Ind. capacity.
He was on duty and employed by the BOP at the ADx
in all relevant times.


Defendant 8: Armijo, Lieutenant, not known.
Ind. capacity.
He was on duty and employed by the BOP at the ADx
in all relevant times.


Defendant 9: the United States of America.

5-

### D.    STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the aate(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE:  <u>EXCESSIVE FORCE AGAINST OFFICER BRUSH</u>

Supporting facts:

1- The term "my cell" in all bellow mentioned allegations, unless stated otherwise shall refer to cell #108, Range A-Lower, in C-Unit, here at the ADX. That is for all dates between 8.19.2018 and 8.23.2018, while the "my cell" shall refer to cell #406, Range B-upper in the same Unit for all dates from 8.25.2018 on wards. That is because, I was housed in cell 108 untill the evening of 8.24.2018, when I was moved to cell 406.

2- In the morning of monday of 8.20.2018 at the breakfast tray, I started and declared my peaceful protest in the way of Hunger Strike ("H·St") while I was housed in cell 108.

3- I sent several written requests to some senior staff members here at the ADX, declaring my H·St. This including, the unit Manager, Mr. Pockor, the ADX's medical director, Dr. Oba, along with the Physician assistant ("PA"), who was also my longtime medical provider, Osagie, and to One of the ADX's high-level SIS official. I also verbally, told the C-unit officer of my H·st.

4- The main purpose of informing these staff of my H·St. was to give the ADX's notice, so I could be afforded all necessary medical attentions with accordance to the BOP's program statements.

5- H·St. does not violate any of the BOP's policies or regulations. Since early 2000's I have gone in morethan 10-diffent H·sts. However, I have never been disciplined for violating any policy as a result of my H·St.

6- It is my practice in all H·sts, including that one, to refrain from eating and drinking any thing, apart from some water, even before I declares my H·St. In that H·st, my last meal I took, was at the dinner time in 8.19.2018.

4

7- On evening of 8.22.2018, at the dinner tray, I had missed a total of 9-consecutive trays. The BOP's H.st. policy requires the medical staff to perform the initial H.st. medical assessment (`M.as.`) once a H.str. prisoner misses his 9th consecutive meals and in some cases, the assessment may be performed even earlier. No such assessment were performed on me in that H.st.

8- Also, in the same evening, the case manager, Carlson, came to me and said that the unit manager, Pockor, had received my request that I sent him declaring my H.st., and he said that the unit officers, Lieutenant (`Lt`) ARMIJO, and the unit Team are informing the warden's office, the captain, and the medical staff on my H.st., and that every one was aware of my H.st. ever since I started refusing trays on monday morning, 8.20.2018.

9- Next morning of 8.23.2018 I wake up feeling very weak, dizzy, tied and with heavy headache. I had missed 10-consecutive trays by that time, but there was no M.as. performed on me.

10- At the lunch time, after refusing the 11th consecutive tray, the three unit officers: MILLER, Baca and BRUSH wanted me to submitt to handcuffing so they could remove my food-commissary items. BRUSH told me that since I had refused 11-consecutive trays, they had to remove my personal food items. I submitted to handcuffing.

11- The BOP's program statement requires the removal of food items and drinks from a Hunger striking prisoner's cell after he refuses the 9th consecutive tray. However, the policy does not authorize the removal of the non-food items, such as books, legal materials, cosmetics...etc.

12- The officers escorted me to the range-law library about 30-feet away from my cell. It was around 11:40 A.m.

13- Each of the three officers was physically much bigger than myself. They collectively, would easily make 600+lbs. BRUSH and Baca each was over 200lbs. while MILLER was close to 200lbs. On 8.26.2018, three days later, I weighed at 138 lbs.

14- Because I was too weak and dizzy, I couldn't put on my training shoes as I usually do when I go out of my cell. I was escorted to the law library wearing a pair of socks and shower sleepers.

15- The three officers noted my extreme and obvious physical weakness to the extent that Officer Baca, seeing me I could hardly walk and appearing dizzy and sick, asked me as they escorted me to the law library "Mohamed, are you Ok?", I said "No, I'm not ok." He said "yea, I can see that, you need to eat man!"

16- Even though I was physically weak, I was in full controll of my feelings and emotions. I made sure that I stay calm, peaceful and respectfull to the staff. This has been my behavior in all of my H.Sts. I never behaved otherwise.

17- After I was placed in the law library, I could see BRUSH removing almost every thing from my cell as he was putting them in plastic bags.

18- About an hour Later, since I was placed in the law library, the three officers cameback and BRUSH told me that Lt. ARMIJO wanted me to take off my personal clothes and put on the BOP's-provided khakis. I told BRUSH that the policy does not require a H.st. prisoner not to have personal clothes while he's in H.st. It does not. I asked to speak with Lt. ARMIJO, and BRUSH said Ok, and the officers left.

19- About 10-minutes later, the three officers cameback and BRUSH told me that Lt. ARMIJO wanted me to be taken to his office so we can talk there. However, because I had previously learned that the staff often beats up prisoners in Lt's office because there is no camera in it, I said "No, the Lt. can come here and speak with me, or, put me back into my cell and the Lt. come there and speak with me."

20- At that point, BRUSH said "OK" we take you back to your cell. He then put handcuffs on me, doubled lock the cuffs, and then the three officers started to escort me through the hall-way towards my cell.

21- By that moment, my previous mentioned H.st. symtoms, supra: 9, were worsening rapidly, but I continued to stay calm.

22- As I was escorted, at no time I did became ever released from the restraints, nor did the officer lose their control of my hands. I never moved suddanly, became angry, combative, resistive, attempted to assault any officer, or even raised my voice.

23- When I arrived at my cell, I stopped, thinking that the officers have missed my cell, and looking towards it, I said; calmely and without posing any threat; "here is my cell, you told me that you're going to put me back into my cell."

24- It is a normal practice for a prisoner who is escorted to his cell or to any other destination that he's aware of, to stop at that cell or destination when he and the escorting officers reaches there. It is not normal to do otherwise, nor it's normal or is a policy for a prisoner to ask officers' permission to stop at such known destination or to declare to the officers, that "now I am stopping".

25- At that moment, officer BRUSH immediatelly without any warning nor any need, threw me against the wall in the area between my cell, #108 and cell 107, while he aggressively, maliciously and sadistically

**D. STATEMENT OF CLAIMS**

smashing my head multiple times against the wall, at the same time shouting "stop resisting, stop resisting" while infact I was not resisting at all.

26- BRUSH's above statement was just a pretext that he chose to make up to justify his malicious and sadistic violence. I had previously learned that prison guards regularly uses such similer statements when they unprovokedly beats up prisoners.

27- I never resisted nor showed any sign of resistance, and I had no energy in me even if I wanted to resist. I said as loudly as I could " I am not resisting... I never resisted any thing... You told me that you're going to put me back into my cell. As the beating on me were going on that day, I repeated these and similer statements in attempt to show that I was being tortured maliciously and sadistically.

28- The smashing of my head against the wall brought me an excruciating and extreme pain that I never experienced in my life. I thought that my head was basting open. The smashing of my head and other beatings that follow also worsened my previously stated H. St. symptoms, Supra.

29- I then found my self being crushed on to the ground, face-down, while BRUSH and another officer most likely, MILLER, punching and kicking me, and also spitting on me.

30- As soon as I was put on the ground, officers also restrained my legs with the legcuffs, and from this moment to the end of the beatings in the observation cell, I was fully restrained with the hand and leg cuffs.

31- Many officers, possibly 10-or more, now swammed into the range like insects and all of them were taking part in punching and kicking me as well spitting on me. The officers carried out these malicious and sadistic attacks against all over my body.

32- As I was on the ground, now lying on my jaw, BRUSH placed his working boot on my neck to the jaw, and used it as a weapon by pressing it maliciously and sadistically, while moving it right and left as if he was trying to crush some thing solid, leaving me with another deadly pain.

33- At one moment as BRUSH's boot still on my neck and other officers were beating me, I found my self that I couldn't breath, and had to cry out that "I can't breath, I can't breath... you're trying to kill me."

34- As I was on the ground, also, BRUSH with help from other officers, made concerted attempts to break my arms, legs, feet and toes. BRUSH was twisting and manipulating them aggressively in order to break them. I cried out in excruciating pain again " he's breaking my legs and my hands, they're trying to kill me."

9-

35- When BRUSH, MILLER and their fellow officers were trying to break my bones and attacking me, my feet were vulnerble open, because those shower-sleepers I had when I was escoted to the law library, See Supra 14, had come or taken off by the officers once the attacks started.

36- BRUSH and his fellow officers made multiple threats and verbal abuse against me. For example, BRUSH said, shouting on me" we gonna fuckin kill you..' "no one's gonna believe you", " scream louder bitch, this's America, not an Iraq or Afghanistan", or similler statements.

37- The above death threats, also cursings, racial slurs, spittings and many other kinds of abuses apart from the physical attacks that were going on un stop, continued up to the end of those beatings that day.

38- I dont know for sure for how long I was being tortured in that particuler area, see Supra. 25, but I assumes that, the beating went on for several minutes, subject to the discovery determination. I was truck at least 70-times at that spot, before I was truck more as I was escoted to observation cell, and then, in it.

39- When I was on the ground and then in the following beatings to the end of the beatings in the Observation cell ('O.C'), the officers always forced my upper body and head down, so I couldn't identify most of the officers who were turtuving and abusing me.

40- I was then viclently made to stand up and walk through the hallway toward the entrance of the range A-, c-unit, while the officers continues to maliciously and sadistically beating me, as at the same time jacking me up by the handcuffs from behind, using the cuffs themselves as another tool and method to punish me with, and as a result, delivering me another excruciting pain.

41- I could not walk strait because of the worsening of my H.S.T symptems, See Supra. 9, and because of the deadly pain all over my body, and especially, my right ankle, which I believed was already broken by BRUSH and his collegues. I had to limp in the excruciating pain as the beatings, spittings and all other kinds of abuses and threats continue.

42- I had no doubt the the officers intended to murder me because they tortured me without no limit. I wished they had already murdered me due to the extreme pain I was forced to go through.

43- Because of the excruciating pain, the limping and the physical weakness... etc, all most all moves I made were the result of officers' physical assault on me... I couldn't control my moves. But at no time I ever tried to attack any one.

44- Not long after I was assaulted, I heard that, BRUSH has been made a Lt, and he and Lt MURTON were transferred other prisons... ADX's officers, fear no conceqvences...

CLAIM TWO: FAILURE TO INTERVINE AGAINST LIEUTENANT ARMIJO.

45- I hereby re-allege and incorporate by refrance the above allegations, 1-44.

46- When we reached the entrance of the range -A, officers un intentionally and very briefly eased their grip off my head. and because of that I could raise my head and see Lt. ARMIJO and Lt. MURTON standing next to each other above the stairs of the entrance as they were witnessing me limping in pain while the officers continues to maliciously and sadistically attack and abuse me.

47- When I saw the two Lt's, I repeated my previous crying, see supra, 27, even more lawdly because I was expecting them to stop the beatings and I wanted them to know that I was being tortored maliciously and sadistically. However, the two Lts, didit stop the beatings even they though each possessed realistic opportunity to do so.

48- Each of the two Lts, saw me being attack, while I was limping in pain, fully restraines and each heard and saw me begging for their intervantion...

49- On information and believe, Lt. ARMIJO and Lt. MURTON had been present in the unit and witnessing the beatings previously; before I had seen there standing by, witnessing the beatings.

50- On information and believe, Lt. ARMIJO was the unit's Lt; on 8-23-18 and therefore, was incharge of the unit's daily operations and its officers.

51- Later that day, after the beatings stopped, Lt. ARMIJO along with some officers intered into the Observation cell where I was put, and ARMIJO lied to me: ARMIJO asked me what happened?... And asked me to explain the events. But I told him that he had already knew every thing... because of what officer BRUSH had told me earlier that day. see supra; 18-19. and I told him that I have seen him standing by with Lt. MURTON witnessing me being beaten...etc, supra 46-48. However, ARMIJO denied all these statements and claimed that he didit know any thing, and that, he had just came in that moment to report to his duty. ARMIJO also told me that he was treating my above statements "as an insaults to him".

52- Later on, in 9-12-2018, when I was housed in cell #40B, Lt. ARMIJO with another Lt, Alexander, came to my cell and both made even larger effort trying to convince me that Lt. ARMIJO was not present at the time of the attack on me in 8-23-2018, and they suggested that I was confusing him (ARMIJO) wish another Lt,' Sukdeo, who might have been present in the unit at the time of the attack. I said; "no, I didnt confuse him with any one...He was there and I saw him.

(2) This may suggest or show that: Lt. Sukdeo was also present during the attack and possibly, played a role in it. He and others might qualify as addit defendants after discovery

11-
App.166

**CLAIM THREE : EXCESSIVE FORCE AGAINST OFFICER MILLER.**

53- I hereby re-alleges and incorporate by refrance the above allegations, 1-52.

54- Passing the entrance while the beatings continues, I was then pushed into the D.C. under Lt's. MURTON's orders and supervision.

55- As I was being pushed through beatings into the D.C, officer MILLER with a huge effort maliciously and sadistically hit me on my face with his knee multiple times, delivering me another excruciating and deadly pain on my face.

56- Because my upper body and head were being constantly forced down, see supra, 39, MILLER whom I believe was at that time one of the officers holding me from back through the handcuffs, has to sneak himself in order to hit my face... without such huge efforts, MILLER couldn't get into my face

57- Officer MILLER was also one of the officers who initiated the beating on me that day, supra 29, MILLER was the officer #1 in the unit that day. Officer BRUSH could not have accomplished his initial attacks on me without MILLER's and very likely, Baca's full support and agreement.

**CLAIM FOUR : FAILURE TO INTERVINE AGAINST LIEVTENANT MURTON**

58- I hereby re-alleges and incorporates by refrance the above allegations, 1-57.

59- Soon after I reached the entrance of the range, see supra. 46-49, Lt. MURTON took full controll of the ongoing tortures against. From that moment to the end of the beatings, MURTON was maliciously and sadistically giving orders to the officers on how to beat me.

60- MURTON started by ordering the officers to place me in the D.C, while at the same time abusing me verbally. For example, he told me " you wanna Hunger Strike in the G.P, ( that's general population units, i.e; in oppose to H-unit where I first new his as an officer several year prior) this's what you gonna get mother fucker...etc.

61- MURTON also told me that I had to walk strait, not to limp and also stay silent not to cry out, otherwise I'll be beaten me. He told me that even after I had already said to him that I can't walk strait because I believed the officers have broken my leg.

62- Because I could not walk strait and couldn't be silent, under MURTON's orders and supervision I was beaten more.

63- The D.C, in C-unit, is located beyond the entrance to Range-A, at the opposite side to the unit officers' and Lt's offices. The D.C, has no camera in it, and for that reason officers often beats prisoners there.

64- Later that day I learned the officer BRUSH lied in the incident report that he fabricated against me. He claimed that I had committed

the prohibited act of "attempting to assault him" while I was being escorted to the D.C. In reality, BRUSH and his fellow officers, had told me that: they were taking me back into my cell. See supra 19-20

65- In the D.C, MURTON kept giving orders to the officers who were physically torturing, such as: "put him against the wall ... bend, bend him over..., place him on the bed..." He also said to the officers "show this dirty Arab terrorist what's ADX". At another time he told me, in response to my crying out that I never resisted any thing, see supra, 27, "look at you an Arab (or he said 'Arabic) bitch, you think there gonna be any one who gonna believe you, you must be crazy".

66- At another time, as officer ESPANOZA was maliciously and sadistically hitting me on my face, MURTON told him "keep it to the body", which I allege that, he was trying to avoid an incriminating evidence.

67- On information and believe, Lt. MURTON, officer BRUSH and ESPANO-ZA, all have long history and reputation in abusing prisoners at the ADX, including using of excessive force against them and then fabricating incident reports against those prisoners.

68- I personally heard prisoners who have been abused by BRUSH and ESPANO-ZA; In one specific case, ESPANOZA participated in torturing a prisoner, whose several ribs were fracture in the torture, about one year after I was tortured.

69- Several years prior to 8-23-2018's torture on me, MURTON had used excessive force against me when he was an officer, in one of my H-st, when I was housed in H-unit...

CLAIM FIVE: EXCESSIVE FORCE AGAINST OFFICER ESPANOZA:

70- I hereby re-alleges and incorporate by refrance the above allegations, 1-69.

71- ESPANOZA worked in perfect coordination with Lt. MURTON in torturing me in the D.C. As MURTON, I knew ESPANOZA since H-unit.

72- ESPANOZA and other officers that I could not identify, maliciously and sadistically beat me, spate on me and verbally abused me, causing me to go through an excruciating pain and great deal of humiliation

73- At one moment, ESPANOZA was very aggressively pulling my beard and ears up and down, forcing me to follow his movements in order to reduce the deadly pain that was causing me, while the officers were holding me to stay put. Espanoza also maliciously and sadistically hit me on my face. Supra 66.

74- Among ESPANOZA's statements to me in the D.C is "stupid little terrorist, you think this's Saudi Arabia, this's United States of America, ..son of a bitch... "we got your leader, Bin Laden, we soon gonna send you where he is.. hell, or some statement in that meaning. He also said " this's not H-unit".

**CLAIM SIX: FAILURE TO INTERVENE AGAINST OSAGIE**

75- I hereby re-alleges and icorporate by refrance the above allegations 1-74.

76- The P.A. OSAGIE ; was among the senior ADX's staff who witnessed the beatings against me and chose not to stop them. As I was being maliciously and sadistically beaten and abused in the O.C., I heard OSAGIE from the cell's door, very close to where I was being beaten, saying approvingly " is he still resisting", while, infact, I was not resisting and I was in full restraints.

77- After hearing OSAGIE's above statement, I repeated my previously made statement, that I never resisted any thing, and also said, " are you also OSAGIE witnessing this, see how they beat me? OSAGIE never replied.

78- OSAGIE's voice was very close from where I was being beaten. At that moment I was already place on the concrete bed inside the O.C. The bed is several feet high from the O.C. floor, and OSAGIE must have seen me and the beatings very easly and without any efforts. OSAGIE must also have heard my for ever repeated statement that I never resisted any thing before his above mentioned approving statement and after it when I repeated my statement.

79- I knew OSAGIE from at least early 2002, and his voice and accent are obviously identifiable to me and to any one who knew him.

80- OSAGIE was a top BOP's/ADX's official who had a realistic opportunity to stop the torture against me in that day, but he decided to be deliberate indiffent.

81- OSAGIE was at the time, a fully trained law enforcement, BOP's senior staff; with accordance to BOP's program statement: OPI: HRD/PDB No: 3300.3, of 5/8/2017 (Employment), section 11.; all staff working "in correctional enviroment" "must be proficient in the knowledge, skills and Abilies (KSAs) needed for correctional work". And " the attainment of proficiency in these areas..." .. is a condition of employment for all staff in correctional institutions". Id. All these staff must train "in three areas; firearms, physical abilities and a written test of job knowledge." Only "physicians and dentists may elect to waive, and chaplains* and PHs staff do not participate in the firearms portion..." Id.

82- Further, all BOP's staff, or at least the ADX's, including OSAGIE himself, would in times work as regular prison guards. I have seen OSAGIE at different orcassions wearing the BOP's guards uniforms, and works as one of them.

83- The only meaningful difference between OSAGIE, and say, Lt. MURTON, and others, is that OSAGIE was both ; a fully trained prison guard, as well, a medical professional, while MURTON was only a prison guard. OSAGIE could have used either of these two position he hold to stop the abuses, but he chosed to use neither.

84- After OSAGIE's above statement; the tortures continued and even got worse. But eventually stopped. By that time I had been beaten for perhaps 15-minutes, un-stop. The beatings stretched over possibly 50-miters or more (from cell 108, see supra 25) to the O.C. during which I was truck more than 150-times

## A. STATEMENT OF CLAIMS:

CLAIM SEVEN: VIOLATION OF MY FREEDOM OF SPEECH/FIRST AMEND. AGAINST OFFICER BRUSH:

85- I hereby re-allege and incorporate by refrance allegations 1-44.

86- BRUSH came to me at the O.C. where I was left for several hours after the beatings, and said to me behind the glass door "I am not finished (or he said "I am not done) with you, I'm gonna kill you, and I saw your journals, and manuscripts and other shits in your cell, trust me, everything is gonna be in the trash", or some statements with similler meanings.

87- Few hours later when I was escoted back to my cell, it found it's virtually empty. BRUSH had removed from my cell almost everything. He did that even before the above described beatings that he initiated. See supra, 17. Among the materials that BRUSH took from my cell, are include but not limitted to:

88- MY DAILY JOURNAL or Diaries: In 12-note books, starts from late 2001 hrough August 2018 just a day or two before BRUSH took them. I spent between 5 to 45 minutes daily, depending on the quantity of materials to write and my health... I wrote about my daily life in prison and whatever important events that I heard or read from the media, with short comments or backgrounds.

89- MANUSCRIPTS: at the time, I was working on two large manuscripts, The larger one was already 900-pages long, yet, unfinished. This was about the concept of peace and tollerance between the three major Religions: Islam, Christianity and Judaism... throghout their respective scriptures and history.

90- Onother manuscript, also unfinished, was Qur'an translation into "Swahili", my native language. The text was complete, about 550-pages, but when BRUSH took, I had just recently statted the commentary, with 200-pages. I had started to work on the Qur'an translation about 10-year earlier. I revised the text twice.

91- The third manuscript was complete. This was about the "slavery" throught the history. I revised the manuscript. It was about 450-pages.

92- These manuscripts along with shorter works that BRUSH took, were the result of many years of reading, studying and collecting. The manuscripts along with my above refranced journals that BRUSH took from me, were the most umportant and the only material achievement that I have worked so hard and so long to acqvire in my intere life. They are irreplaceble.

93- Onother valuable item BRUSH took were my notes; a summary of between 130-150 important books that I have read previously.

94- BRUSH also took number of books that survived with everything he took fom my cell, the shake-down of 8.19.2018, see infra, these include-de, but not limited to (1) Mavsuvatul-Hadiyth (2) N-Awtar, (3) Shachv-Muslim (4) Bidaa-yah wannihaayah (1-of 2-volumes) (5) Qamus Al-Mvhiyt (6) Al-Mvghniy (7) Tafs-Ibav Atiyyuh, Ibnu Kathiyr and Fat-hul-Qadiyr...

-25-

**95-** Each of these books was in a single or double valumes, but originally was in several vulumes. mostly religious, and each was important and expensiv.

**96-** Each of these stollen materials was taken by BRUSH from my cell, each was clearly marked as belonged to me with my name and initials, and registration number... etc. manuscripts, journals and notes, were in three different folder; each holding the above identification information, and each was in my hand-writing. The journals also hard each the starting and ending dates. (In every H·st, I pack and mark my materials as such for easy identification by the staff who often inter my sell for the removal of food/drinks items)

**97-** No officer or staff could ever mistaken my materials for trash or any thing else unimportant, because each was clearly packed and marked as described. BRUSH must have maliciously and intentionally targetted them.

**98-** Few days after the removal of materials I submitted written request to correctional counselor, insisting on my materials, especially. my journals, manuscripts and notes, stating that: they must be kept for me, and if I'm not allowed to keep them, I'll send them out of prison. The counselor responded by stating that: every thing will be kept in the storage untill I come off my H·st.

**99-** After I was told that my material cannot be found after my H·st, in October, 2018, I sent several written requests asking any and all help to find my material:... The requests included, but not limited to; the ADX's warden, the unit team, the property officer, and Lt, and an SIS staffmember.

**100-** I also filed an Administrative Remedy on the above materials. The warden's and subsequent responces carrys: false and incorrect findings, that: the effoct were made for me to identify my materials... See EX. 2    . That is clear and intentional lie. The discovery will show my countless efforts to get my things back.

**101-** Before I ended my H·st, and right after it, few items were & returned to me. These included: 2-valumes of Arabic-Bible, English Dictionary, bunch of Old Admn. Remedies, 3 or 4-Religious books, photo album, prayer rug, pair of shoes, shower sleepers, a t-shirt,... and some 17-or 30, soups.

**102-** Besides the above expensive materials that BRUSH took from me; he also took other items include but not limited to: few shorter works/researches, personal clothes, legal and religious materials, cosmetic, all writing and postage materials, all dental materials, toiletries... and every thing. He even took the cup of water I used to drink with. He also stole all books and commessay recepts. I spent for almost a week with no toilet paper, tooth paste, tooth brush, soap... and a cup to drink water with. He only left in my cell a matcess, a pillow, and blanket.

**103-** The material officer BRUSH stole, including: journals, manuscripts and notes, had previously survived all H·st's, and shake-downs, including the Large shake-down of 8·19·2018, 4-days earlier. That organized shake down confiscated majority of my books claiming to be "contraband" but never touched my above materials!

104- The BOP has no remedy for recovering damages arises from such materials related to the First Amendment, such as journals, manuscripts, and notes. The small claims program, (small Tort) only covers to $1000.00 damages. As stated above, supra, 102. BRUSH even stole my books receipts. I managed to get few receipts, form the bookstore, and filed that with my claim, but even with receipt, the BOP, refused to pay anything... My journals, manuscripts and notes, are price-less... BOP don't have remedy for such First Amendment guaranteed rights.

105- BRUSH's confiscation of my materials, was motivated by evil intent, malicious and harassment against me. There was no single reasonable relation to any legitimate penelogical interest... with such confiscation. As stated, see supra, 103; all the materials BRUSH maliciously stole, were left untouched 4-days earlier. And several of ADX's senior staff told me, that: BRUSH lacked any rational reason in removing and apparent destroying of such materials. One of the staff who told me this, is the case manager who led the shake-down of my cell in 8.19.2018. The case manager and his officers, saw the materials but didnot touched them, because posed no threat, and there was no reasonable pelogical interest in confiscating them.

106- In removing and apparent destroying my materials, BRUSH also knowingly and intentionally, violated a number of BOP's own policies. See infra. 138-a.

107- Later, in the evening of 8.23.2018 I was given an incident report for "attempting assault" against BRUSH. BRUSH fabricated the incident to justify the above described crimes against me. See supra 1-84.

108- I was later found "guilty" for attempted assault, by the ADX's disciplinary officer... The statements used to find me "guilty" were of the staff who themselves, may be found guilty in assaulting me... Subject to the discovery determination. BRUSH, MILLER and Baca, each fabricated report that was used to find me "guilty". BRUSH and MILLER, both initied and advanced the tortures of 8-23-2018 against me. The discovery will reveal Baca's role in that attack. He was the third unit officers in that day, see supra, at. 10. About a year since I was tortu-red, Baca apparently, based on prisoner's conversation with me, participated along with ESPANOZA to beat up that prisoner after tieding him on 4-points... several of his ribs were broken as result. Baca and the rest of the "witnesses" whose state-ment's were used to "convict" me, through the discovery, they might be revealed as BRUSH's assistants in the crimes against me that day.

109- The disciplinary process that convicted me was rigged. The staff representa-tive was bias, and fabricator, who fabricated my witnesses' statement. She was impo-sed on me, after my own picked staff representative were both disqualified.

110- Before the fabricated incident report of 8.23.2018, I had more than 12-years of clear conducts. I've never been disciplined for assaulting any ADX's staff prior to that fabrication.

111-when I was waiting for my trial at the MCC, N.York in 2001, I was maliciously and sadistically beaten by even larger group of correctional officers who were led by captain Aponte, Lt. Carrino, and counselor Santiago. I was tied on 4-points on a bed and beaten for several hours... Among the injuries I sustained, we include but not limited to fracture of my eye-socket and broken nose... I was hospitalized for 10 or 11-days.

112-After that event, as in this present case prison staff fabricated a case against me to justify their own crimes. I a separate case and without me being present or represented, the court concluded that I had committed two acts: grabbing a radio from an officer and covering a camera. See U. states v. Salim, 287 F. Supp.2d, 250, 294 (2nd Cir. 2005).

113-The court's conclusion was based on another prisoner's statement on my absent. I have denied those allegations and all others surounding the case. I've similarly denied the BOP's disciplinary charges and findings arised from the same case.

## PHYSICAL INJURIES:

114-The attack of 8.23.2018, left me with several serious and parmanent injuries. The injuries I received includes but not limited to: during the assault and shortly after it, my body was full of lacerations, bruises and abrasions acompanied with deadly pain. My left wrist to this day, almost three years later carrys scars that replace the painful injury caused by the officer's using of the handcuff as a device of punishment in manupulating my wrists and jacking me from back on the ground and as they violantly escoted me to the OC. See Supra 34,40. These short time injuries some took up to two weaks or so to heal.

115- My ankle and wrists, all were swollen. I thought initially all were broken, because BRUSH and his colleges made a concerted attempt to break them. Supra 34; my jaws also were badly targeted. In the first two months, the pain on my wrists and jaws was 8 out of 10. Few hours after the assault, my nose violently stated to bleed; the bleeding came down after 2 or 3-days.

116-The permanent physical injuries continue to this day, include but not limited to, pain and swelling of my right ankle, pain on my wrists, jaws and periodically, but some times, heavy bleeding through my my nose.

117-The medical staff desregarded my complaining of pain on my wrists and jaws and multiple requests for an x-ray. The x-ray of my wrists and jaws were delayed untill 10.18.2018, almost 2-months after the beating. I was told, the result were normal... However, the pains continues.

118-My right ankle was injured with an "acute fracture". The x-ray was only conducted on 8.31.2018, 8-days after the beatings. The medical staffs' actions and inaction that followed, shows the high extent of their deliberate indiff.

D. STATEMENT OF CLAIMS:

119- On 9.3.2018, JONES told me: x-ray shows "twisted muscles". Next evening, 9.4.18, came with splint and a wheel chair... saying: my leg was fractured. He also said, in the coming few days a an orthopedist will examine my ankle. On 9.12.18, Dr. Oba replaced the splint with hard cast. When I asked him about the orthopedist JONES had previously mentioned, Dr. Oba said: he looked into my x-ray and told Oba to put cast on me. He said that, the orthoped said: the cast must stay on me for 3-weeks, then remove it, x-ray again, if not healed, put second cast for another 3-weeks, remove the cast, x-ray again, if not healed, the surgery must follow.

120- After the cast was put on me, I was then x-rayed on 9.25.2018 with the cast. On 9.26.18 JONES told me: the fracture was there, unhealed. On 9.30.18 I received OSAGIE's paper work on the recent x-ray, stating "partial healing". On 10.23.18, second x-ray, again, with the cast taken, and the x-ray techician told me: the previous x-ray had missed some details... On 11.2.18, I received OSAGIE's another paper work on the second x-ray, which I assumed was saying "continue to heal" (his handwriting wasn't that clearer to me).

121- After 3 or 4-weeks, the cast was not that effective; old, loose, stinks... etc, but was never changed. It stay on me till was removed for the first and last time on 11.16.2018. On this day, the wheel chair also was taken from me.

122- OSAGIE removed the cast on 11.16.2018. My ankle was very much swollen almost as it were the day the cast was put on me, 2+ months prior. The pain was also very high. I asked OSAGIE for any physical therapy follow up, or any other help, but he said: I didn't need any. On 11.18.2018, I submitted a sick call for the terrible pain on my ankle and wrists. On 11.20.18, my ankle was x-rayed again. On 12.6.2018, a medical staff came in response to my sick call. He issued me 14 Ibuprofen tablets, and said: he'll give me a steriod shot after two weeks. He never came back. Those 14-tablets were the first pain medication given to me since I was figured on 8.23.18.

123- On 12.23.18, I sent a cup-out/request to Dr. Oba, complaining about the ankle and wrists pains. On 1.9.19, P.A Saroski sees my swollen and painful ankle and hears my complain of pain in ankle and wrists... She told me: I must learn to live on those pains, they might never goes away. She refused my request for pain medication and told me that: I must get from the commissary... I told her, I've tried all commissary medications didn't work. But she refused any medication for me.

124- The pain continued. And on 2.19.19, a nurse refused to give me a sick call request, stating, I must get when P.A Saroski makes her rounds. Saroski, never made round in the next 2-weeks. She eventually made in 3.6.19, but she said: she didn't have sick call request, I must write in regular paper (previously said: I can't).

125- I finally was seen by Dr. Oba in 4.23.19. He finally prescribed me with sulindac 200mg tab. for pain. He also issued me a compression garment/sock for the swelling. Sulindac was replaced by meloxican 7.5 mg. in 4/2020. I'm now since 4/2021 on sulindac again.

19-

## EMOTIONAL AND MENTAL INJURIES:

126- The assault of 8.23.18 against me and the loss of my materials left me with high level of depression that I never experienced before. The excessive ~anx~ anxiety, fear of prison guards, lack of concentration, poor memory, dessapearence of desire to interact and associate with others, enjoyment of doing things that once I enjoyed..., poor sleeping, almost daily night mares that depict me violent acts of 8.23.18 against me...etc, are only some of my new normal that I'm forced to live with.

127- My life is full of shame and humiliation and the feeling of failure to accomplish any thing after the humiliation of 8.23.18 and the huge loss of every thing that I have worked for almost 20-years. These feelings are so serious that have forced me to seriously consider to end my own life. I have tried to contact some religious authority who may provide the necessary Islamic ruling that justfy the ending of my life.

128- Since Oct., 2019. I have been prescribed with Citalopram 20 mg. tab. for my depression. I'm on 40 mg, now. Also, in march 2021, Mirtazapine, has been added. I am now on the above Citalopram and Mirtazapine 45 mg. tab. I was also told that I'am suffering from the PTSD.

## CLAIM EIGHT: DELIBERATE INDIFFERANCE AGAINST JONES:

129- I hereby re-alleges and incorporates by refrance the above allegations .114-128.

130- JONES, a nurse, came with the "force team" and a camera to perform the medical assessment ("M.A.) related to the beatings, after the beatings stopped in O.C.

131- JONES's M.A. was superficial, not real. I complaint to him infront of the camera about the substantial and excruciating pain all over my body, and especially my right ankle that was already and obviously swollen to about ½ of an orange size in either side. JONES noted the swelling and said he'll comeback.

132- JONES cameback about an hour later without the camera. I complaint to him again as I did previously and even more. I told JONES that I believed that my leg/ankle was broken, I couldn't walk due to the excruciating and substantial pain, and that I needed an x-ray to check my jaws, wrists... and especially my ankles. JONES refused all these and other requests. He said, the swelling will go away by themselves from my ankles. He refused my request to see the ADX's doctor or even the P.A, just as he refused me any pain medication or even a bag of ice.

133- JONES, even though my injuries and symptoms, including the swellings of my both ankles, my wrists, one side of my face, cuts by handcuffs on my left wrist, lacerations, bruises and brasions on my whole body..., he refused to exame my injuries. Responding to my excruciating and substantial pain complaint, JONES told me "Mohamed, you must take your trays, this would be alot easier if you eat". The he left. I never saw JONES taking any notes in neither visit.

**STATEMENT OF CLAIMS**

**134**- I also asked JONES when he cameback to me in the O.C. to assess me for my H.st. JONES said that, the medical staff are aware that I was in H.st, and have already missed 11-consecutive trays, but he was only asked to assess me for the use of force incident, not H.st. However, I did complained to JONES about my then, worsening H.st. symptoms. See supra.9., but he equally, egnored my complaints

**135**- The injuries sustained and their symptoms, along with my worsening H.st, were very obvious, serious and substantial, easy noticeble and recognizable by anyone who saw them, see supra.15., regardless whether he's a medical professional or not. Further, JONES, as HUDDLESTON, knew that the force ~~used~~ was used against me... and in the use of force, the injuries, often, substantials, are to be expected.

**136**- JONES' and the ADX's medical staff refusal to assess me for my H.st, that day despite them being required to do so by the BOP's Program Statement, was an attempt to avoid any medical record that would indicate that I was beaten when I was very substantially weak in H.st. Furthermore, JONES's that day and his, HUDDLESTON's and OSAGIE's subsequent refusal to exame my substantial and obvious injuries, denial of giving any pain medication, and ordering an earlier x-Ray,.. were motivated by, but not limited to their effort to avoid making any record of my substantial injuries I sustained from the 8.23.18 attack, and also, wanted to punish me for my being in H.st, and therefore, used my obvious, serious and substantial medical need as a tool to force me out of the H.st.

**137**- JONES also saw me in several more time for H.st. M.A. In each, he totally refused to assess my injuries, provide pain medication, refer me to the doctor, or even issue me with an ice bag to reduce my ankle's pain; On 8.27.18, JONES led HUDDLESTON on H.st. M.A. on me. JONES, saw me hobbling my way to cell door, cell #406, while my ankle was un socked, obviously exposed to show them the seriousness and substiality of my injury. My right ankle was swollen to about 75%, of an orange size, while my 4-small toes were almost black and obviously and substantially swollen to about 3/4 of an inch. I complaint about the excruciating and substantial pains, and that I can't sleep, pray or walk, and that I wish I kill myself... I asked for pain medication or at least an ice bag, an x-Ray and to see the doctor. JONES however, refused each of my request and he even to look at my injures, he only conducted H.st. assessment. He told me "once you eat, we'll exame you."

**138**- JONES also led M.A. for H.st, on 9.3.18, 9.5.18 and participated several more in each, he refused all my serious and substantial medical need.

**139**- Unrelated to JONES' inaction, I received x-ray on 8.31.18. On 9.3.18, JONES told me, x-ray shows "twisted muscles", no fracture. On 9.5.18, after assessing me for H.st. in the morning, cameback in the evening with a wheelchair and applied a splint on my ankle saying x-Ray shows I sustained a fracture. But he denied me pain medication or ice.

D. STATEMENT OF CLAIMS
CLAIM NINE: DELIBERATE INDIFFERANCE OF HUDDLESTON

140- Ihereby re-alleges and incorporates by refrance the above allegations, 129-139.

141- HUDDLESTON, a nurse, conducted the first H.st. assessment in my cell on 8.26.18. He saw me nabbling in excruciating pain, while my ankle was naked exposed with an obvious and substantial swellings, as I was telling him I can't walk, pray in reguler position or sleep, due to the excruciating and substantial pains on my ankle and to a less extent, other areas of my body. I begged HUDDLESTON for an x-ray, pain pills or ice, or at least reffrral to the doctor, however, HUDDLESTON, even though aknowledge that he was aware that the force was used against me few days earlier, he absulutelly refused even to look at my obvious, serious and substantial injuries. He told me " I'm here to do the H.st. assessment... Any treatment for your injuries that you want, that will come...after you come off your H.st. That's all we care about right now.

142- HUDDLESTON apart from hearing my complains about the substankal pains, and that I wished I kill myself due to the unbearable pains...etc, he witnessed the obvious, serious and substantial injuries on my body including swellings and other injuries and symptoms stated ealier, see supra, 133, 137, and he admitted that he knew that the force was used against me...

143- The injuries and the symptoms... that HUDDLESTON witnessed, all were so obvious, serieos and substantion and easly naticeble and recognizable by any one who saw them, regardless if was a medical pofessional as HUDDLESTON or a layman!

144- HUDDLESTON saw me in other occassions often with JONES or OSAGIE. Each time they refused to treat my injuries. This includes 8.29.18, 8.31.18 and 9.3.18.


CLAIM TEN: DELIBERATE INDIFFERANCE AGAINST OSAGIE

145- Ihereby incorporates by refrance allegations 75-84, and 114-144.

146- OSAGIE ordered me to be escoted from cell 604 upper to medical room downstairl for H.st. M.A. OSAGIE witnessed my uncovered, obvious and substantially swollen right ankle, observed my crying-in-pain face, and heard my complains about the excruciating and sabstantial pains on my ankle, wrists, jaws and other eceas of my body... I told him that because of the pain I couldn't walk, pray in reguler way or sleep... and that I wish to die. However, OSAGIE only performed the H.st. assesments and absolutelly declined to look at my injuries, which were obvious any way and to any one, order for an x-ray, issve pain medication, or even a bag of an ice. OSAGIE wanted me to come off H.st, in order to get treatments, including an xray...and said " everything will be allright if you eat?.

147- After the M.A. under OSAGIE's order, I was tightly strapped and tied will leg cuffs right on broken ankle on the wheelchair, and then pushed to the medical unit for me force feeding. After the feeding, OSAGIE ordered me to walk back and forth with the heavy leg cuffs on my painful ankle. I told OSAGIE that I couldn't

-122-

walk, but OSAGIE insisted, even though he and every one present could easily observe my crying face due to the pain I was in. For fear of being beaten again, I had to walk and obey OSAGIE.

148- After the walk, I was once again trapped in the same previous manner, and then I was left in the same fixed, excruciating position for about 2-hours.

149- On 8·31·18, OSSAGIE and HUDDLESTON assessed me for Ht. st., and then OSAGIE and his collegue, again refused me all my previous requests, even though my ankle now was almost swollen to 90% of an orange size...

150- I was then strapped in the same previous manne, supra. 147, and pushed on the wheel chair to the medical unit for another force feeding. In this day, I repeated my injuries complains, especially my ankle... stating that was broken, I need x-ray... etc. OSAGIE, initially refused again, now claiming that I had been already assessed on the injuries, which I denied.

151- After that, OSAGIE forced me to take walk again, and rejected my statements that I couldn't walk, see supra. 147,... and I had to obey him again. My face was clearly full of crying-in pain, OSAGIE and every one else, observed that.

152- After the forced walk, OSAGIE very briefly, pretended to exame my right ankle... The whole process lasted in few second. He then ordered an x-ray.

153- My injuries, especially, my right ankle, were so obvious, serious and substantive, and any one, whether a medical proofessional or any one else, would easly notice and recognize my serious and substantial medical needs: I couldn't walk except with extra ordinary hardship, the swelling was so obvious and extentive; my face, especially during walking express the excruciating pain; I complained; I was subjected to use of force... Each of these needed no special/medical training to be identified as a symptom or indication of a serious medical need.

154- OSAGIE didn't infact exame my ankle after I complained infront of the camera. He pretended as such for the later-camera reviewal. He; nor any one, needed to exame my ankle; the injury were obvious, serious and substentive, noticeble to every one. He as with JONES and HUDDLESTON, knew all along, that I faced substantial risk of serious harm. OSAGIE ordered an x-ray. He could have done it long time prior.

155- After OSAGIE ordered an x-ray, he again recklessly, ordered me to be trapped in the previous manner, supra. 148. After 2-hours of excruciating pain, I was x-rayed. After the x-ray, I was forced to walk back to c-unit, possibly 300-400 mitters away, limping my way to the unit. I couldn't refuse, because I knew I could be beaten again.

156- After the above forced walking, my ankle pain and swelling got worsen in the next 2-days, forcing me to cry in excruciating pain as I never did before.

157- In 9·3·18, OSAGIE warned me in my cell, not to complain again on camera, or write to superior staff... He said, he didn't want to see me going through more problems... I didn't complaint again for fear of another beatings. OSAGIE saw me several more times, but refused to give me pain medication... Only once, ordered a bag of ice for my ankle.

D. STATEMENT OF CLAIMS

CLAIM ELEVEN: BATTERY AGAINST THE UNITED STATES: Based on the Attack occured outside my Cell #108, and on the Ground:

158- The defendant, the UNITED STATES OF AMERICA ("the 'U.S') is liable under the Colorado law, because: its agents inflicted on me an intentional, wanton and willfull harms: Officer BRUSH initiated these attacks in the area between Cell #108 and 109, by aggressively smashing my head multiple times against the wall,.. supra. 25. The smashing was harmful, coursed excruciating pain, at. 28. BRUSH and other, likely, MILLER, then punched and kicked me and also spate on me. at. 29. Thereafter, possibly 10-or more officers took part in wantonly and willfully punching and kicking me, and spitting on me. They attacked me all over my body, at. 31. BRUSH also willfully and wantonly, placed his working boot on my neck to my jaw...and then aggressively, pressed his boot...resulting to more harmful pains, at. 32. Due to the aggression of BRUSH act, he deprived of breath at one moment... I couldn't breath, at 33. Brush and others tried to break my limbs and toes...resulting to more harmful pain. at. 34. BRUSH and other officers also, verbally threaten and abused me. BRUSH told me "we gonna fuckin kill you..." "scream louder bitch, this's America, not an Iraq or Afghanistan" or similar statements. at. 36. I was possibly beaten in that place for several more minutes; at. 38

CLAIM TWELVE: BATTERY AGAINST THE U.S: Based on the beating occured After I was made To stand up, in the Way Towards the O.C:

159- After the above beatings and abuses, supra. 158, I was violently made to stand up and walk... Now, officers willfully and wantonly and intentionally, continued to beat me... They also, intentionally jacked me up by the handcuff from behind, using the cuffs as a tool and method to harm me with...They again harmed me through excruciating pain and cuts on my wrist. supra, at 40. I couldn't walk right, they forced me to walk as they beat me and spate on me. at. 41. As I was walking towards the O.C; Lt. MURTON, verbally abused me... He also ordered more beatings on the way because I couldn't walk straight and I refused to be silent, at. 60-62.

CLAIM THIRTEEN: BATTERY AGAINST THE U.S: Based on the Beatings Occured inside the O.C:

160- As I was being pushed into the O.C, Officer MILLER willfully and wantonly hit me on my face multiple time. He did it intentionaly and with great effort. Supra, at. 55. Lt. MURTON gave orders on how to beat me in the O.C, as he verbally abused me: at. 65-66. In the observation cell, officer ESPANOZA also, willfully and wantonly hit me on my face, at. 66, 73. ESPANOZA and others also beat me, spate on me and verbally abused me in the O.C, at. 72, 74. ESPANOZA also willfully and wantonly pulled my beard and ears, causing more harms and humiliation. at. 73.

-24-

CLAIM FOURTEEN: NEGLIGENT SUPERVISION, AGAINST THE U.S. Based on Lt's, Armijo's and Murton's Actions and Omissions:

162- Each of the two Lt's, due to his official status was both, the duty to legally supervise the lower officers, and the legal duty towards me... Both Lts, wilfully and wantoly breached those duties. As a result, the tortures against me were much prolonged and harmful: Both Lt's, witnessed the tortures against me, Supra. 46. After I saw them, I made my crying louder, expecting them to stop the beatings, but they didn't. at 47. Each of the Lt's, saw me being attacked, while limping, fully restrained, and each heard and saw me begging for their intervention..., at 48. Lt. Armijo, was Lt. incharge of the unit operations on 8-23-18, at 50. Armijo, lied to me to avoid his legal duty. at 51-52. Lt. Murton, supervised the tortures on me, at 59, 65, 66. He also verbally abused me, at 60, 65. Murton, ordered me to beaten more because I couldn't walk straight and I couldn't remain silent, without crying out... at 61-62.


CLAIM FIFTEEN: NEGLIGENT PERFORMANCE, AGAINST THE U.S. Based on Actions and Omission of Jones, Huddleston, and Osagie:

CLAIM 15-A: The Intentional Failure to Diagnose my ankle injury for 2-weeks: 162- I was injured on 8-23-18. But the x-ray was ordered on, 8-31-18, Supra, 139, 152. The diagnose was made in 9-5-18, at 139. This 2-weeks delay was intentional: Each of the 3-medical staff could have ordered earlier x-ray, hence, produced earlier diagnose, but each willfully and wantonly declined to do that: JONES saw me minutes after the beating stopped, saw me obvious symptoms, heard my complains but refused to order an x-ray... or even look at the injuries, at 131-133. My injuries were so obvious,.. noticeble to any one, medical or non-medical professional, at 135. Each, JONES (at 133) HUDDLESTON (at 141), and OSAGIE (at 146) made statements that indicates the motive of the early treatment/diagnose was my H.st. HUDDLESTON also, witnessed my obvious and substantial injuries, and heard my complains, and, he knew that forced was used against me..., but he refused to do any thing to get the diagnose earlier, at 141. The injuries he saw on me were obvious to medical proffessional to a lay man, at 142-43. OSAGIE saw my injury and crying and heard my complains, but repeatedly acted with high level of reckless... at 145-51. OSAGIE didn't actually exame my ankle on 8-31-18, because the need of x-ray was obvious to anyone he simply ordered for an x-ray. at 153-54. The delay of diagnosed caused huge injury through unnecessary pain and possibly, prolonged it

CLAIM 15-B: Intentional Deprevation of Pain Medication, for almost 8-months: 163- Each of the 3-medical staff, willfully and wantoly refused me pain medication. Supra, 162. Each recognized and saw my serious injurie, at. 131-57. The only pain medic. given to me before April 2019, was 14 Ibuprofen in 16-6-18. I made all efforts to get pain medic. before April 2019, but ADX's-medic-staff refused or were unresponsive... at 121-25.

## STATEMENT OF CLAIMS:

### ADDITIONAL FACTS:

164- When I was in H. st. and in need of pain medication, I put repeated commissary requests for pain medication and other stuff, but I never got the medication.

165- After the H. st. I got pain medication from the commissary, sometimes purchased by other prisoners for me. But non if these medication helped my pain. Among the medication that I got from commissay were : Ibuprofin, Aspirin, and Naproxen Sodium 220 mg. Non helped, and I told medical staff but kept refusing prescribe me pain medication till April 2019, see supra. ¶21-125.

166- In previous hunger strikes, and even in that one of 2018, I was allowed to use at least some medications, The medical wouldn't take my medications which I almost always hapened to have in my cell. In that H. st. even though the medical staff refused to provide me any pain medication, they gave me a milk of magnesi, laxative for my constipation.

167- After the 2018 H. st. I have at twice gone on H. sts. and in both I continue to keep and used all of my medication, including the pain medication that was first prescribed for me in April 2019.

168- Right after I was injured in 8-23-18, I also complained about my substantial and obvious injuries to the unit staff. This include, but not limited to, Ms. Torre, the then C-unit correctional counsel. I spoke with her in the following morning. of 8-24-18... I told her that I'm full of pain and I thought that my legs and hands are broken... and I need pain medication and be examed by medical staff. She saw me limping in pain toward the cell bars to show her the substantiall and obvious swellings on my legs, hands and one side of my face... I also showed her the cuts on my left wrist, caused by officer's mis-used of the hand cuffs. Supra 40. Noticing the obvious injuries, especially the substantial swellings, she asked me whether I was x-rayed, to which, I said no. She said she'll contact the medical because she think, as she put it "those swelling must show that something is really wrong". She said, she think I need an x-ray, and don't know why I haven't got one. Also, at the evening of that day I asked the unit officer to contact the medical for the same stated reasons. Later, the officers told me that I'll be moved to cell#406. See supra: 1. When they opened my cell door, with them a fimale Lt, I told them I can't work to upstairs of B-range due to the pain. when the officers observed my obvious injuries, especially the huge swellings on my legs, they asked whether I got any pain medication and x-ray. I said: No, they said, they'll call the medical, they said, because obviously I needed x-ray and pain medic. but insistes: I must walk to cell# 406, because even though obviously I'm injured, medical didn't provide them any memo indicating that I can't walk.

169- To this day, due to unhealed fracture on my ankle, I can't prolong my standing prayers, jog, seat in certain positions, jump with my right leg ...etc, without experiencing serious pain and risking to trigger a fresh fracture. I don't believe that my fracture was healed during the cast removal and I know, the cast was too old to be affectived. d. ¶119-121

CAUSES OF ACTION: RIGHTS VIOLATED BY THE DEFENDANTS:

- EXCESSIVE FORCE CLAIMS: Claims: 1, 3 and 5. against Brush, Miller & Espanoza:

170- Officers, BRUSH, MILLER and ESPANOZA, individually and collectively, violated my 8th. Amendment right, by inflicting on me cruel and unusual punishment; through maliciously and sadistically using physical excessive force... The force used was unnecessary and excessive; the officers knew that I was weak and in Hist., Supra.10.15. They attacked me without prior warning, nor need, at 25, I was not resisting, at 27, and at all times of the attacks, I was in full restraints, at. 22, 30. Furthermore, they made huge efforts to heat me on face, at. 55-59, pulling my beard and ears and attacked me in other means, at. 72-74. These and the rest of the attacks left me with substantial physical and emotional injuries and pains; at. 114-124.

171-The three officers along with others and Lt. MURTON, also knowingly violated several BOP's own regulations. These include but not limited to; Prog-Statement, No: P5566. 06. (ef. 11.3.2005)" USE OF FORCE", Ex. 5," the BOP authorize use of force as a last alternative." and "staff must only use that amount of force necessary." Id, at 1. And "force will...be used only when attempts to gain voluntary cooperation...have not been successful" Id. 2  a.b. The officers should have used "calculated use of force" because I was in secured area. Id. 4.  b. page, 6. But they violated this policy, because they premeditated the attacks on me. See also; other violations, Id. b.  a., b., pp. (1) (3). also at.14  c, Pg: 23 (vedeo taping the use of force). They also, violated Pr. stat. No: 3420.11. (.12.6.2013) " STANDARDS of Employee conducts" by using physical violence, threats...and "profane...abusive language... and brutality...on me, EX. 2 at 5  c. (page.2)

 - FAILURE TO INTERVENE CLAIMS: Claims, 2, 4, and 6. V. Acmise, Murton and Osagie:

172-ACMISO, MURTON and OSAGIE, violated my 8th. Amendment rights; right to be free from cruel and unusual punishment, each had "a concomitant constitutional duty to protect me from such harm" Hudson v. McMillan. Each of these "three, had "realistic opportunity" to stop further violations of my right, but failed to do so. Each watched the attacks on me and murton. organized them. Supra, at. 46-51, 59-62, 65, 76-84. Each of the three was in a supervisal; senior position, and could easly stop the abuses. Their choice to stand-by and perticipate in the abuses, prolonged my sufferings and injuries.

173-The two Lt's also knowingly violated BOP's program stats, see Ex. 5, at. 15. a. page. 24-25 (stating that Lt. must "display professional behavior..." and "ensure only the force necessary to control the inmate is used...")

174-OSAGIE was one the most influencial ADX's staff in dealing with muslim prisoners including my self. I have witnessed him in many occassions overriding others' judgments.

 - DELIBERATE INDIFFENCE CLAIMS: 8, 9, and 10. V. Jones, Huddleston, and Osagie:

175- Each of these three defendants violated my 8th. Amendment right by acting with deliberate indifferent manner towards my substantial and serious medical needs. Each, even refused to exame my injuries, even though they were obvious and I have complained to them about those injuries. Supra at. 131-37, 140-44, 146-57.

176- These defendants' deliberate indifference resulted to substantial harms and damages. This includes but not limited to: the delay of x-ray, resulted in to delay of diagnose. For two weeks, I was force to make long walks (up stairs-down stairs in med assesment), forced to walk to distance cell, at 168, forced to walk and trapped with chains for hours, forced to walk back from medical unit, limping perhaps 400 mitters, forced to walk within my cell... for 2-weeks ...without a wheel chair, splint or cast... All these unnecessarily increased me excruciating pain, and increased the undiagnosed fracture to be more clearly and to prolong the healing process... to this very day. See Injuries, at 114-125.

177- When JONES came to my cell with the wheel chair and splint, at 139, he said that the Orthopedist, said the officer should no longer strapp my ankle until the hard cast put on me, because the strapping increase the injuries. From now on, I was always moved through a wheel chair... But these only came after 2-weeks of intentional unnecessary deadly pain... The 3 of defendants also violated my 8th Amend. by refusing me pain medication for almost 8-months, supra, at 119-25. Also, they violate B.O.P.'s prog. statement.

- FREEDOM OF SPEECH CLAIM: CLAIM 9. Against BRUSH:

178- BRUSH violated my 1st. Amendment right of the U.S. Constitution that forbid & abridging me freedom of speech, or of the press. BRUSH's actions were motivated by evil intent, at 86, 105. His action had no reasonable correlation with any penelogical interest. Id. BRUSH's actions against my materials left me with irreplaceble loss and damages and caused me to suffer a great deal of emotional and mental pain and damages.

179- BRUSH also knowingly violated BOP's Pr. stat. see EX. 8 (inmate personal property) at 5(b)(2)(i) through (v) (stating the policy on contraband... inmate must be provided with envetory list, given oppurtunity to identify his material, chance to send them home... and in case material destroyed, staff will documents the materials and reasons for such destruction...) BRUSH never did any of these requirements. BRUSH also violated Prog. stat. of Hunger strike, see EX. 6 at 9. C. (stating that staff only remove any commissary food items... during H. st. "inmate may still purchase noon food items...). BRUSH took my precious materials and every thing else. at 102-103. BRUSH also violated Prog. stat. on inmate manuscripts, EX. 9, at 6-8 (stating that inmate is allowed to prepare...and send out and publish manuscripts) BRUSH stole myne. at 89-92.

- BATTERY CLAIMS: CLAIM 11-13. Against the United States of America.

180- The U.S is liable under Colorado law because its agents intentionally, willfuly and wantonly attacked me... at 158-160. And caused long time and irrepeable harms, damages and injuries. See the injuries, at 114-128. The officers, repeatedly, verbally expressed their evil intents... See example at. 36, 60, 65, 72, and 74.

- NEGLIGENT SUPERVISION AND NEGLIGENT PERFORMANCE CLAIMS: 14-15, V. U.S:

181- The U.S. is liable under colorado law because the 2-Lts (claim 14) and the 3-medical staff (claim 15) had legal duty of care and supervising others, respectively. The Lts breach of the duty, prolonged the harm on me... supra at 161. The 3-mediss, breach of the duty caused and prolonged the harms and injuries at; 162-3. The injuries were foreseeble, and my conditions were obvious equally to medical professional and lay men; at; 168, 135, 143, 153.

**E.   PREVIOUS LAWSUITS**

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated?  ✓ Yes ___ No (*check one*).

*If your answer is "Yes," complete this section of the form.  If you have filed more than one previous lawsuit, use additional paper to provide the requested information for each previous lawsuit.  Please indicate that additional paper is attached and label the additional pages regarding previous lawsuits as "E. PREVIOUS LAWSUITS."*

Name(s) of defendant(s):            Erick Holder, et al.

Docket number and court:          07-cv-02697-MSK-GNB

Claims raised:                              Several Constitutional claims

Disposition: (is the case still pending?     Trial, partially relief, granted
has it been dismissed?; was relief granted?)

Reasons for dismissal, if dismissed:       _____

Result on appeal, if appealed:               _____


**F.   ADMINISTRATIVE REMEDIES**

*WARNING: Prisoners must exhaust administrative remedies before filing an action in federal court regarding prison conditions.  See 42 U.S.C. § 1997e(a).  Your case may be dismissed or judgment entered against you if you have not exhausted administrative remedies.*

Is there a formal grievance procedure at the institution in which you are confined?

          ✓ Yes ___ No (*check one*)

Did you exhaust administrative remedies?

          ✓ Yes ___ No (*check one*)

29

## G.    REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "G. REQUEST FOR RELIEF.* wherefore, asking the court to grant me the followings:

A- Issue injunction order to Jones, Huddleston and Osagie (claim 8-10, offic. capacities) to arrange immediatelly for me to be examed by an expert in broken bones, and follow his recommendation on treatment, including suggery.

B- Immidiatelly arange for psychiastrist to evewate and treat me for the PTSD, etc.

C- Issue an injunction, ordering Brush (claim 7, offic. capacity) to immidiately locate the material he confiscated from my cell, and submit them to me in their enterety.

D- Award me compensantory damages jointly and severally against Jones, Huddleston, and Osagie for their deliberate indiff. (claims 8-10, individual capacities).

E- Award me compensantory damages against Brush, Miller and Espanoza, for exc. force (135).

F- Award me compenstatory damages against Los Almejo, Murton and Osagie, for failure to intervine (claim 2, 4, and 6).

G- Award me demage against Brush, for 1st Amend violation (claim 7, individual capacity).

H- Award me punitive damage against each of individual defendant.

I-J- Attorney + expert fees, if one will vownter or appointe. Also my filing fee, postage...etc

K- Award me 2-million dollers, against the U.S. (Tort claims:11-15).

## H.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Mohammed
(Plaintiff's signature)

May 19, 2021
(Date)

(Form Revised December 2017)

30

CERTIFICATE OF SERVICES

I, Khalfan Kh. Mohamed, hereby certifiy that on May 19, 2021, have mailed out my Second Amended Complaint with the attached exhibits, addressed to:

Office of the Clerk
United States District Court
901-19th Street, Room A105
Denver, CO 80294, 3589.

Dated, May 19, 2021

Khalfan Kh. Mohamed.
U.S.P, Florence, PO Box 8500          Khalfan Kh. Mohamed, #44623-054
Florence, CO 81226-8500                May 19, 2021
                                       s/ mohammed

---

DECLARATION OF MAILING:

I, Khalfan Kh. Mohamed, declare under penalty of perjury, under 28 U.S.C § 1746, that on May 19, 2021, have submitted my above refrances document with attached exhibits, as a legal mail, with all necessary legal mail Requirement at ADX and sufficient Postage. Addressed to:

Office of the clerk
Unite States District Court
901-19th Street, Room A105
Denver, CO 80294-3589.

Dated: May 19, 2021

Khalfan Kh. Mohamed                   Khalfan Kh. Mohamed, 44623-054
U.S.P, Florence, PO Box 8500          May 19, 2021
Florence, CO 81226-8500               s/ mohammed.

C. Ex:1— through: 9] Are exh. with the 2nd Amended Complaint

Attachment :1

EX:1: EXCESSIVE FORCE ADMN· REMEDY+ RESPONSE.

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Mohammed Khatani K     44623-054     D     ADX
      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A - REASON FOR APPEAL** I'm asking the expunge of Inc. report # 224 issued by C.O BRUSH on 8|23|18. Also asking that CO BRUSH and his associates be held criminally responsible for their crimes against me. The Adx-authority also responsible. The Reg. Director failed to respond.
- CO BRUSH lied in the Inc. report, claiming that he asked me to be moved to the holding cell. In fact, all what he said was to move me to my cell # 108, c-unit, after I declined to go to see Lt Armulo, as he first asked me to. This claim was then rejected by the Lt him self, who said to me; he didn't know anything about that.
(see # 1). The Reg. Director wrote that I must appeal to the warden the DHO finding. But I'm forced not to ... while I never rejected the DHO report. Also I repeat, the appeal was used to punish me even more.
- I'm asking also that BRUSH and his colleagues including LT. MURTON, C.O ESPANOLA ...and CO MILLER, among other, be held responsible along with the top Adx-authority.
- On 8|23|18 C.O BRUSH, LT MURTON, CO. ESPANOLA, CO MILLER etc, committed a serious crimes against me without any provocation. CO BRUSH, possibly with help from others, broke my right ankle intentionally and without any provocation. I also received many other injuries.
- LT MURTON, supervised and led the assault and beating on me. He was there to give orders in these crimes, especially in the holding cell.
- I have never assaulted or harmed no one that day. Only I refused to go to Lt office.
- The Adx and BOP in general can be an investigative authority in these crimes.
- The Adx is fully responsible in the crime and there for the accountable for all the damage I was made to receive. Unprovocation.

                                    Mohamed

    12.19.18
      DATE                                          SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

JAN 28 2019

Administrative Remedy Section
Federal Bureau of Prisons

_____             GENERAL COUNSEL
      DATE

ORIGINAL: RETURN TO INMATE           CASE NUMBER: ___955144·A1___

**Part C - RECEIPT**
                                  CASE NUMBER: _____

Return to: _____    _____    _____    _____
          LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION
SUBJECT: _____

_____                                                                                                    
      DATE                           SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

UPN LVN         ♻ PRINTED ON RECYCLED PAPER     **App.188**             BP-231(13)
                                                                                  JUNE 2002

**Administrative Remedy No. 955144-A1**
**Part B - Response**


This is in response to your Central Office Administrative Remedy Appeal where you allege on August 23, 2018, staff members at the ADX physically assaulted you without provocation.  You also claim a false incident report was prepared to cover staff's actions.  You request the incident report be expunged and the responsible staff members held criminally responsible for their alleged actions.

As indicated by the Warden and Regional Director, your allegation of physical assault by staff members at the ADX was forwarded to the appropriate authority for review.  A thorough review will be conducted and proper action will be taken as deemed necessary. However, a decision to personally press criminal charges is one which is yours to make.  You may contact whichever prosecutorial entity or legal advisor you believe is appropriate to assist you with this matter.

In addition, you have the ability to file a remedy appealing any sustained disciplinary action.  Therefore, the incident report you received on August 23, 2018, will not be addressed in this response.

This response is provided for informational purposes.


___3/29/17___
Date

_____
Ian Connors, Administrator
National Inmate Appeals


RECEIVE
APR 2 4 2019
ADX Warden's Office

App.189

Attachment : 2

EX: 2 : DESTRUCTION/CONFISC. OF MY MATERIAL ADMN. REMEDY + Response.

U.S. Department of Justice

Central Office Administrative Remedy Appeal

Federal Bureau of Prisons

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MOHAMED KHAFAN K.   44623-054   A   ADX

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A - REASON FOR APPEAL** The Reg. Director and the warden failed to address my complaint.
- I'm asking the full return of my personal property or complete payment of its cost if those property are lost/destroyed.
- The staff (Gov) BOP can't steal/destroy my property without full Due process afforded to me
- @removal of my personal property and stealing them, is a complete violation of my Const rights under 5th Amend. of the U.S Constitution
- On 8/23/19, C.O. BRUSH and others, took my personal property that includes a) my invoices (2) 3- Large and other manuscripts. (3) my journals . (4) My notes, from 100+ diff. books (5) my books, 9-10 of them, (6) 15-20 personal letters (7) N. papers (8) Differ. Commissary items including my personal clothing, religious items, cosmetics, writing materials, medical items (9) C.O. Brush also has stolen my legal materials and (10) 20-photo tickets. He also stol many other materials.
- DE ENTE LIES'NO it ever worked with me to prove my ownership of stolen items, I sa a lie their never complaint about my missing property. I have done so even during my H.strike before I knew that my property not to be returned. I spoke/wrote to unit staff, Lt. and even the warden him self.
- I'm asking for my property or complete payment of them
- THE ORGANIZED CRIME. THE ADX - planned the crimes and now the whole BOP defend it. No good.

4|5|19                                     Mohamed
DATE                                SIGNATURE OF REQUESTER

**Part B - RESPONSE**

property

RECEIVED

APR 1 5 2019

Administrative Remedy Section
Federal Bureau of Prisons

Ex. 2

---

_____                    _____
DATE                                         GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE            CASE NUMBER: 960784-A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____                    _____
DATE                        SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN          PRINTED ON RECYCLED PAPER                                    BP-231(13)
                                                                              JUNE 2002

Administrative Remedy Number 960784-A1
Part B - Response


This is in response to your Central Office Administrative Remedy
Appeal, in which you claim your staff members have not returned all
of your property.  For relief, you request the return of your
property or compensation.

We have reviewed documentation relevant to your appeal and, based
on the information gathered, concur with the manner in which the
Warden and Regional Director addressed your concerns at the time of
your Request for Administrative Remedy and subsequent appeal.  Your
property was taken while you were on a hunger strike.  Once you
declared your hunger strike was over, authorized property was
returned.  Staff members have made attempts for you to show proof
of ownership for some items and have provided you with a confiscation
form.  You provide no additional information to support your claim
of staff members acting contrary to established policy and procedures
or outside the scope of their duties.

Lastly, regarding your request for compensation, Program Statement
1330.18, Administrative Remedy Program, does not provide such
relief.  There is a statutorily-mandated procedure in place for
addressing such a request.  Therefore, your request will not be
considered in this response.

Accordingly, your appeal is denied.


_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals


RECEIVED

JUL 16 2019

ADX AW Office


App.192

Attachment :3

EX: 3: DEPRAVATION OF MEDICAL TREAT. ADMN. REMEDY+RESPONSE

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

---

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __MOHAMED KHATFAN K__ __44623-054__ __D__ __ADX__
        LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

Part A - REASON FOR APPEAL. The Reg. director failed to respond. I'm asking that my const. /prisoner rights including adequate medical needs be respected. and holding the ADX /BOP /PH respons. for all damages.
~ ADx medical intentionally neglected and ignores my medical needs- Example:
1- The medical ignored my beeing in H. strike even though I informed them and other staff. I started H. strike in 8/2/18, but I was assessed only in 8/23/18. A c/o broke my right ankle, but medical refused to assess my ankle and gave me an x-ray till 8/31/18.
2- While my ankle was broke and in H. strike, medical staff forced me to work with legg cuff chains and black box, and I was chained on a solid black chair at least twice .. causing deadly pain and possibly increased the fracture. Only in 9/5/18 I was given a wheelchair.
3- Since 8/26/18 up to 10/2/18, I have been complaining about the pain in my legs, wrists, jaws, .. backs at least 3-time per week during the H. strike assessment. And my first complaint, was in the day I was brutally assaulted by a group of officers in C-unit, in 8/23/18.
4- I didn't have to put a sick call req; but I put it multiple times, incl. 9/25/18, 10/14/18 ...etc
5. Only in 10/30/18 I got x-ray on my wrist and jaws, almost 70-days after I was assaulted.
6- Today, as of 1.3.19, my ankle, wrist.. etc still full of pain. Her. In recent weeks I put 2-sick call Cl. 14/18, and another one after that) but no medical treatment I receive but a few tablets.
* I'm asking that my const. and prison rights be kept.. All above violation violates my rights...
and I am holding the ADX /BOP responsible for all and each damages I'm receiving.

__1/3/19__                       __Mohamed__
   DATE                                  SIGNATURE OF REQUESTER

Part B - RESPONSE

RECEIVED

JAN 28 2019

Administrative Remedy Section
Federal Bureau of Prisons

---

        DATE                                 GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE                 CASE NUMBER: __958295 A1__

Part C - RECEIPT

                                                     CASE NUMBER: _____

Return to: _____
        LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____
    DATE                           SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

**Administrative Remedy No. 958295-A1**
**Part B - Response**


This is in response to your Central Office Administrative Remedy
Appeal wherein you allege your medical negligence with regard to
various injuries.  For relief, you request to receive adequate
medical treatment.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  Most recently, you were evaluated by the physician on
December 6, 2018, at which time the ankle fracture was noted to
be healed and x-rays of your right wrist were noted to be
normal.  You were prescribed Ibuprofen and counseled on
safety/accident prevention.  There is no evidence to suggest
medical negligence.

The record reflects you have received medical care and treatment
in accordance with evidence based standard of care and within
the scope of services of the Federal Bureau of Prisons.  You are
encouraged to comply with proposed medical treatment so Health
Services can continue to provide essential care and to contact
medical personnel through routine sick call procedures should
your condition change.

Considering the foregoing, this response is provided for
informational purposes only.


_2 |11|19_
Date

_JC_
Ian Connors, Administrator
National Inmate Appeals

Attachment: A

EX: 4, ADMN. TORT CLAIM + RESPONSE.

Ex. G.

Page 1

**1. Submit to Appropriate Federal Agency TO: The Regional**
Director, Federal Bureau of Prisons
North Central Regional Office
Gateway Complex, Tower II, 8th Floor
400 State Avenue, Kansas City, Kansas
66101-2492.

**2. Name, Address of claimant, et...**
Khayer khonnis Mohamed   Reg#44673-054,
U.S. Penitentiary max, PO Box 8500
Florence, CO 81226-8500

| 3. Type of Employ: N/A | 4. Date of Birth 7-25-1973 | 5. Marital Stat: | 6. Date and Day of Accident 8-23-2018, (~Unit AOx floor Approximately | 7. Time: |
|---|---|---|---|---|

**8. Basis for of claim...**
I was severly beaten, punched, kicked
by large number of officers/prison guards in retaliation for my hunger strike.
The beatings took place when I was already restrained and handcuffed and
while I was weak in hunger strike.
Over the course of his beating my ankle was fractured and my other limbs
were aggressively twisted, in attempt to break them and I received Sevres in
that to S, upper body. My face, head, heels and legs all were swollen. Eventually
over the next several months I was given neglegard medical treatments.
this includes the delay examination on my injuries and delay of diagnoses.
                                                                CONTINUE

**9.                    PROPERTY DAMAGE**
Name and Address of owner...
N/A

Briefly describe the property...
N/A

                    **PERSONAL INJURY/WRONGFUL DEATH**
State nature and extent of each inj...
                    Severly fractured ankle oil in severe pains or
my right leg especially when standing or walking, also inability to walk
normally and total inability of exercising.
The pain on my ankle and my right wrist prevents me up to this day
to pray normally while my wrist is producing pains while bending = CONTINUE

**11.**
| NAME | WITNESSES | ADDRESS |
|---|---|---|
| Mr. X. Ossagie | | N/A |

| 12-a Property Damage N/A | 12b Personal Injury 2,000,000 Two million dollen | 12c Wrongful Death N/A | 12 d Total 2,000,000 Two millions dollers |
|---|---|---|---|

| 13a. Signature of Claimant Mohamed | 13b Phone numb of... N/A | 14. Date of claim April 8, 2019 |
|---|---|---|

Page 2.

**8. BASIS OF CLAIM (CONTINUES)**

diagnoses, refusal to provide treatment, pain medication and even an ice bag, except on one occasion.

I still cant work normally today, 7+ moths after, I was attacked and I may never walk properly again. At the same time, I still have regular pain on my ankle, wrists, back and on my jaws.

The staff intentionally broke my bones and then refused me proper medical treatment

**10.**          **PERSONAL INJURY - CONTINUES**

writing and I cant write continuessly at a single seating as I used to do before I was attacked. I have to stop in every few minutes.

Also I still have pains in other parts of my body including on my Jaws, back and my left wrist.

Also till this day I have imotional and mental distress including the fear of being beaten again and being killed, as the officers had told me that they will kill me.. I have dreamsend strange nightmare of being attacked ..etc.



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS  66101*

January 26, 2021

Khalfan Khamis Mohamed, #44623-054
United States Penitentiary Administrative Maximum - ADX
P.O. Box 8500
Florence, CO  81226

RE:    Tort Claim TRT-NCR-2019-04561
        Amount of Claim:  $2,000,000.00

        Certified Mail Receipt No:    7018 0360 0002 2080 7585

Dear Claimant:

Your above referenced tort claim has been considered for administrative review pursuant to 28 C.F.R. § 0.172, <u>Authority: Federal Tort Claims</u> and 28 C.F.R. Part 14, <u>Administrative Claims under Federal Tort Claims Act</u>:  Investigation of your claim did not reveal that you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.

As a result of this investigation, your claim is denied.  This memorandum serves as a notification of final denial under 28 C.F.R. § 14.9, <u>Final Denial of Claim</u>.  If you are dissatisfied with our agency's action, you may file suit in an appropriate U.S. District Court no later than 6 months after the date of mailing of this notification.

Sincerely,

Richard M. Winter
Regional Counsel

Attachment: 5

EX# 5: PROGRAM STAT: USE OF FORCE AND APPL: OF RESTRAINTS.

| | |
|---|---|
| **OPI:** | **CPD/CPB** |
| **NUMBER:** | **5566.06, CN-1** |
| **DATE:** | **8/29/14** |
| **SUBJECT:** | **Use of Force and Application of Restraints** |



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program

# Statement

OPI:    CPD/CPB

NUMBER:    5566.06, CN-1

DATE:    August 29, 2014

# Use of Force and Application of Restraints

/s/

*Approved*:   Charles E. Samuels, Jr.

Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5566.06, **Use of Force and Application of Restraints**, dated November 30, 2005:

1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

**Section 6d.**

An inmate who is pregnant should not be placed in restraints unless there are reasonable grounds to believe the inmate presents an immediate, serious threat of hurting herself, staff, or others, or that she presents an immediate credible risk of escape that cannot be reasonably contained through other methods. For additional guidance refer to Section 13.



# Program

# Statement

**U.S. Department of Justice**

Federal Bureau of Prisons

**OPI:**   CPD/CSB

**NUMBER:**   P5566.06

**DATE:**   11/30/2005

**SUBJECT:**   <u>Use of Force</u> and Application of Restraints

1.   [<u>PURPOSE AND SCOPE</u> §552.20.   **The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage,**

**and to ensure institution security and good order.   Staff are**

pro|

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

App. 202

**authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate:**

**a.      Assaults another individual; b.      Destroys government property; c.      Attempts suicide;**

**d.      Inflicts injury upon self; or**

**e.      Becomes violent or displays signs of imminent violence.**

**This rule on application of restraints does not restrict the use of restraints in situations requiring precautionary restraints, particularly in the movement or transfer of inmates (e.g., the use of handcuffs in moving inmates to and from a cell in detention, escorting an inmate to a Special Housing Unit pending investigation, etc.).]**

Under this rule precautionary restraints may also be used as prescribed by medical staff for medical purposes in accordance with procedures set forth in the Health Services Manual.

The use of restraints on inmates due to mental illness (e.g., to prevent suicide or infliction of self-injury) is subject to this Program Statement's provisions and the Program Statement on

**[Bracketed Bold - Rules]**

Regular Type – Implementing Information

Suicide Prevention Program.      This includes the placement, reviews, and release of inmates from restraints at all Bureau facilities, including medical referral centers.

This policy's purpose is not to discourage employees from using the amount of force necessary to protect themselves from assault, bodily harm, and/or loss of life.      This policy will provide guidance and instruction on appropriate procedures when

confronted with situations that may require the **use of force** to gain control of an inmate.

An employee may not use brutality, physical violence, or intimidation toward inmates, or use any force beyond that which is reasonably necessary to subdue an inmate.

2.      **PROGRAM OBJECTIVES**.  The expected results of this program

pro|

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

3

44623054

are:

   a.   Force will ordinarily be used only when attempts to gain voluntary cooperation from the inmate have not been successful.

   b.   When force is used, it will be only the amount of force required to subdue an inmate, or preserve or restore institution security and good order.

   c.   Confrontation avoidance techniques will be used when feasible to avoid calculated **use of force** situations.

   d.   When an inmate must be subdued, the **use-of-force** team technique will be used when feasible.

   e.   Any inmate restrained to a bed will be checked every 15 minutes.

   f.   Chemical agents will be used as specified and, to the extent practicable, only after a review of the inmate's medical file, unless such a delay would endanger the safety of the inmate, other inmates, staff and the community, result in severe property damage, or effectuate an escape.

   g.   Restraints will be applied only for purposes outlined in policy and in authorized methods.

   h.   Staff will be trained in confrontation avoidance, **use of force** team technique, use of chemical agents, and application of restraints.

   i.   Each **use of force** incident will be documented, reported, and reviewed.

3.   **DIRECTIVES AFFECTED**

a.   **Directive Rescinded**

P5566.05   **Use of Force** and Application of Restraints on

Inmates (12/31/96)

b.   **Directives Referenced**

P1380.05     Special Investigative Supervisors Manual (8/1/95)
P3420.09     Standards of Employee Conduct (2/5/99)

**4**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

P5214.04     HIV, Handling of Inmates Testing Positive (2/4/98)

P5324.03    Suicide Prevention Program (5/3/95)

P5500.11    Correctional Services Manual (10/10/03)

P5500.12    Correctional Services Procedures Manual (10/10/03)

P6031.01    Patient Care (1/15/05)

P6190.03    Infectious Disease Management (6/28/05)

c.    Rules cited in this Program Statement are contained in 28 CFR 552.20-27 and 29 CFR 1910.

4.    **STANDARDS REFERENCED**

a.    American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4190, 4-4191, 4-4202, 4-4203, 4-4206, 4-4281 **(M)**, and 4-4405

b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3A-17, 3-ALDF-3A-17-1, 3-ALDF-3A-28, 3-ALDF-3A-29, 3-ALDF-3A-31, and 3-ALDF-4E-32

c.    American Correctional Association 2nd Edition Standards for the Administration of Correctional Agencies:   2-CO-3A-01

5.    **[TYPES OF FORCE §552.21.]**   Since inmates occasionally become violent or display signs of imminent violence, it is sometimes necessary for staff to use force and restraints to prevent them from hurting themselves, staff, or others, and/or from destroying property.

    **[a.    Immediate Use of Force.   Staff may immediately use force and/or apply restraints when the behavior described in §552.20 constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order.]**

Section 552.20 refers to Section 1 of this Program Statement.

    In an immediate **use of force** situation, staff may respond with or without the presence or direction of a supervisor.

**5**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

[b.   **Calculated Use of Force and/or Application of Restraints.**
This occurs in situations where an inmate is in an area that can
be isolated (e.g., a locked cell, a range) and where there is no
immediate, direct threat to the inmate or others.   When there is
time for the calculated use of force or application of
restraints, staff must first determine if the situation can be
resolved without resorting to force (see §552.23).]

Section 552.23 refers to Section 7 of this Program Statement. (1)
**Circumstances.** Calculated rather than immediate use of

force is desirable in all instances corrections workers

encounter.   Although this is not always possible, staff must use

common sense and good correctional judgment in each incident to

determine whether the situation allows for the implementation of

calculated or immediate use of force procedures.

   The safety of all persons is a major concern and Bureau of
Prisons staff are required by laws, rules, and regulations,
related to the Bureau of Prisons, to protect others from the
hostile actions of inmates.   Immediate or unplanned use of force
by staff is required when an inmate is trying to self-inflict
injuries which may be life-threatening or is assaulting any other
person to include other inmates.   The destruction of government
property may require the immediate use of force by staff in some
circumstances.   If the above circumstances are not present,
staff should, if possible, employ the principles of calculated
use of force.

   Calculated use of force is appropriate, for example, if the
inmate is in a secure area or in an area where doors/grills may
be secured, including cases when the inmate is making verbal
threats or brandishing a weapon, provided staff believe there is
no immediate danger of the inmate inflicting injury or harm to
himself or herself or others.   Calculated use of force permits

the use of other staff (e.g., psychologists, counselors, etc.) to

attempt to resolve the situation non-confrontationally.

   (2)   **Documentation.**   The entire interaction must be
documented in writing and placed in the FOI Exempt section of the

6

pro|

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement

44623054

documented in writing.

The Warden or Acting Warden, Associate Warden (Correctional Services), Captain, and Health Services Administrator or designee will comprise the After-Action Review Team. Each review must be conducted on the next work day following the incident (see

Section 15). A representative of the Council of Prison Locals at the appropriate level will be provided a copy of the After-Action report in accordance with appropriate laws, rules, and regulations.

The Warden must provide documentation to the Regional Director within two work days after the inmate has been released from

restraints (if applicable). The report will confirm the review was conducted and the **use of force** was either appropriate or inappropriate. This requirement applies to all instances involving the **use of force**, excluding the use of firearms (see the Program Statements on the Correctional Services Manual and the Correctional Services Procedures Manual for additional information on **Use of Force** Team Techniques).

6.   [**PRINCIPLES GOVERNING THE USE OF FORCE AND APPLICATION OF RESTRAINTS** §552.22

   a.   **Staff ordinarily shall first attempt to gain the inmate's voluntary cooperation before using force.**]

See Section 7 of this Program Statement for confrontation avoidance procedures prior to any calculated **use of force**.

[b.   **Force may not be used to punish an inmate.**

   c.   **Staff shall use only that amount of force necessary to gain control of the inmate. Situations when an appropriate**

**amount of force may be warranted include, but are not limited to:**
(1)   **Defense or protection of self or others;**

(2)   **Enforcement of institutional regulations; and**

   (3)   **The prevention of a crime or apprehension of one who has committed a crime.**

   d.   **When immediate use of restraints is indicated, staff may**

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

approval of the Warden or designee.

h.    Restraint equipment or devices (e.g., handcuffs) may not be used in any of the following ways:

(1)    As a method of punishing an inmate;

(2)    About an inmate's neck or face, or in any manner which restricts blood circulation or obstructs the inmate's airways;]

Tape shall not be placed around an inmate's mouth, nose, or neck.  Staff protective equipment must be sufficient to insulate staff from an inmate's spitting or biting, and conform with

29 CFR 1910.1030 and the Program Statement on Infectious Disease Management.    Staff will not use any item or device (e.g., towels, sheets, blankets, hosiery, masks) in **use of force** situations.

[(3)    In a manner that causes unnecessary physical pain or extreme discomfort;]

In general, when applying restraints, staff will use sound correctional judgement to ensure unnecessary pressure is not applied to the inmate.

Although the proper application of restraints may result in some discomfort, prohibited uses of restraints include, but are not limited to: "hogtying", unnecessarily tightness, or improperly applied restraints.  All inmates placed in restraints should be closely monitored.

When it is necessary to use continued restraints after any **use of force** incident, hard restraints (i.e., steel handcuffs and leg irons) are to be used only after soft restraints have proven ineffective, or a past history of ineffectiveness exists.

[(4)    To secure an inmate to a fixed object, such as a cell door or cell grill, except as provided in §552.24.]

Section 552.24 refers to Section 10 of this Program

Statement.

[i.    Medication may not be used as a restraint solely for security purposes.

**10**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

11.    [USE OF CHEMICAL AGENTS OR NON-LETHAL WEAPONS §552.25. The Warden may authorize the use of chemical agents or non-lethal weapons only when the situation is such that the inmate:

a.    Is armed and/or barricaded; or,

b.    Cannot be approached without danger to self or others; and,

c.    It is determined that a delay in bringing the situation under control would constitute a serious hazard to the inmate or others, or would result in a major disturbance or serious property damage.]

Qualified health personnel (Physician, Physician's Assistant, or nurse) shall be consulted prior to staff using chemical agents unless the circumstances require an immediate response. Ordinarily, in a calculated **use of force** situation, the inmate's medical file must be reviewed by these personnel to determine whether the inmate has any diseases or conditions which would be dangerously affected if chemical agents or non-lethal weapons are used.  This includes, but is not limited to: asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure.  Local procedures will be developed where 24 hour medical coverage is unavailable.

12.    [MEDICAL ATTENTION IN USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS §552.26

   a.    In immediate use of force situations, staff shall seek the assistance of mental health or qualified health personnel upon gaining physical control of the inmate.  When possible, staff shall seek such assistance at the onset of the violent behavior. In calculated use of force situations, the use of force team leader shall seek the guidance of qualified health personnel(based on a review of the inmate's medical record) to pro

**20**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

identify physical or mental problems.   When mental health staff or qualified health personnel determine that an inmate requires continuing care, and particularly when the inmate to be restrained is pregnant, the deciding staff shall assume responsibility for the inmate's care, to include possible admission to the institution hospital, or, in the case of a pregnant inmate, restraining her in other than face down four-point restraints.

    b.   After any **use of force** or forcible application of restraints, the inmate shall be examined by qualified health personnel, and any injuries noted, immediately treated.]

If any staff involved in a **use of force** reports an injury, Health Services personnel should provide an immediate examination and initial emergency treatment as required.   Staff may also seek treatment from their personal physician.

13.   **USE OF FORCE IN SPECIAL CIRCUMSTANCES.**   In certain extenuating circumstances, and after confrontation avoidance has failed or has proven to be impractical, staff may be forced to make a decision, such as whether to use force on a pregnant inmate or an aggressive inmate with open cuts, sores, or lesions.

Special cases such as mentally ill, disabled, or pregnant inmates, after consultation with the Clinical Director, must be assessed carefully to determine whether the situation is grave enough to require the use of physical force.

    a.   **Pregnant Inmates.**   When pregnant inmates have to be restrained, necessary precautions must be taken to ensure the fetus is unharmed.   Health Services personnel must prescribe the necessary precautions, including decisions about the manner in which the inmate is to be restrained, i.e., whether medical personnel should be present during the application of restraints, whether the inmate should be restrained at the institutional hospital or a local medical facility, etc.

    b.   **Inmates with Wounds or Cuts.** Aggressive inmates with open cuts or wounds who have attempted to harm themselves or others should be carefully approached by staff in the prescribed protective clothing/gear.   A full body shield should also be

21

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

used during these encounters to protect staff.   Aggressive inmates, after placement in restraints, should be placed in administrative detention and separated from other inmates.

Ordinarily, inmates of this status must remain in administrative detention until cleared to return to the general population by the Captain, Chief Psychologist, and the Clinical Director with the Warden's approval.

14.    **[DOCUMENTATION OF USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS §552.27.     Staff shall appropriately document all incidents involving the use of force, chemical agents, or**

**non-lethal weapons.   Staff shall also document, in writing, the use of restraints on an inmate who becomes violent or displays signs of imminent violence.   A copy of the report shall be placed in the inmate's central file.]**

a.    **Report of Incident**. A **Use of Force** Report (BP-E583) will be prepared on the **use of force**, chemical agents/pepper mace, progressive restraints, and non-lethal weapons.   This reporting requirement includes the application of progressive restraints on an inmate who complies with the placement of the restraints.

The report must establish the identity of all involved in the incident; inmates, staff, and others.   It must provide a vivid, detailed description of the incident.   The report, including mental health/medical reports must be submitted to the Warden or designee no later than the end of the tour of duty.   A copy of the report is to be placed in the inmate's central file.   Copies are also to be sent within two work days to:

(1)    Assistant Director, Correctional Programs Division;  (2) Assistant Director, Health Services Division;

(3)    Central Office Correctional Services Administrator;  (4) Regional Director; and,

(5)    Regional Correctional Services Administrator.

A report is not necessary for the general use of restraints

(for example, the routine movement or transfer of inmates).

pro{

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)
211

b. **Use of Restraints Reporting Requirements**

   **Documented Reviews.**   The following reviews will be documented as indicated:

(a) Fifteen-minute check - **fifteen-Minute Restraints Check Form (24 Hours)** (BP-S0717.055);

(b) Two-hour Lieutenant check - **Two-Hour Lieutenant Restraints Check Form (24 Hours)** (BP-S0718.055);

(c) Health Services Staff Review  - **Health Services Restraint Review Form (24 Hours)** (BP-S0719.055); and

(d) Psychology Staff Check  - **Psychology Services Restraint Review Form (24 Hours)** (BP-S0720.055).

   Staff must complete all forms until the inmate is released from restraints.   The forms will be submitted to the Warden as required for periodic reviews of an inmate's placement in restraints.   After release from restraints, these forms must be compiled and maintained in the Inmate's Central File and Special Investigative Supervisor's file.

   c.   **Videotape of Use of Force Incidents**. Staff must obtain a video camera immediately and record any **use of force** incident, unless it is determined that a delay in resolving the situation would endanger the inmate, staff, or others, or would result in a major disturbance or serious property damage.

   The video recording will also include any medical examination conducted after:

   the application of restraints,

   use of chemical agents,

   use of pepper mace, and/or

   use of non-lethal weapons.

   Calculated **use of force** shall be videotaped following the sequential guidelines presented in the Correctional Services

**23**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Manual.    The original videotape must be maintained and secured as evidence in the SIS Office.    A copy of every videotape, after review by the Warden (within four work days of the incident), unless requested sooner by the Regional Director, will be

provided immediately to the Regional Director for review.

The Regional Director shall forward videotapes of questionable or inappropriate cases immediately to the Assistant Director, Correctional Programs Division, Central Office, for review.

When a threat to the safety of the inmate, staff or others, or property, requires an immediate response, staff are obligated to obtain a camera and begin recording the event as soon as feasible.    As soon as control of the situation has been obtained staff must record information on:

injuries;

circumstances that required the need for immediate **use of force**; and

identifications of the inmates, staff, and others involved.

d.    **Documentation Maintenance**.    The Captain must maintain all documentation, including the videotape and the original BP-E583, for a minimum of 2½ years.    A separate file must be established on each **use of force** incident.

15.    **AFTER-ACTION REVIEW OF USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS**. Following any incident involving the **use of force** (calculated or immediate) and the application of restraints, the Warden, Associate Warden (responsible for Correctional Services), Health Services Administrator, and Captain must meet and review the incident.    The review is conducted to assess the rationale of the actions taken (e.g., if the force was appropriate and in proportion to the inmate's actions).

The review team should gather relevant information to determine if policy was adhered, and complete the standard After-Action Report (BP-E586), indicating the nature of the review and findings.    The BP-E586 should be submitted within two working days after the inmate is released from restraints.

a.    **Videotape Review**.    The After-Action Review Team should pro

24

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

review the actions of the staff for compliance with the Correctional Services Manual and this policy.   At a minimum, this review should include the following:

The Lieutenant displayed professional behavior during the Forced Cell Team technique.

The Lieutenant ensured only the force necessary to control the inmate is used, based on the nature of the incident.

The Lieutenant monitored the actions of the inmate and team members; and was not involved in subduing the inmate unless it is deemed necessary to prevent staff or inmate injury.

The **Use of Force** Team members were wearing the proper protective gear.

Unauthorized items such as towels, tape, surgical mask, hosiery, etc., was not being used.

Introductions were made by the Lieutenant, Use if Force Team members, medical staff, and staff involved in the confrontation avoidance technique as well as

identifying all staff present, including those observing.

**Use of Force** Team members used sound correctional judgment to ensure unnecessary pressure is not applied to the inmate.

**Use of Force** Team members used only the amount of force necessary to gain control of the inmate.

Inabilities to effectively gain control of the inmate are assessed and may indicate that additional training is necessary.

There was continuous operation of the video and breaks were documented and appropriately justified.

Prompt examination of the inmate followed the move and findings were noted on the video tape.

The method of chemical agents used was predetermined and use of devices was in accordance with the Correctional Services Manual.

The inmate was given the opportunity to voluntarily submit to

pro

**25**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

the placement of restraints.

Conversations were appropriate and necessary between team members and individuals during the **use of force**.

b.   **Report Completion**. When this review is completed, an

After-Action Review Report (BP-E586) must be completed, as soon

as possible, not later than two working days after the inmate has

been removed from restraints.   This will ensure that staff with

relevant information will be available and any necessary medical

follow-up can be immediately provided to ascertain the nature of

any injuries involved.

The Warden or designee will attest by his or her signature that the review was conducted and the **use of force** was appropriate or inappropriate.

c.   **Further Investigation**. The reviewers should also decide if the matter requires further investigation.   If deemed

appropriate, the Warden will refer the matter for further investigation to the Office of Inspector General, Office of

Internal Affairs, or Federal Bureau of Investigation.   Copies of the report must be forwarded to the Regional Director and Assistant Director, Correctional Programs Division, Central Office.

d.   **Report on Restraints Use**.     A report is not necessary for the general use of restraints.   For example, a report is not required in the routine movement or transfer of inmates.

16.     **TRAINING IN THE CONFRONTATION AVOIDANCE/USE OF FORCE TECHNIQUE**. In order to control any potential situation involving aggressive inmates, all staff must be made aware of their responsibilities through ongoing training.   At a minimum,

training must cover:

communication techniques,

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

App.215

Attachment : 6

EX: 6 : PROGRAM STATEMENT : HUNGER STRIKES.

**OPI:**      **HSD/HSS**
**NUMBER:**    **P5562.05**
**DATE:**      **7/29/2005**
**SUBJECT:**   **Hunger Strikes**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

**OPI:**   HSD/HSS

**NUMBER:**   P5562.05

**DATE:**   7/29/2005

**SUBJECT:**   Hunger Strikes

1.   [<u>**PURPOSE AND SCOPE**</u> §**549.60.**   **The Bureau of Prisons provides guidelines for the medical and administrative management of inmates who engage in hunger strikes.**   **It is the responsibility of the Bureau of Prisons to monitor the health and welfare of individual inmates, and to ensure that procedures are pursued to preserve life.**]

2.   **SUMMARY OF CHANGES.**   Section 6 has been expanded to include

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

4462300.4

pretrial and holdover inmates and ICE detainees.

Section 9 identifies Health Services staff and Food Service staff as those who may offer alternative beverages and nutritional supplements, if authorized by the physician. This section also indicates food and toothpaste may be left in the inmate's cell.

Section 10 describes procedures for notifying the Regional Counsel when an inmate refuses treatment and the initiation of involuntary treatment.

3.   **PROGRAM OBJECTIVES.**   The expected results of this program are:

  a.   The health and welfare of any inmate on a **hunger strike** will be monitored.

b.   Food and beverages will be offered to inmates regularly.

  c.   When an inmate's life or health is threatened, involuntary medical treatment will be administered.

[**Bracketed Bold - Rules**]

Regular Type - Implementing Information

  d.   Every incident of an inmate on a **hunger strike** will be properly reviewed, documented, and reported.

4.   **DIRECTIVES AFFECTED**

a.   **Directive Rescinded**

P5562.04   Hunger Strikes, Inmate (6/20/94)

b.   **Directives Referenced**

P5566.05   Use of Force and Application of Restraints on

Inmates (7/25/96)

P6031.01   Patient Care (1/15/05)

P6090.01   Health Information Management (1/15/05)

c.   Rules cited in this Program Statement are contained in

pro|

**2**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group All rights reserved Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

28 CFR § 549.60-66.

5.   **STANDARDS REFERENCED**

a.   American Correctional Association 4th

Edition Standards for

Adult Correctional Institutions: 4-4257 and 4-4397 **(M)**

b.   American Correctional Association 4th

Edition Standards for

Adult Local Detention Facilities: 4-ALDF-4D-15 **(M)** and

4-ALDF-2A-52

6.  [**DEFINITION** §**549.61.   As defined in this rule, an inmate is on a hunger strike**:

  **a.   When he or she communicates that fact to staff and is observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours; or**

  **b.   When staff observe the inmate to be refraining from eating for a period in excess of 72 hours.   When staff consider it prudent to do so, a referral for medical evaluation may be made without waiting 72 hours.**]

A **hunger strike** may be announced by the inmate, or observed by staff, even though the inmate may be taking liquids.

**#**   At times, an inmate may not actually engage in a **hunger strike**, but merely make a bid to gain attention.

Other types of inmates (not on inpatient status in a Bureau of Prisons Medical Referral Center or hospitalized in the community) who should be monitored according to this policy include:

**#**   Inmates who are observed to be unable to eat or drink by virtue of mental illness or acute medical conditions.   Although not intentionally on a hunger

strike, these inmates are either unwilling or unable to eat or drink sufficiently to prevent complications.

pro|

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

\#   Inmates with metabolic disorders or certain other illnesses, who deviate from normal eating habits or intake of fluid, could experience an immediate, significant hazard to their health and well-being.

In any case, it is also recognized that after long-term deprivation of food and shorter term deprivation of fluid, serious irreversible changes can occur, and sudden death can occur.

Procedures required in this Program Statement apply to pretrial and holdover inmates and ICE detainees.

7. [**INITIAL REFERRAL**   §549.62

   a.   **Staff shall refer an inmate who is observed to be on a hunger strike to medical or mental health staff for evaluation and, when appropriate, for treatment.**]

Each Warden shall establish referral arrangements for the institution.   In addition, staff may consult Health Services anytime they observe an inmate refraining from consuming food and/or liquids prior to 72 hours.

   [**b.**   **Medical staff ordinarily shall place the inmate in a medically appropriate locked room for close monitoring.**]

Ordinarily, placement in the medically appropriate room is a determination the institution physician makes.   This room will be a single cell observation room (i.e., dry cell or cell with water shut-off capabilities), where no other inmate contact is possible (i.e., other inmates can't pass food or liquid items to the

inmate on **hunger strike** status).

Inmates in Administrative Detention or Disciplinary Segregation may be retained in this status and remain in the SHU unless the physician determines movement to other quarters is medically necessary.

The Warden is to determine the type of observation for **hunger strike** inmates (e.g. continuous, 15 minute checks, routine).

\#   Under no circumstances will inmate companions be used to

pro[

**4**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

monitor **hunger strike** inmates.

8. [**INITIAL MEDICAL EVALUATION AND MANAGEMENT** §549.63

   **a.    Medical  staff  shall  ordinarily  perform  the  following procedures  upon  initial  referral  of  an  inmate  on  a  hunger strike:**

   **(1)    Measure  and  record  height  and  weight;  (2)    Take  and  record vital  signs;**

   **(3)    Urinalysis;**

   **(4)    Psychological  and/or  psychiatric  evaluation;  (5)    General medical  evaluation;**

   **(6)    Radiographs  as  clinically  indicated;**

   **(7)    Laboratory  studies  as  clinically  indicated.]**

   If  an  inmate  refuses  the  initial  medical  evaluation,  a  signed Refusal  of  Treatment  form  (BP-A358)  must  be  obtained  and  also documented  in  the  Progress  Notes  (SF-600)  of  the  Inmate's  Health Record.    (Refer  to  the  Program  Statement  on  Patient  Care)

   **[b.    Medical  staff  shall  take  and  record  weight  and  vital  signs at  least  once  every  24  hours  while  the  inmate  is  on  a  hunger strike.    Other  procedures  identified  in  paragraph  (a)  of  this section  shall  be  repeated  as  medically  indicated.**

   **c.    When  valid  medical  reasons  exist,  the  physician  may  modify, discontinue,  or  expand  any  of  the  medical  procedures  described  in paragraphs  (a)  and  (b)  of  this  section.**

   **d.    When  medical  staff  consider  it  medically  mandatory,  an inmate  on  a  hunger  strike  will  be  transferred  to  a  Medical Referral  Center  or  to  another  Bureau  institution  considered medically  appropriate,  or  to  a  community  hospital.]**

   The  decision  to  transfer  an  inmate  on  a  **hunger strike**  for medical  reasons  should  only  be  made  after  consultation  with  a physician.

   **#**   The  inmate  should  be  admitted  to  a  community  hospital  if  his medical  condition  warrants  continuous  enteral  (oral)  or intravenous  support.

**5**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**#**   Local institutions need not transfer an inmate on a **hunger strike** to a Medical Referral Center (MRC) unless an MRC's specific services are required.

**#**  Mentally ill inmates who do not eat or drink for more than 30 days, regardless of the apparent reason, should be referred to an MRC for evaluation and treatment of the underlying mental illness.

   e.   Medical staff shall record in the appropriate section of the inmate's Health Record, entries for all the medical procedures described in this section.   (Refer to the Program Statement on Health Information Management.)

9.   [**FOOD/LIQUID INTAKE/OUTPUT** §549.64

   a.   **Staff shall prepare and deliver to the inmate's room three meals per day or as otherwise authorized by the physician.**]

   A verbal offer of a meal will not suffice.   Food from the food tray may be left in the inmate's cell.   Ordinarily, when the food tray is left in the inmate's cell, perishable food items will not be left for more than two hours.

   [**b.**   **Staff shall provide the inmate an adequate supply of drinking water.   Other beverages shall also be offered.**

   **c.**   **Staff shall remove any commissary food items and private food supplies of the inmate while the inmate is on a hunger strike.   An inmate may not make commissary food purchases while under hunger strike management.**]

An inmate under **hunger strike** management may still purchase

non-food items, such as stamps, from the commissary.   The inmate

is allowed to have toothpaste in the dry cell.

   d.   All food and water intake and output will be monitored and recorded as needed or to the extent possible.   The Warden shall make this determination after consultation with the physician. This procedure is to continue until ended by a physician.

**#**   This means a dry cell must be available for housing **hunger strike** inmates.

6

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Health Services and Food Service staff may offer alternative beverages, including liquid nutritional supplements, if authorized by the physicians. Any beverages other than drinking water must be documented (e.g. BP-S292) and that information relayed to Health Services staff. Acceptance of liquids alone should not be documented as accepting a meal.

10. **[REFUSAL TO ACCEPT TREATMENT** §549.65

   **a. When, as a result of inadequate intake or abnormal output, a physician determines that the inmate's life or health will be threatened if treatment is not initiated immediately, the physician shall give consideration to involuntary medical treatment of the inmate.]**

   The decision to force treatment upon the inmate is a medical decision, preferably by a written physician's order, with potential legal implications.

   When it appears to medical staff that the inmate's condition is deteriorating to the extent that intervention may soon be required, the Regional Counsel must be notified so any legal issues may be addressed. Although legal counsel has been notified, medical staff should not suspend or delay involuntary treatment if the physician is convinced to a reasonable medical certainty that there is an immediate threat to the inmate's life, or permanent damage to the inmate's health.

   Regional Counsel will determine whether it is appropriate to contact the local U.S. Attorney's Office.

   **#** In the case of potential involuntary treatment of a pretrial inmate, institution legal staff or the

   Regional Counsel must be notified that intervention may be required, in order to determine whether the court should be notified.

   **#** In all such situations, the Regional Counsel will inform the Regional Director.

   **[b. Prior to medical treatment being administered against the inmate's will, staff shall make reasonable efforts to convince the inmate to voluntarily accept treatment. Medical risks faced by the inmate if treatment is not accepted shall also be**

proↄ

7

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Attachment: 7:

EX: 7: PROGRAM STATEMENT: STANDARDS OF EMPLOYEE CONDUCT.

OPI:         **OGC/ELE**
**NUMBER:**   **3420.11**
**DATE:**      **12/6/2013**
**SUBJECT:**    **Standards of Employee Conduct**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

OPI:   OGC/ELE

NUMBER:   3420.11

DATE:   12/6/2013

SUBJECT:   Standards of Employee Conduct

*/s/*

*Approved*: Charles E. Samuels, Jr.

Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

To provide policies and procedures, referred to as the "Standards of Conduct," to complement those issued by the Office of Government Ethics on:

pro

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

Attachment : 8

EX: 8 : PROGRAM STATEMENT : INMATE PERSONAL PROPERY.



**U.S. Department of Justice**

Federal Bureau of Prisons

Program Statement

# Program Statement

OPI:   CPD/CSB

NUMBER:   5580.08

DATE:   August 22, 2011

# Inmate Personal Property

/s/

*Approved*: Thomas R. Kane

Acting Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

**§ 553.10  Purpose and scope.**

**It is the policy of the Bureau of Prisons that an inmate may possess ordinarily only that property which the inmate is authorized to retain upon admission to the institution, which is issued while the inmate is in custody, which the inmate purchases in the institution commissary, or which is approved by staff to be mailed to, or otherwise received by an inmate.  These rules contribute to the** pro|

**1**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement

44020054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

App.227

Ammunition or explosives.

Combustible or flammable liquids.

Knives or tools not provided in accordance with the Program Statement **Correctional Services Manual**.

Hazardous or poisonous chemicals and gases.

Narcotics or other controlled substances not dispensed or approved by the institution HSU are also hard contraband.

Medicine the HSU dispensed or approved is hard contraband if not possessed by the inmate for whom it was prescribed or if not consumed or used in the manner prescribed.
Staff must consult the institution pharmacist or other health services staff member in any case involving questions whether a prescribed medication represents contraband.

Medicines the inmate carries into the institution at the time of commitment (e.g., voluntary commitment) will be forwarded to the institution medical staff for disposition. If appropriate, this medicine will be returned to the inmate.

**(2)   Staff shall consider as nuisance contraband any item other than hard contraband, which has never been authorized, or which may be, or which previously has been authorized for possession by an inmate, but whose possession is prohibited when it presents a threat to security or its condition or excessive quantities of it present a health, fire, or housekeeping hazard. Examples of nuisance contraband include: personal property no longer permitted for admission to the institution or permitted for sale in the commissary; altered personal property; excessive accumulation of commissary, newspapers, letters, or magazines which cannot be stored neatly and safely in the designated area; food items which are spoiled or retained beyond the point of safe consumption; government-issued items which have been altered, or other items made from government property without staff authorization.**

The Warden may set limits locally, based on available storage space, on the amount of commissary items, newspapers, magazines, etc., each inmate may retain.

5.  **PROCEDURES FOR HANDLING CONTRABAND**

**§ 553.13 Procedures for handling contraband.**

**(a)   Staff shall seize any item in the institution which has been identified as**

proj

9

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

**contraband whether the item is found in the physical possession of an inmate, in an inmate's living quarters, or in common areas of the institution.**

**(b)  Staff shall dispose of items seized as contraband in accordance with the following procedures.**

Exceptions to these procedures may occur only upon written authorization of the Warden or designee.

The procedures described in this section apply to and include property found in the inmates physical possession, in an inmates living quarters, or in common areas of the institution.
These procedures also encompass the property of inmates processed through Receiving and Discharge (R&D), such as new commitments and inmates received through transfer.
When religious items are confiscated the chaplain must be consulted as to the validity of the items.

**(1)  Staff shall return to the institution's issuing authority any item of government property seized as contraband, except where the item is needed as evidence for disciplinary action or criminal prosecution.  In such cases, staff may retain the seized property as evidence.**

Seized government property, if not altered, may be placed in normal stock for reissue.

Altered government property, including items an inmate made from government property without staff authorization, will be destroyed at the Warden's discretion.
The Warden may delegate the authority to determine if altered government property is to be destroyed.
The chaplain must be consulted regarding the disposition of religious items confiscated.

**(2)  Items of personal property confiscated by staff as contraband are to be inventoried and stored pending identification of the true owner (if in question) and possible disciplinary action.  Following an inventory of the confiscated items, staff shall employ the following procedures.**

**(i)  Staff shall provide the inmate with a copy of the inventory as soon as practicable.  A copy of this inventory shall also be placed in the inmate's central file.**

Placing a copy of the inventory in the Inmate Central File will assist staff in the investigation of possible tort claims.

**(ii)  The inmate shall have seven days following receipt of the inventory to provide staff with evidence of ownership of the listed items.  A claim of ownership may not be accepted for an item made from the unauthorized use of** prop

**10**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

App.229

government property. Items obtained from another inmate (for example, through purchase, or as a gift) without staff authorization may be considered nuisance contraband for which a claim of ownership is ordinarily not accepted.

(iii)  If the inmate establishes ownership, but the item is identified as contraband, staff shall mail such items (other than hard contraband), at the inmate's expense, to a destination of the inmate's choice.  The Warden or designee may authorize the institution to pay the cost of such mailings when the item had not been altered and originally had been permitted for admission to the institution or had been purchased from the commissary, or where the inmate has insufficient funds and no likelihood of new funds being received.  Where the inmate has established ownership of a contraband item, but is unwilling, although financially able to pay postage as required, or refuses to provide a mailing address for

return of the property, the property is to be disposed of through approved methods, including destruction of the property.

The Confiscation and Disposition of Contraband form (BP-A0402) will be completed.

Ordinarily, the Correctional Systems Manager (CSM) is responsible for authorizing the institution to pay mailing costs.

(iv)  If the inmate is unable to establish ownership, staff shall make reasonable efforts to identify the owner of the property before any decision to destroy the property is made.

(v)  Staff shall prepare and retain written documentation describing any items destroyed and the reasons for such action.

Destroying contraband will be accomplished as follows:

   Ordinarily, the CSM (for R&D only) or Captain or designee receives the inmate's proof of ownership and determines if an item is contraband.

   When it is determined that the item is to be destroyed, the CSM (for R&D only) or Captain or designee will prepare the written documentation describing the item(s) destroyed and the reasons for this action.

   Ordinarily, property is held for 120 days before it is destroyed.  This delay allows an inmate the opportunity to obtain proof of ownership and/or appeal the decision through the Administrative

pro|

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Remedy Procedure.

The employee who actually destroys the property, and at least one staff witness to the disposal, will state in writing that they have witnessed the destruction.

Records of disposal of property will remain on file for at least two years to ensure the availability of information necessary to an investigation of a subsequent tort claim.

**(vi)   Where disciplinary action is appropriate, staff shall delay disposition of property until completion of such action (including appeals).**

**(c)   Staff shall retain items of hard contraband for disciplinary action or prosecution or both.   The contraband items may be delivered to law enforcement personnel for official use.   When it is determined that the item is not needed for criminal prosecution, the hard contraband shall be destroyed as provided in paragraph (b)(2)(v) of this section.   Written documentation of the destruction shall be maintained for at least two years.**

**(d)   Staff may not allow an inmate to possess funds in excess of established institutional limits.   Staff shall deliver to the cashier any cash or negotiable instruments found in an inmate's possession which exceed the institution's allowable limits.   Funds determined to be contraband shall be confiscated for crediting to the U.S. Treasury.**

All cash and negotiable instruments in the possession of inmates is unauthorized.

Cash and negotiable instruments that were inadvertently delivered to the inmate via the mail and are immediately turned over to staff shall be returned to the mail room to be processed in accordance with the Program Statement **Correspondence**.

All other cash and negotiable instruments found in the inmates possession shall be processed as contraband.  The cash and negotiable instruments shall be turned over to the cashier.

**(1)   Where disciplinary action against the inmate is appropriate, staff shall delay final disposition of the funds until such action (including appeals) is completed.**

**(2)   Prior to a decision on the disposition of funds, staff shall allow the inmate a reasonable amount of time to prove ownership.**

**6.  INMATE TRANSFER BETWEEN INSTITUTIONS AND INMATE RELEASE**

pro

**12**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**(2)   The inmate's property may be sent with the inmate to the medical facility when the inmate is not expected to return to the sending institution, will be at the medical facility over 120 days, or for any other justified reason.   The Warden at the sending institution shall prepare and place in the inmate's central file written documentation for forwarding the inmate's personal property.**

**(d)   The Warden of the medical facility shall return an inmate's personal property ordinarily in the same or equivalent size container as originally used by the sending institution.   Property accumulated over that amount, at the option of the inmate, will either be sent to a destination selected by the inmate, at the inmate's expense, donated, or destroyed.   If the inmate is financially able but refuses to pay for the mailing, or if the inmate refuses to provide a mailing address for forwarding of the property, the property is to be disposed of through approved methods, including destruction of the property.**

On occasion, staff may allow an inmate to retain more property than he or she brought to the institution.   Situations when this might be permitted include when the inmate has been at the institution over three months or when a transfer is unexpectedly effected immediately after the inmate has made significant commissary purchases.

If the inmate is re-designated after completing medical treatment to an institution other than the sending institution, the medical facility is to notify the sending institution of this fact via GroupWise.

The medical institution will send this message when treatment has been completed and the inmate is ready for transfer.
Upon receiving the GroupWise message, the institution retaining the inmates property will arrange for the property to be forwarded to the institution to which the inmate was transferred.

Ordinarily, once every 30 days, staff will inspect the stored property to guard against tampering or pilferage.

## 9.   U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) DETAINEES

ICE has placed limitations on the amount of personal property for detainees who will be deported. Consequently, detainees who transfer to other facilities should have their property limited to the following items:

> Wedding Band (plain, no stones).
> Prescribed Medication.
> Legal Materials (ongoing case).

pro

**17**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Attachment: 9

EX: 9 : PROGRAM STATEMENT : INMATE MANUSCRIPTS.

Federal Bureau of Prisons

# Program Statement

**OPI:** FPI

**NUMBER:** 5350.27

**DATE:** 7/27/99

**SUBJECT:** Inmate Manuscripts

1. **PURPOSE and SCOPE.** To encourage inmates to use their leisure time for creative writing and to permit the direct mailing of all manuscripts as ordinary correspondence.

2. **SUMMARY OF CHANGES.** This revision updates the Directives Referenced, adds a Program Objective and a Standards Referenced section, and makes other editorial and format changes consistent with current Bureau policy. The requirement for an Institution Supplement has been eliminated.

3. **PROGRAM OBJECTIVE.** The expected result of this program is: Inmates will be afforded the opportunity to write and mail

manuscripts for publication.

4. **DIRECTIVES AFFECTED**

a. **Directive Rescinded**

PS 5350.07   Inmate Manuscripts (7/16/79)

b. **Directives Referenced**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pro|

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

| | | |
|---|---|---|
| P S | 5265.10 | Correspondence (12/18/97) |
| P S | 5270.07 | Inmate Discipline and Special Housing Units (12/29/87) |
| P S | 5580.05 | Personal Property, Inmate (9/30/96) |
| P S | 5800.10 | Mail Management Manual (11/3/95) |

c.   Rules cited in this Program Statement are contained in 28 CFR 551.80 through 551.83.

**[Bracketed Bold - Rules]**

Regular Type - Implementing Information

PS 5350.27

7/27/99

Page 2

5.   **STANDARDS REFERENCED**

a.   American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:   3-4428 and 3-4429

   b.   American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities:   3-ALDF-5D-01

   c.   American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies:   None

d. American Correctional Association Standards for Adult Correctional Boot Camp Programs:   1-ABC-5C-06 and 1-ABC-5D-01

pro|

**2**
© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Print to PDF without this message by purchasing novaPDF (http://www.novapdf.com/)

235

6.   [DEFINITION.   §551.80.   As used in this rule, "manuscript" means fiction, nonfiction, poetry, music and lyrics, drawings and cartoons, and other writings of a similar nature.

7.   [MANUSCRIPT PREPARATION §551.81.   An inmate may prepare a manuscript for private use or for publication while in custody without staff approval.   The inmate may use only non-work time to prepare a manuscript.]

8.   [MAILING INMATE MANUSCRIPTS §551.82.   An inmate may mail a manuscript as general correspondence, in accordance with Part

540, Subpart B of this chapter.   An inmate may not circulate his manuscript within the institution.]

Part 540, Subpart B refers to the Program Statement on

Correspondence.

9.   [LIMITATIONS ON AN INMATE'S ACCUMULATION OF MANUSCRIPT MATERIAL §551.83.   The Warden may limit, for housekeeping, fire-prevention, or security reasons, the amount of accumulated inmate manuscript material.]

The Warden may choose to address the issue of accumulation of inmate manuscripts in the Institution Supplement on Inmate Personal Property.

/s/

Kathleen Hawk Sawyer

Director

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-02516-RBJ-KMT

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA,

      Defendants.

---

## MOTION TO DISMISS SECOND AMENDED COMPLAINT IN PART PURSUANT TO RULES 12(b)(6) AND 12(b)(1)

---

In his Second Amended Complaint ("SAC"), ECF No. 64, Plaintiff sues under the First and Eighth Amendments and the Federal Tort Claims Act ("FTCA"). Plaintiff's excessive-force, failure-to-intervene, and First Amendment claims against individually named defendants should be dismissed for lack of a *Bivens* remedy, and four Defendants are entitled to qualified immunity. The related official-capacity claims fail for failure to state a claim, as does the FTCA claim for negligent supervision, which is also not exhausted.

## BACKGROUND

Plaintiff, an ADX inmate, was convicted of the al Qaeda-directed bombings of the U.S. Embassies in Tanzania and Kenya in August 1998. *See United States v. Bin Laden*, 156 F. Supp.

2d 359, 360 (S.D.N.Y. 2001).  While in BOP custody, Plaintiff helped a co-conspirator in the

bombings attack a correctional officer.  *United States v. Salim*, 287 F. Supp. 2d 250, 294-95, 355

(S.D.N.Y. 2003).  Here, he claims that ADX officers violated his rights.  Specifically, Plaintiff

alleges that on August 23, 2018, while he was on hunger strike, officers beat him and verbally

insulted him after he attempted to stop at his cell during an escort.  He further alleges that written

materials were removed from his cell during this time period, and that medical staff were

deliberately indifferent to the injuries that he sustained as a result of the use of force.  A detailed

timeline of the relevant factual allegations is attached hereto as Exhibit 1.[1]

The following claims should be dismissed:[2]

| Claim | Defendant | Capacity | Bases for dismissal |
|---|---|---|---|
| Excessive Force | Brush | Individual | No *Bivens* remedy |
| | Miller | Individual | No *Bivens* remedy |
| | Espinoza | Individual | No *Bivens* remedy |
| Failure-to-intervene | Armijo | Individual | No *Bivens* remedy |
| | Murton | Individual | No *Bivens* remedy |
| | Osagie | Individual | No *Bivens* remedy; qualified immunity |
| Freedom of Speech | Brush | Individual and official[3] | No *Bivens* remedy; qualified immunity; no injunctive relief |
| Deliberate Indifference | Jones | Individual and official[4] | Qualified immunity; no injunctive relief |
| | Huddleston | Individual and official | Qualified immunity; no injunctive relief |
| | Osagie | Individual and official | Qualified immunity; no injunctive relief |
| Negligent Supervision | U.S. | | Failure to exhaust and state claim |

[1] The SAC consists of 30 handwritten pages containing a plethora of allegations.  In order to efficiently present the most pertinent allegations relevant to this motion, Defendants have followed the suggestion in this Court's Practice Standards to provide a timeline of the key events.  *See* RBJ Practice Standards at 3.

[2] If this Motion is granted, the following claims will remain: Plaintiff's battery claims against the United States (claims 11-13) and Plaintiff's medical malpractice claims against the United States (claims 15A and 15B).

[3] Plaintiff seeks an order that the confiscated materials be returned to him.  SAC at 30.

[4] Plaintiff seeks an order that he be evaluated by outside specialists and a psychiatrist.  *Id.*

2

**App.238**

## ARGUMENT

I.     **The Court should not imply a *Bivens* remedy for the excessive force, failure-to-intervene, and First Amendment claims.**

Plaintiff claims that Brush, Miller, and Espinoza used excessive force; that Armijo, Murton, and Osagie failed to intervene; and that Brush violated his First Amendment rights.  *See* Ex. 1 at 1-3.  All seven claims should be dismissed pursuant to Rule 12(b)(6) because special factors counsel against implying a novel *Bivens* remedy.

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), recognized a limited "implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights" in a case involving a Fourth Amendment claim for unreasonable search and seizure.  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  The Court subsequently recognized a *Bivens* remedy in a Fifth Amendment equal-protection violation case, *Davis v. Passman*, 442 U.S. 228 (1979), and an Eighth Amendment failure-to-provide-adequate-medical-treatment case, *Carlson v. Green*, 446 U.S. 14 (1980).  Since then, the Court "has consistently refused to extend *Bivens* to any new context."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) ("expanding the *Bivens* remedy is now a disfavored judicial activity").

In deciding whether to imply a *Bivens* remedy, a court must first determine whether the claim arises in a context that is different from *Bivens*, *Davis*, and *Carlson*.  *See Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (citing *Malesko*, 534 U.S. at 68).  The context is new if it differs from previous Supreme Court cases due to, *inter alia*, the constitutional right at issue, the generality or specificity of the official action, the risk of disruptive intrusion by the judiciary into the functioning of other branches, or the presence of special factors that previous *Bivens* cases did not consider. *Abbasi*, 137 S. Ct. at 1860.  If the context is new, the court must then assess: (1) whether any

**App.239**

alternative process exists, and (2) whether special factors counsel hesitation in implying a remedy. *See id*. at 1858.

### A.   First Amendment Claim

<u>The First Amendment claim here presents a new context</u>.  The allegedly improper removal of manuscripts and books from Plaintiff's cell involves an entirely different constitutional right and factual context than *Bivens*, *Carlson*, and *Green*.  Indeed, the Supreme Court has never found that *Bivens* extends to First Amendment claims.  *See, e.g.*, *Minneci v. Pollard*, 565 U.S. 118, 124 (2012) (recognizing that the Court has not found a *Bivens* remedy for violations of First Amendment rights); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (citations omitted) (same).

<u>There are alternative processes available</u>.  *First*, Plaintiff can pursue a claim under the Small Claims Act, which allows "[t]he head of an agency" to "settle a claim for not more than $1,000 for damage to, or loss of, privately owned property that is caused by the negligence of an officer or employee of the United States Government acting within the scope of employment . . ." 31 U.S.C. § 3723(a).  Congress did not choose to impose individual liability through the Small Claims Act.  *Second*, Plaintiff can seek a remedy under the prison grievance system.  *See* 28 C.F.R. § 542.10; *see also Malesko*, 534 U.S. at 74 (recognizing prison grievance system as available alternative process counseling against extending *Bivens*); *K.B. v. Perez*, 664 F. App'x 756, 759 (10th Cir. 2016) (same); *see also* ECF No. 64-1 at 4-6 (administrative remedy documents).

<u>There are additional special factors counseling judicial restraint</u>.  *First*, the Supreme Court has observed that there is "legislative action suggesting that Congress does not want a damages remedy" against individual correctional officers because it considered prisoner abuse in the context of the Prison Litigation Reform Act of 1996 ("PLRA") and has "been active in the area of prisoners' rights." *Abbasi*, 137 S. Ct. at 1865.  Congress's decision not to provide a stand-alone

4

**App.240**

damages remedy "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.*; *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1998) (courts should not imply a damages remedy where Congress's inaction "has not been inadvertent"). Separation-of-powers concerns are heightened in the prison context, where Congress is better suited than the judiciary to "balance the challenges prison administrators and officers face in maintaining prison security against the expansion of the private right of action for damages." *Morgan v. Shivers*, No. 1:14-cv-7921-GHW, 2018 WL 618451, at *6 (S.D.N.Y. Jan. 29, 2018); *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) ("the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial").

*Second*, the Supreme Court recognized that the threat of personal liability could impede the proper functioning of BOP facilities by causing officials to alter their behavior and judgment to avoid individual liability, at the expense of institutional security and other critical prison-management decisions. *Abbasi*, 137 S. Ct. at 1863. Implying a damages remedy here would have a profound impact on BOP operations because officers' desire to avoid liability may cause them to hesitate in their response to disobedient behavior such as that at issue here. This is precisely the compromise to security and critical management decisions that the Supreme Court envisaged in limiting *Bivens*. *Abbasi*, 137 S. Ct. at 1863. In addition, "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered." *Id.* at 1856. That is why it rests with Congress "to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers . . . ." *Id.*

Each of these concerns satisfies the "remarkably low" threshold for finding a special factor. Congress did not create a damages remedy in the First Amendment context, and the constant

specter of lawsuits will stifle the ability of prison officials to effectively regulate and monitor the items that inmates maintain in their cells. The Court should therefore decline to extend a *Bivens* remedy to Plaintiff's First Amendment claim. *See, e.g.*, *Millbrook v. Spitz*, No. 18-cv-01962-RM-KMT, 2019 WL 4594275, at *4 (D. Colo. Sept. 23, 2019); *Shepard v. Rangel*, No. 12-cv-01108-RM-KLM, 2014 WL 7366662, at *17 (D. Colo. Dec. 24, 2014).

### B.   Excessive Force and Failure-to-Intervene

<u>The claims present a new context</u>. Here, allegations that an inmate stopped unexpectedly during an escort and was then subjected to a use of force in order to bring him under control bear "little resemblance" to *Bivens*, *Carlson*, and *Green*, particularly where that inmate was subsequently convicted by a Disciplinary Hearing Officer of attempted assault. *See* SAC at ¶ 108; *Abdo v. Balsick*, No. 18-cv-01622-KMT, 2019 WL 6726230, at *6 (D. Colo. Dec. 11, 2019). The claims therefore present a new context.[5]

The Supreme Court has emphasized that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743. And whether the Tenth Circuit has "implicit[ly]" recognized the extension of *Bivens* to excessive force claims in the Fourth Amendment context,[6] *see Smith*, 2021 WL 1799400, at *4-5, does not address the question of

---

[5] The Court need not decide whether all excessive force and failure-to-intervene claims present new contexts, although courts in this district have often so held. *See, e.g.*, *Abdo*, 2019 WL 6726230, at *6 ("no question" that excessive force claim was new context); *Millbrook*, 2019 WL 4594275, at *3-4 (new context where officer slammed handcuffed inmate's head and shoulders against bars and stuck finger in inmate's anus); *but see, e.g.*, *Smith v. Trujillo*, No. 20-cv-00877-RBJ-NYW, 2021 WL 1799400, at *4-5 (D. Colo. Mar. 26, 2021), *adopted*, 2021 WL 1608829 (D. Colo. Apr. 26, 2021).

[6] The cases cited in *Smith* neither implicitly nor explicitly countenance an extension of *Bivens* in the circumstances presented here. In *Jones v. Theodoroff*, 104 F. App'x 141 (10th Cir. 2004), the Tenth Circuit did not address whether a *Bivens* remedy existed. In *Farmer v. Brennan*, the

**App.242**

whether there are meaningful differences between a particular case (i.e., this case) and previous

contexts.  *See Abbasi*, 137 S. Ct. at 1859.  One meaningful difference, even in "almost parallel

circumstances" is enough.  *Id.* at 1859.  As *Smith* recognized, excessive force claims are "not

identical on all fours" to previous *Bivens* contexts.  2021 WL 1799400, at *4.  That is sufficient to

demonstrate a new context.  The same is true for Plaintiff's failure-to-intervene claims –

allegations that officers failed to intervene to stop the use of force after an inmate stopped

unexpectedly at his cell differ in meaningful ways from *Bivens*, *Carlson*, and *Green*.

<u>There are alternative processes</u>.  The availability of *any* alternative process for protecting a

plaintiff's interest may counsel against extending *Bivens*.[7]  *Abbasi*, 137 S. Ct. at 1858 (citations

omitted).  *First*, as discussed above, Plaintiff can seek a remedy under the prison grievance system.

*See, e.g.*, *K.B.*, 664 F. App'x at 759.  *Second*, Plaintiff can bring, and in fact has brought, claims

under the FTCA, which, in the wake of *Abbasi*, several courts have acknowledged as an alternative

process.  *See* 28 U.S.C. § 2680(h) (recognizing remedy for assault by federal law enforcement);

*see, e.g.*, *Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020), *cert. denied*, (recognizing FTCA as

alternative process for excessive force claim); *Silva v. U.S.*, No. 19-cv-02563-CMA-MEH, 2020

---

Supreme Court assumed, without deciding, that a *Bivens* remedy existed for a transsexual prisoner
who was beaten and raped by another inmate after being housed in the general population.  *See* 511
U.S. 825, 829-30 (1994).  Those facts bear no resemblance to the facts here, and *Abbasi* did not
recognize *Farmer* as a case in which a *Bivens* remedy had been approved.  In *Graham v. Connor*,
the Court observed in dicta that the legal standard for analyzing Fourth Amendment excessive
force claims under 42 U.S.C. § 1983 is the same as the standard for evaluating excessive force
claims under *Bivens*.  490 U.S. 396, 394 n. 9 (1989).  That is hardly a formal extension of *Bivens*.
Nor were the facts in *Graham* similar to those presented here.  *Id.* at 388-89.
[7] An alternative process need not ultimately prove successful, *Bowman v. Sawyer*, No. 19-cv-1411-
WJM-KMT, 2020 WL 6390992, at *5 (D. Colo. Nov. 2, 2020), or provide monetary damages. *See,
e.g.*, *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (declining to extend *Bivens* in the absence of
alternative *Bivens* remedy); *Huerta*, 2019 WL 399229, at *15.

**App.243**

WL 7706785, at *6 (D. Colo. Dec. 29, 2020) (same).

*Third*, Plaintiff can seek injunctive relief. SAC at 30. Injunctive relief is "the proper means for preventing entities from acting unconstitutionally." *Malesko*, 534 U.S. at 74 (availability of injunctive relief is alternative process available to federal prisoners); *see also Abbasi*, 137 S.Ct. at 1863 (same); *K.B.*, 664 F. App'x at 759 (same). Similarly, Plaintiff can invoke the mandamus statute to "compel an officer … of the United States" to address his alleged injuries. *See* 28 U.S.C. § 1361; *see also Millbrook*, 2019 WL 4594275, at *4.

There are additional special factors counseling judicial restraint. The special factors set forth in section I.A., *supra*, counsel against extending *Bivens* to Plaintiff's excessive force and failure-to-intervene claims. The Court should decline to find a remedy for these claims.[8]

## II.   Brush is entitled to qualified immunity on the First Amendment claim, and the official-capacity claim also fails.

Qualified immunity represents "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1986). Qualified immunity "is the norm in private actions against public officials," who enjoy a "presumption of immunity when the defense of qualified immunity is raised." *Pahls v. Thomas*, 718 F.3d 1210, 1227) (10th Cir. 2013) (internal quotations omitted). To overcome qualified immunity, Plaintiff must satisfy a heavy, two-part burden, showing that (1) the defendant's own conduct violated a constitutional right, and (2) the right allegedly violated was clearly established at the time of the conduct. *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017).

---

[8] This Court has observed that there is a seeming anomaly in allowing a state inmate to pursue damages for excessive force under 42 U.S.C. §1983 while barring such damages against federal officers. *See Smith*, 2021 WL 1608829, at *2. The Supreme Court has addressed that anomaly, concluding that despite passing Section 1983, "Congress did *not* create an analogous statute for federal officials." *See Abbasi*, 137 S.Ct. at 1854 (emphasis added).

<u>Plaintiff has not plausibly alleged a violation of his First Amendment rights</u>.  Plaintiff alleges that Brush violated his First Amendment rights by removing from his cell 12 notebooks, three or four large manuscripts consisting of over 1,000 pages of material, other "shorter works," notes summarizing 130-150 books, and multiple books, some with several volumes.  SAC at ¶¶ 87-95.  But ADX policy limits inmates to a maximum of eight books and two personal compositions or manuscripts.  *See* Ex. 2, FLM 5580.08B, Inmate Personal Property (Nov. 28, 2019), at 3, 9.[9] Personal papers are limited to one cubic foot and "[m]anuscripts must not create a fire hazard, a housekeeping problem, or a security concern because of excess paper."  *Id.* at 3-4.  The allegations demonstrate that Plaintiff's materials far exceeded these limits.

To state a First Amendment claim, a prisoner "'must plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest.'"  *Al-Owhali v. Holder*, 687 F.3d 1236, 1242 (10th Cir. 2012) (quoting *Gee*, 627 F.3d at 1188).  Plaintiff has pled no such facts.  Indeed, the Tenth Circuit has held that a prison official does not violate a prisoner's First Amendment rights "simply by enforcing a prison regulation limiting the number of books he could keep in his cell."  *Neal v. Lewis*, 414 F.3d 1244, 1248-49 (10th Cir. 2005).  And there are obvious "legitimate administrative and penological objectives" inherent in such limitations, including "fire safety, institutional security, control of the source and flow of property within the prison . . . ."  *Id.* 1248.  Plaintiff has not attempted to refute the government's anticipated "usual justifications" for applying these limits to him.  *See Gee*, 627 F.3d at 1186 (complaint must show why government's anticipated "usual justifications" lack rational connection to challenged action).  Plaintiff has thus failed to allege that Brush violated his First

---

[9] The Court may take judicial notice of BOP policies.  *Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010).

Amendment rights.

While Plaintiff appears to further contend that prison officials did not comply with BOP procedures regarding confiscated property, he does not allege that *Brush* personally participated in any decisions regarding the disposition of his property. *See* SAC at ¶¶ 99-100 (describing requests made to other prison officials to return written materials). And an alleged failure to adhere to a prison regulation does not amount to a constitutional violation. *See, e.g.*, *Williams v. Miller*, 696 F. App'x 862 (10th Cir. 2017) (holding that "[m]erely showing that [prison officials] may have violated prison policy is not enough" to establish a constitutional violation) (citations omitted).

<u>There is no clearly established law.</u> There is no particularized law that would have made it clear to Brush that he was violating Plaintiff's rights by removing an excess of written materials from Plaintiff's cell. Instead, Tenth Circuit precedent holds that a prison official *does not* violate a prisoner's rights by enforcing such limits. *See Neal*, 414 F.3d at 1248-49 (10th Cir. 2005).

Accordingly, Brush is entitled to qualified immunity.

<u>The related official-capacity claim fails.</u> For the reasons above, Plaintiff has failed to plead a First Amendment violation, and the related official-capacity claim fails for the same reasons.

**III.   Osagie is entitled to qualified immunity on the failure-to-intervene claim.**

Osagie is entitled to qualified immunity on Plaintiff's failure-to-intervene claim.

<u>Plaintiff has failed to allege Osagie's personal participation.</u> To establish a failure-to-intervene claim, Plaintiff must plausibly allege that Osagie observed or had reason to know of a constitutional violation, and had an opportunity to intervene. *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (citing *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)). The only non-conclusory allegations regarding Osagie's involvement in the August 23, 2018, incident are: (1) Plaintiff "heard Osagie from the [observation] cell's door, very close to where I

was being beaten, saying approvingly 'is he still resisting?'" and (2) Plaintiff called out to Osagie to ask whether he was witnessing the beating, but Osagie never responded.  *See* SAC at ¶¶ 76-77.

Plaintiff speculates that because Osagie's voice sounded "very close" and Plaintiff was on a bed in the cell, "Osagie must have seen me and the beatings very easily[.]"  *Id.* at ¶ 78.  This allegation is conclusory and not entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 678-79. And the remaining allegations do not plausibly allege that Osagie *actually observed* anything that happened in the observation cell.  Indeed, all that can be plausibly inferred is that Osagie was standing near the observation cell and had been told that Plaintiff had been resisting.  SAC at ¶ 76. The allegations about what Osagie heard and observed are equally consistent with legal conduct (i.e. that Osagie believed that Plaintiff had been resisting and that the officers were acting lawfully to regain control over Plaintiff).  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567-69 (finding that plaintiffs had not "nudged their claims across the line from conceivable to plausible" where alleged conduct was consistent with lawful behavior); *Iqbal*, 556 U.S. at 681 (even though alleged conduct was "consistent" with discrimination, the allegations did not plausibly allege that conduct was discriminatory "given more likely explanations" for the actions).

Thus, Osagie is entitled to qualified immunity because Plaintiff has failed to plausibly allege his personal participation in a constitutional violation.  *See, e.g.*, *Pahls*, 718 F.3d at 1228 (emphasizing the importance of identifying specific actions taken by particular defendants).

<u>There is no clearly established law</u>.  Plaintiff's conclusory allegations do not plausibly suggest that Osagie had "fair and clear warning" that a failure to intervene in a constitutional violation that he did not personally observe would violate Plaintiff's constitutional rights.  *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted) (requiring identification of a case where an officer acting under similar circumstances committed a constitutional violation); *see also*

11

**App.247**

*Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added).

### IV.   Deliberate Indifference Claims

Plaintiff brings *Bivens* and injunctive-relief claims asserting that Jones, Huddleston, and Osagie were deliberately indifferent to his medical needs by (1) refusing to examine or treat his ankle; (2) denying him pain medication; and (3) delaying an x-raying of his jaw and wrists.

#### A.   Jones, Huddleston, and Osagie are entitled to qualified immunity.

A deliberate indifference claim has two components: (1) an objectively serious deprivation of care for a serious medical need; and (2) subjective knowledge, and disregard, of an excessive risk of serious harm. *Farmer v. Brennan,* 511 U.S. 825, 834, 837 (1994). The objective prong requires that the alleged deprivation be "'sufficiently serious'" such that "a prison official's *act or omission* must result in the denial of the 'minimal civilized measure of life's necessities.'" *Id.* 834 (emphasis added). A prisoner must show "acts or omissions sufficiently harmful" that they "evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). To meet the objective component based on a delay in care, Plaintiff must allege that a delay "resulted in substantial harm." *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).

To satisfy the subjective prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 828. In addition, Plaintiff's allegations must plausibly show that each Defendant's mental state was criminally culpable, "akin to 'recklessness in the criminal law.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). This requirement is intended to "isolate[] those who inflict punishment." *Farmer*, 511 U.S. at 837, 839 (it is not enough that an official "should have known" about a serious risk; instead, the official must actually perceive that risk and deliberately ignore it). A showing of negligent or inappropriate care is insufficient to

**App.248**

plead the subjective prong. *Self*, 439 F.3d at 1233, 1235.

Each of Plaintiff's alleged injuries will be addressed in turn.

        a.   <u>Broken ankle</u>

<u>Failure to plead subjectively culpable intent</u>.  As detailed in the timeline of the care that Plaintiff alleges receiving, *see* Ex. 1 at 3-4, Jones, Huddleston, and Osagie repeatedly examined and provided treatment for Plaintiff's ankle.  While the existence of a fracture was not immediately recognized, it was ultimately diagnosed and treated with a splint, followed by a hard cast (at the direction of an orthopedist), and by providing Plaintiff a wheelchair.  SAC at ¶¶ 119, 139.  Plaintiff received multiple x-rays and his ankle fracture healed.  *Id.* at ¶¶ 120, 122; ECF No. 64-1 at 9.

These facts do not plausibly show that Jones, Huddleston, or Osagie disregarded a known, substantial risk of harm with criminally reckless intent.  *See Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018), *cert. denied*, 140 S. Ct. 252 (2019) (medical providers "do not act with deliberate indifference when they provide medical treatment even if it is subpar"); *see also Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (even "grossly negligent" medical judgment "is not subject to second-guessing in the guise of an Eighth Amendment claim.").  The Supreme Court has held that "the question whether … additional diagnostic techniques or forms of treatment [are] indicated is a classic example of a matter for medical judgment" that does not give rise to an Eighth Amendment claim.  *Estelle*, 429 U.S. at 107; *see also Sherman v. Klenke*, 653 F. App'x 580, 588 (10th Cir. 2016) (where "'the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors'" (quoting *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987)).  Similarly, here, disputes concerning whether an x-ray should have been ordered sooner or whether ice was indicated are classic examples of medical judgments that are insufficient to establish a

**App.249**

constitutional violation.  *Id.* at 107; *see also Irons v. Samu*, No. 06-cv-02254-PAB-BNB, 2010 WL

749797, at *10 (D. Colo. March 2, 2010) ("the application of ice is within the discretion of the

health care provider.").  Plaintiff has therefore not sufficiently pleaded the subjective element of

deliberate indifference as to Jones, Huddleston, or Osagie, entitling each to qualified immunity.

      <u>Failure to plead objective deprivation</u>.  Plaintiff must allege that he suffered a serious harm

as a result of any allegedly deficient treatment.  *See Stafford v. Stewart*, 461 F. App'x 767, 769

(10th Cir. 2012) ("[I]t is the harm claimed by the prisoner that must be sufficiently serious to

satisfy the objective component, and not solely the symptoms presented at the time the prison

employee has contact with the prisoner." (internal citation and quotation marks omitted)).  "The

substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or

considerable pain.'"  *Mata*, 427 F.3d at 751 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950

(10th Cir. 2001)).  Plaintiff received the proper casting upon discovery of his ankle fracture, and

his ankle healed.  *See* SAC at ¶¶ 119, 139; ECF No. 64-1 at 9.  The only harm that Plaintiff

attributes to the delay in diagnosis is that he experienced pain during the delay, which is the

subject of Plaintiff's separate claim about pain (discussed below).  Plaintiff's claim about his

ankle – as distinct from his claim about pain – does not meet the objective component.

      <u>No clearly established law</u>.  Plaintiff has not alleged that Jones, Huddleston, or Osagie

violated any clearly established law "particularized to the facts of the case."  *White*, 137 S. Ct. at

551-52.  Defendants are aware of no precedent finding that prison medical providers violate the

Constitution when they examine an inmate, order and review x-rays, and confer with an outside

orthopedic specialist about the course of care to be administered.

           b.    <u>Failure to treat pain</u>

      <u>Failure to plead personal participation</u>.  Plaintiff alleges that his requests for pain

medication were not filled by the commissary during his hunger strike, but that when he ended his hunger strike, he was able to obtain medications from the commissary, including ibuprofen, aspirin, and naproxen sodium.[10]   SAC at ¶¶ 146, 164-165; *see also id.* at ¶ 122 (ibuprofen provided by medical staff on December 6, 2018).[11]   Plaintiff has not alleged that Jones, Huddleston, or Osagie were responsible for any decision not to allow him to obtain medication from the commissary.  *Id.* ¶ 164 (asserting that "commissary" did not fill his requests for pain medication). They are therefore entitled to qualified immunity.

Failure to plead subjectively culpable intent.[12]   The well-pled facts do not plausibly show that Jones, Huddleston, or Osagie disregarded a known, substantial risk of harm with criminally reckless intent regarding Plaintiff's complaints of pain.   When Plaintiff stopped hunger-striking—a matter entirely within his control—he was able to get pain medication from the commissary.  *Id.* at ¶¶ 164-165.  At its core, Plaintiff's claim arises from his opinions that he should have received pain medication while on hunger strike and/or that he should have received different pain medication. However, "a difference of opinion . . . as to the optimal pain-management regimen does not amount to deliberate indifference."  *Todd v. Begelow*, 497 F. App'x 839, 842 (10th Cir. 2012);

---

[10] *See* BOP Program Statement P6541.02 (Nov. 17, 2014) (providing procedures for purchasing OTC medications, as well as procedures permitting indigent inmates to obtain OTC medications), *available at* https://www.bop.gov/policy/progstat/6541_002.pdf (last visited July 20, 2021).

[11] Plaintiff also claims that his pain was exacerbated during forced feedings, SAC at ¶¶ 147-148, 150-151, but he has no constitutional right to avoid forced feedings.  *Al-Adahi v. Obama*, 596 F.Supp. 2d 111, 120-121 (D.D.C. 2009) (force feedings and use of restraints during feedings arise from "a need to preserve the life of the Petitioners."); *Couch v. Godinez*, No. 13-cv-1100-JPG, 2014 WL 860801, at *5 (S.D. Ill. March 4, 2014) (citing *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011)) ("It is well established that prison authorities have a right, and indeed a duty, to force-feed an inmate who persists in a hunger strike[.]"); *Parmelee v. Clark*, No. CV-13-5046-EFS, 2013 WL 3777093, at *2 (E.D. Wash. July 17, 2013) ("It appears a prisoner would have no constitutionally protected right in avoiding forced nutrition . . . in response to a 'hunger-strike.'").

[12] For purposes of this Motion only, Defendants do not argue the objective component with respect to Plaintiff's claim regarding the alleged failure to treat his pain.

15

**App.251**

*Johnson v. Correct Care Sols., LLC*, 2018 WL 7372075, at *9 (D. Colo. Nov. 21, 2018) ("Even if Defendants had in fact failed to provide Plaintiff with medication other than Aleve and Tylenol, [t]he failure to provide stronger pain medication does not constitute deliberate indifference." (internal quotations and citations omitted)).  And such a difference of opinion particularly negates an inference of criminally reckless intent in the context of a hunger strike, where pain medications may be legitimately refused.  *See, e.g.*, *Lucio v. Santos*, 600 F. App'x 480, 481-82 (7th Cir. 2015) (refusal to prescribe acetaminophen because inmate was on hunger strike was a legitimate medical reason); *Lewis v. UTMB Medical Staff*, No. 2:19-cv-223, 2019 WL 8012672, at *7 (S.D. Tex. Dec. 13, 2019) (recommending dismissal of deliberate indifference claims for failure to treat pain because plaintiff alleged that defendants denied him pain medication because he was on hunger strike), *adopted*, No. 2:19-CV-223, 2020 WL 838537 (S.D. Tex. Feb. 20, 2020).  Plaintiff has therefore not sufficiently alleged that Jones, Osagie, and Huddleston acted with criminally reckless intent.  *Cf. Slusher v Suthers*, No. 01-cv-0229-PSF-BNB, 2006 WL 2846452, at *9 (D. Colo. Sept. 29, 2006) (granting summary judgment in favor of prison medical staff because they knew that ibuprofen and other OTC medications could be purchased at prison canteen).

No clearly established law.  There is no clearly established law demonstrating that every reasonable officer would have known, beyond debate, that the management of Plaintiff's complaints of pain amounted to a constitutional violation. *See Al-Kidd*, 563 U.S. at 741.

c.   Wrists and jaw

Plaintiff alleges that he did not receive x-rays of his wrists and jaw until October 18, 2018. SAC at ¶ 117.  However, Plaintiff does not sufficiently allege any underlying need for x-rays of his wrists and jaw.  Although Plaintiff alleges that he experienced swelling and pain in his jaw and wrists, the x-rays were ultimately taken and were found to be normal.  *Id.* at ¶ 115, 117.

16

**App.252**

Accordingly, Plaintiff has not established an objective deprivation resulting in the denial of the "minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (internal quotations omitted). Moreover, the allegations do not demonstrate that Jones, Huddleston, and Osagie each knew they were depriving Plaintiff of essential medical care with respect to his wrists and jaw. *See id.* at 837-38. Finally, Plaintiff cannot point to any clearly established law demonstrating that every reasonable officer in Defendants' position would have known, beyond debate, that a delay in x-raying Plaintiff's wrists and jaw amounted to a constitutional violation. *See Al-Kidd*, 563 U.S. at 741. Jones, Osagie, and Huddleston are therefore entitled to qualified immunity.

### B.  Plaintiff's official-capacity claims should be dismissed.

Plaintiff brings his deliberate indifference claims against Jones, Huddleston, and Osagie in both their individual and official capacities. SAC at 3 n.1. Plaintiff's failure to allege deliberate indifference also requires dismissal of his official-capacity claims.[13]

### V.  Negligent Supervision Claim (Claim 14)

Plaintiff brings a negligent supervision claim against the United States under the FTCA, which fails both because it is unexhausted and because he fails to state a claim for relief.[14]

Failure to exhaust administrative remedies. Prior to filing an FTCA action, a plaintiff must exhaust his administrative remedies. *See* 28 U.S.C. § 2675. The Tenth Circuit has repeatedly stressed that this presentment requirement is "'jurisdictional and cannot be waived.'" *See, e.g.*,

---

[13] To the extent Plaintiff may seek money damages for his official-capacity claims, such damages are not available. *See Matthews*, 744 F.Supp.2d at 1167.

[14] Plaintiff also asserts two claims for medical malpractice under the FTCA. SAC at ¶¶ 162-169. Plaintiff is required to provide a certificate of review in connection with his medical malpractice claims within sixty days of service of the SAC. *See* Colo. Rev. Stat. § 13-20-602. In the event that Plaintiff does not provide a certificate of review on or before August 23, 2021, Defendants intend to file an additional motion to dismiss the medical malpractice claims on that basis.

*Lopez v. United States*, 823 F.3d 970, 976 (10th Cir. 2016) (quoting *Bradley v. United States by Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991)).  A claim is properly presented to an agency only if the claim "serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct."  *Barnes v. United States*, 707 F. App'x 512, 516 (10th Cir. 2017) (internal quotations and citations omitted).  The key inquiry is whether the administrative claim notifies the agency of the need to investigate specific conduct, because "'Congress wants agencies to have an opportunity to settle disputes before defending against litigation in court.'"  *Lopez*, 823 F.3d 976 (internal quotations and citations omitted).

Courts routinely dismiss FTCA claims where critical facts related to those claims were not included in the administrative claim.  In *Barnes*, the plaintiff's negligent training and supervision claims were dismissed because the administrative claim included no mention of any possibility that the plaintiff's injuries were caused by negligent training and supervision.  707 F. App'x at 516; *see also Lopez*, 823 F.3d at 977 (dismissing FTCA claim where administrative claim did not give notice that agency needed to investigate whether VA hospital was negligent in credentialing doctor who allegedly provided negligent care).

Here, Plaintiff's administrative claim focused on his allegations that he was beaten and did not receive proper medical treatment.  *See* Ex. 3, Decl. of Paula Trujillo at ¶ 10 and Att. 2.  Similar to the claim in *Barnes*, the claim makes no mention of the possibility that either the alleged beatings or Plaintiff's injuries were the result of negligence by persons in the officers' supervisory chain.  *Id.*  If Plaintiff had alleged facts related to a failure to supervise, those allegations would have required investigation into completely different aspects of the incident and BOP's operations.  Since the agency was not afforded an opportunity to investigate this claim, it must be dismissed under Fed. R. Civ. P. 12(b)(1).  *See Lopez*, 823 F.3d at 977 (finding that district court lacked

subject matter jurisdiction over FTCA claim that had not been properly exhausted).

    <u>Failure to state a claim</u>.  In order to state a claim for negligent supervision under Colorado law, a plaintiff must allege that the defendant "knew his employee posed a risk of harm to the plaintiff and that the harm that occurred was a foreseeable manifestation of that risk." *Keller v. Koca*, 111 P.3d 445, 446 (Colo. 2005) (citations omitted); *see also Destefano v. Grabrian*, 763 P.2d 275, 288 (Colo. 1988) ("[A] person who knows or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm may be directly liable to third parties for harm proximately caused by his conduct.").  Here, Plaintiff has made no allegations that any BOP supervisory official knew that any of the officers involved in the alleged beatings posed an unreasonable risk of harm to either him specifically or to any other inmate(s).  Although Plaintiff alleges that several of the officers have a "reputation" of abusing prisoners and then fabricating incident reports against those prisoners, SAC at ¶ 67, Plaintiff does not plead specific facts regarding these incidents nor does he allege that any of the officers' supervisors were aware of these "reputations."  Indeed, the allegation that the officers fabricated incident reports to cover up abuses suggests that BOP supervisory officials *would not* have known about the alleged abuse.  Accordingly, Plaintiff has failed to state a claim of negligent supervision under Colorado law.  *See De Gomez v. Adams Cty.*, No. 20-cv-01824-CMA-NYW, 2021 WL 1581241, at *12 (D. Colo. Feb. 23, 2021), *adopted*, 2021 WL 1577793 (D. Colo. April 22, 2021) (recommending dismissal of negligent supervision claim because complaint failed to sufficiently allege that the employer "knew that a particular employee (or employees) posed an undue risk of harm to inmates").

## CONCLUSION

    The Court should dismiss the following claims of the SAC (ECF No. 64): the First Amendment claim (against Brush); the excessive force and failure-to-intervene claims (against

Brush, Miller, Espinoza, Murton, Armijo, and Osagie); the deliberate indifference claims (against

Osagie, Huddleston, and Jones); and the negligent supervision claim (against the United States).

Respectfully submitted on this 27th day of July, 2021.

MATTHEW T. KIRSCH
Acting United States Attorney

s/ Jennifer R. Lake
Jennifer R. Lake
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: jennifer.lake@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on July 27, 2021, I served the foregoing document, including copies of any unpublished decisions cited therein, on the following non-CM/ECF participant in the manner indicated:

Khalfan Khamis Mohamed (U.S. mail)
Reg. No. 44623-054
ADX – Florence
P.O. Box 8500
Florence, CO 81226

s/ Jennifer R. Lake
Jennifer R. Lake
United States Attorney's Office

**App.256**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-02516-RBJ-KMT

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA,

      Defendants.

---

## EXHIBIT 1 – TIMELINE OF RELEVANT FACTUAL ALLEGATIONS[1]

---

### Use of Force

- <u>August 20, 2018</u> – Plaintiff declared his intent to go on hunger strike.  ECF No. 64 at ¶ 2.

- <u>August 23, 2018</u> – Plaintiff was moved to the law library so that officers could remove commissary food items from his cell.  *Id.* at ¶ 10.

- <u>August 23, 2018</u> – After items were removed from Plaintiff's cell, Brush ordered Plaintiff to go to Lt. Armijo's office.  *Id.* at ¶ 19.  Plaintiff refused to go.  *See id.*

- <u>August 23, 2018</u> – Brush handcuffed Plaintiff so that he and two other officers could escort Plaintiff out of the library.  *Id.* at ¶¶ 19-20.

- <u>August 23, 2018</u> – Despite the order to go to Lt. Armijo's office, Plaintiff decided to stop at

---

[1] The allegations in this timeline are taken from the Second Amended Complaint, ECF No. 64, and have been organized into each of the legal claims made by Plaintiff.

his cell as they passed it, without giving the officers warning of the move. *See id.* at ¶ 23. When Plaintiff tried to stop at his cell, Brush allegedly threw Plaintiff against the wall, smashed his head, and told him to stop resisting, though Plaintiff denies resisting. *Id.* at ¶¶ 25-27.

- <u>August 23, 2018</u> – Plaintiff was placed in leg restraints, at which time ten or more unidentified officers allegedly assaulted and verbally insulted him. *Id.* at ¶¶ 30-38, 41. His right ankle was broken. *Id.* at ¶ 41. Plaintiff alleges that because his head was held down, he couldn't identify most of the officers. *Id.* at ¶ 39.

- <u>August 23, 2018</u> – The officers then moved Plaintiff to an observation cell. *See id.* at ¶ 40-41, 54. Along the way, the officers allegedly continued to beat Plaintiff. *See id.* at ¶¶ 41-43.

- <u>August 23, 2018</u> – Plaintiff alleges that he saw Lts. Armijo and Murton witnessing the beatings during the walk to the observation cell. *See, e.g.*, *id.* at ¶¶ 46-49.

- <u>August 23, 2018</u> – Once in the observation cell, Miller and Espinoza allegedly continued to beat him under Lt. Murton's direction. *Id.* at ¶¶ 54-56, 65-66, 71-74.

- <u>August 23, 2018</u> – Plaintiff asserts that Osagie, a physician's assistant, was present outside the observation cell but failed to intervene. *Id.* at ¶¶ 76-77.

- <u>Unidentified time</u> - Plaintiff was found guilty of attempted assault by a Disciplinary Hearing Officer, a fact which he acknowledges. *Id.* at ¶ 108.

## **First Amendment**

- <u>August 23, 2018</u> – while Plaintiff was in the observation cell, Brush allegedly told Plaintiff that his journals and manuscripts would be put in the trash. *Id.* at ¶ 86.

- <u>August 23, 2018</u> – when Plaintiff was escorted back to his cell, it was "virtually empty[.]" *Id.* at ¶ 87. Plaintiff alleges that 12 notebooks, three or four large manuscripts consisting of over 1,000 pages of material, other "shorter works," notes summarizing 130-150 books, and multiple books, some with several volumes, were removed, among other things. *Id.* at ¶¶ 87-95.

- <u>A few days later</u> – Plaintiff submitted a written request to a correctional counselor requesting the return of the items. *Id.* at ¶ 98. The counselor told him his things were in storage. *Id.*

- <u>October 2018</u> – Plaintiff was allegedly told that the materials could not be found, and he submitted written requests to the ADX's warden, the Unit Team, the Property Officer, an unidentified Lieutenant, and an "SIS staff member." *Id.* at ¶ 99.

- <u>Unidentified time</u> – Some items were returned to Plaintiff at an unidentified time, including an Arabic Bible, an English dictionary, 3-4 religious books, a photo album, a prayer rug, copies of old administrative remedies, shoes, shower "sleepers", food items, and clothes. *Id.* at 101.  Plaintiff asserts that other items have been destroyed.  *See id.* at ¶¶ 105-06.

### **Deliberate Indifference**

- <u>August 23, 2018</u> – As a result of the use of force, Plaintiff alleges that he suffered a fracture of his right ankle, pain in his wrists and jaw, a bleeding nose, and lacerations and bruises. *Id.* at ¶¶ 114-115.  Defendant Jones, a nurse, examined Plaintiff twice after the use of force. *Id.* at ¶¶ 130-131.  Jones said the ankle swelling would go away on its own, allegedly refused to let Plaintiff see a doctor or physician's assistant, and did not provide pain medication or ice.  *Id.* at ¶ 132.  Plaintiff further alleges he was subsequently treated or examined <u>16</u> times, as set forth below.

- <u>August 26, 2018</u> – Huddleston, a paramedic, examined Plaintiff.  *Id.* at ¶ 141.

- <u>August 27, 2018</u> – Jones and Huddleston examined Plaintiff.  *Id.* at ¶¶ 137, 144.

- <u>August 31, 2018</u> – Huddleston and Osagie examined Plaintiff; Osagie ordered an x-ray.  *Id.* at ¶¶ 139, 144, 149-152, 154.

- <u>September 3, 2018</u> – Jones, Huddleston, and Osagie examined Plaintiff.  *Id.* at ¶¶ 138, 144, 157.  Jones said the x-ray showed "twisted muscles" in the ankle.  *Id.* at ¶¶ 119, 139.

- <u>September 4, 2018</u> – Jones told Plaintiff his ankle was fractured, applied a splint, and gave him a wheelchair.  *Id.* at ¶¶ 119, 138-139, 162.[2]

- <u>September 12, 2018</u> – A hard cast was applied after review of the x-rays by an orthopedist. *Id.* at ¶ 119.

- <u>September 25, 2018</u> – X-ray of ankle, showing fracture partially healed.  *Id.* at ¶ 120.

- <u>October 18, 2018</u> – X-rays of wrists and jaw, which were normal.  *Id.* at ¶ 117.

- <u>October 23, 2018</u> – X-ray of ankle, showing fracture continuing to heal.  *Id.* at ¶ 120.

- <u>November 16, 2018</u> – Hard cast was removed.  *Id.* at ¶¶ 121-122.

- <u>November 20, 2018</u> – X-ray of ankle.  *Id.* at ¶ 122.

---

[2] Plaintiff alleges he was given a splint and wheelchair on both September 4 and September 5.  *See* ECF No. 64 at ¶¶ 119, 139.

- <u>December 6, 2018</u> – Plaintiff evaluated by a physician.  ECF No. 64-1 at 9.  The physician noted that Plaintiff's ankle fracture had healed and the x-rays of his right wrists were normal.  Plaintiff was provided Ibuprofen for continued pain.  *Id.*; *see also* ECF No. 64 at ¶ 122.  Plaintiff admits he received the Ibuprofen.  *Id.*

- <u>January 9, 2019</u> – Plaintiff's ankle and wrists examined.  *Id.* at ¶ 123.

- <u>April 29, 2019</u> – Plaintiff was provided pain medication and a compression sock for swelling.  *Id.* at ¶ 125.

- <u>Unidentified time</u> – Plaintiff acknowledges that he was able to buy pain medication from the commissary after his hunger strike ended.  *Id.* at ¶¶ 164-65, 177.

- <u>Unidentified time</u> – Plaintiff admits he received ice at least once.  *Id.* at ¶ 157.

- <u>Ongoing</u> – Plaintiff claims continuing pain in his ankle, wrists and jaw, and nosebleeds.  *Id.* at ¶¶ 116, 169.  He has been prescribed medications for depression, and purportedly has been told that he may have PTSD.  *Id.* at ¶¶ 126-128.

**App.260**



**U. S. Department of Justice**
Federal Bureau of Prisons
United States Penitentiary,
Administrative Maximum Institution
Florence, Colorado

## INSTITUTION SUPPLEMENT

OPI:         Case Management Coordinator
NUMBER:   FLM 5580.08B
DATE:       November 28, 2019

# Inmate Personal Property

Approved:     B. True, Warden
                 ADX Florence

1.  **PURPOSE AND SCOPE**:  It is the policy of the Bureau of Prisons and the United States Penitentiary, Administrative Maximum, Florence, Colorado, that inmates may possess only such property as authorized for retention as defined in the National Program Statement. This supplement must be read in conjunction with national directives for a clear understanding of policy.   This Supplement provides guidelines for inmate personal property.

2.  **DIRECTIVES AFFECTED**:

    **A.**  Directives Rescinded:  FLM 5580.08A, Inmate Personal Property, dated February 6, 2017.

    **B.**  Directives Referenced:   Program Statement 1315.07, Inmate Legal Activities, dated November 5, 1999.

    Program Statement 5270.09, Inmate Discipline Program, dated July 8, 2011.

    Program Statement 5270.11, Special Housing Units, dated November 23, 2016.

    Program Statement 5350.27, Inmate Manuscripts, dated July 27, 1999.

    Program Statement 5580.08, Inmate Personal Property, dated August 22, 2011.

    **C.**  Standards Referenced:   American Correctional Association Standards, 4th Edition, Standards for Adult Correctional Institutions:  4-4163, 4-4164, 4-4166, 4-4268, 4-4269, 4-4192, 4-4293, 4-4294, 4-ALDF-2A-23, 4-ALDF-2C-01.

3. **LIMITATIONS ON INMATE PERSONAL PROPERTY (ADX):**

    **A.**   Storage Space:  Each individual cell will ordinarily be furnished with a concrete bed, in addition to a concrete/metal stool, desk and TV shelf.   No other furnishings or shelves are authorized without approval from the Warden.

    The amount of personal property allowed for each inmate will be limited to those items which can be neatly and safely maintained.   Under no circumstances will any materials referred to in this policy be accumulated to the point where they become a fire, sanitation, security, or housekeeping hazard.

    In order to define what a "reasonable" amount of property is, it shall be interpreted narrowly as meaning all authorized items that can be neatly stored in the inmate's cell, not to exceed the authorized limits (see Attachments). Inmates will be advised during the Administration & Orientation (A&O) program of what personal property they are authorized to maintain.

    The amount of personal property allowed for inmates admitted to the institution hospital will be limited to current legal cases and approved hygiene articles.   Any other items of personal property will have to be approved by the Health Services Administrator, Captain, or their designee.

    **B.**   Institution Issue Clothing:  Refer to Attachment 1, Section 1 of this supplement or Institution Supplement entitled Laundry Procedures.

    **C.**   Special Purchase Items:  Special Purchase items will be authorized only to the point where they can be neatly and safely maintained.   All requests for special purchase items, which are ordered from outside sources, must be approved and signed by the approving official.   Individual vendor orders shall not exceed more than one per inmate per month with a maximum amount of $300 per quarter.

    Requests to purchase shoes (white, black or black and white) must be approved by the appropriate Unit Manager.   After the initial purchase, additional purchases will be made on an exchange basis only.   Proof of ownership through the Inmate Personal Property Form, BP-A0383, and/or commissary receipts will be required.   All excess watches must be turned in for disposition (mailed home at the inmate's expense or otherwise disposed of).   All Special Purchase orders over $100 must be approved in writing by the Warden.   A copy of all major items purchased from the institution commissary, received through the mail or received through any other approved source, will be maintained in the inmate's Central File and in the commissary.

    **D.**   Legal Material:  Inmates may be allowed to maintain legal material necessary for current legal actions.   The amount of storage space provided for legal materials is dependent upon the total storage space available.   Legal materials will be limited to the amount that can be neatly stored in the inmate's cell.   Ordinarily, the total amount of legal materials will be limited to a level of three (3) cubic feet per inmate.   Personal

legal books will count toward this limitation.   In no case shall the amount of personal legal materials be such as to pose a fire, sanitation, security, or housekeeping hazard.

An inmate who claims a need for additional storage space in connection with current legal activities, may be provided space by his Unit Team on a temporary basis.   The Supervisor Attorney should be consulted if there is a question concerning excess legal material.

**E.**   Hobby Craft:   Hobby craft projects, authorized by the Recreation Department, Unit Managers and the Captain, will be limited to two (2) projects at a time. The projects must be mailed home at the inmate's expense upon completion.   Purchase of approved hobby craft materials will be requested by submitting a weekly (or quarterly) Hobby Craft Order form to the Unit Manager.   Prohibited colors (gray, black, red, camouflage) for clothing items outlined in the National directive will also be applied to hobby craft yarn.

**F.**   Commissary Items:   Commissary items found in excess of the amounts established on this commissary slip or not in their original containers will be considered contraband and confiscated.   All items sold by the commissary are subject to the approval of the Warden.

The total amount of consumable commissary that an inmate is allowed in his assigned cell will not exceed the current possession limit (including new arrivals with commissary items from their previous institution). Commissary possession limits are annotated on current commissary form.

**G.**   Correspondence and Reading Materials:   Education materials for current correspondence courses are exempt from property limits.   However, once completed, all associated books and materials will be removed from the housing units and returned to the Education Department, or if personal, mailed out at the inmate's expense. Education books and materials are to be limited to those issued to the inmate, or approved by the Education Department.   Books will also be provided by the Education Department on an exchange basis and will be limited to the amount approved by that department.

Institution copies of newspapers may be issued in the housing units, with select magazines and books available for checkout upon request.   Copies may also be provided for inmates confined in the institution hospital, upon request.

Personally owned books should be purchased pursuant to the Institution Supplement on Incoming Publications.

Personal compositions, manuscripts, and correspondence filed in authorized folders, must be properly organized and limited to two (2).   Contraband materials concealed in such folders will result in confiscation of the entire folder and its contents.   Personal papers and correspondence will be limited to one (1) cubic foot.   Manuscripts must not

create a fire hazard, a housekeeping problem, or a security concern because of excess paper.   Institution issued writing tablets will be limited to two (2).

**H.** Religious Items:   In cooperation with the Captain, Religious Services will make the final determination concerning authorized items as they relate to religious practice (i.e. medallions, pamphlets, etc).   Hobby craft, or items utilized for other than their intended purpose, will be considered contraband, although religious in nature.   See Attachment 1, Section 4, for authorized items.

**I.** Earbuds and Televisions:   Inmates at the ADX are issued one television unit, one set of earbuds, one earbud extension cord (if needed), and one earbud adapter (if needed).   Television units will only be utilized with earbuds.   Inmates who abuse television privileges will be subject to disciplinary action.

**J.** Eyeglasses:   Inmates may possess only two pairs of corrective eyeglasses, unless a written exception is provided by Health Services staff.   Due to security concerns, eyeglass frames must be made of plastic and not contain metal reinforcement. If an inmate arrives with eyeglasses containing metal, these eyeglasses will be confiscated with a confiscation form generated and an alternative will be provided. Inmate in possession of metal-containing eyeglass frames will be given the opportunity to mail unauthorized eyeglasses home at the inmate's expense.

During Intake Screening, Health Services staff will determine if eyeglasses need to be replaced.   If eyeglasses must be replaced, an appointment for examination by the optometrist will be scheduled.   If an inmate has a prescription for eyeglasses which is not more than six months old, Health Services will make the scheduling determination.

Any staff member who identifies an inmate who has altered his eyeglass frames to maintain eyeglass usability should notify Health Services staff.   Health Services staff will interview the inmate and new frames will be ordered for replacement.   The inmate will be informed that any future altering of eyeglasses will result in an incident report. If the altered frames appear to be weapon-like or other security threat, they will be confiscated immediately and an incident report written.

Broken frames should be confiscated and returned to Health Services.   Discretion is urged when enforcing this policy.   If the frames appear to be temporarily mended, Health Services staff will determine if the inmate is allowed to keep the glasses until the new frame arrives, which should be documented on a Medical Duty Status form.

**K.** Restrictions:

1) No unauthorized item will be used as a shower curtain, floor covering, or hung from cell bars.   Cell bars will be kept clear of all items.

2) Items such as metal or thick plastic notebook covers/rings/binding, paper clips, paper fasteners, rubber bands, plastic wrapping, etc., will not be issued

or be in the possession of inmates.   Such items will be considered contraband and will be disposed of, when discovered.

3)   No item of any type will be taped, pasted, or otherwise affixed to walls, doors, windows, or bars.

4)   Accumulation of institutional condiments, paper cups, food, etc., will not be tolerated.   All accumulated items will be considered nuisance contraband and confiscated.   Disciplinary action may be taken, as deemed appropriate, by staff.

5)   Cell and Cell Sallyport sanitation is the responsibility of the inmate.   Floors, windows, walls, etc., shall be cleaned in such a manner that a high level of sanitation is consistently maintained.

6)   All altered institution-issued or personally owned items, such as clothing, toothbrushes, magazines, books, etc., will be confiscated and an incident report written.

7)   Maps showing specific or detailed routes within the North American Continent will be reviewed on a case-by-case basis for suitability by Correctional Systems or Correctional Services staff, with special concern for any maps showing detail of areas housing any federal correctional facilities.   For example, a map of Colorado may be considered for approval, but a detailed map of Fremont County may likely be unauthorized.

8)   No liquid materials considered to be fire hazards will be kept in the cell.

9)   Empty containers or containers with something other than what was originally in them, such as milk or juice cartons, ice cream containers, plastic bottles, plastic bags, etc., are considered as nuisance contraband and will be confiscated.

10)   Ball-point ink pens containing a metal filler are not permitted.   Only pens approved and sold in the Commissary are authorized for inmate use, to include SBO purposes.

11)   Personal clothing to include ball caps, sweat suits, will be plain gray or white in color.   Tennis shoes must be predominately white or black.   All other colors will be considered contraband with the exception of religious headgear, which is subject to the approval of the Chaplain, in conjunction with the Captain.

12)   Local area phone books (Fremont, Pueblo, and El Paso counties) with residential listings or area maps will not be permitted.   Yellow pages (business listings) with a demonstrated need may be retained upon approval of unit staff.

13) Any individual item with a value of $100.00 or more must have written authorization by the Warden.

14) The selling, trading, borrowing, loaning, passing, or presenting of any items of personal property to an inmate by a staff member or other inmate is prohibited.

15) Personal locks are not authorized in the institution.

16) Cards, dominoes, checkers, chess, etc., are the property of the Recreation Department and are to be issued by the Unit Officer.   They are not to be retained in an inmate's property if his property is packed up.

17) Completion of Inmate Personal Property Record, BP-A0383:   When completing the BP-A0383, staff shall be precise in the description of property items, i.e. instead of "a lot" of letters, 25 personal letters; instead of one watch, one plastic Timex watch.   This form should be completed anytime an inmate's housing (except within same unit), admission/release status changes, inmate personal property is placed in storage (Discipline Hearing Officer sanctions), and if the inmate is removed from their cell for safety or security reasons (restraints, suicide watch, dry cell, etc.).

18) Inmates will not be permitted to possess steel toe shoes of any kind.

## 5.   CONTRABAND:

**A.**   Definition:   Contraband will be defined in accordance with the National directive on Inmate Personal Property.

**B.**   Items of Value:   Confiscation of articles, such as excess/unauthorized watches, will normally result in an incident report. In such cases, the item(s) will be retained for 120 days to allow for an appeal.

Any item of personal property confiscated from an inmate must be receipted through a Confiscation and Disposition of Contraband form, BP-402.   The staff member confiscating the contraband shall complete Sections 1-5 and have the inmate sign Section 6, indicating they received a copy of the form.   If the inmate is claiming ownership of the confiscated item(s), this will also be indicated in the space provided in Section 6.   When inmates refuse to sign Section 6, staff will note Refused to Sign, and affix the date.   Staff shall provide a copy of the Confiscation and Disposition of Contraband form to the inmate and forward the form to the Lieutenant's Office.   A copy of the form shall be placed in the appropriate Unit Team's box for inclusion in the inmate's Central File.   The original Form BP-402 shall remain on file in the confiscated property binder, located in the confiscated property locker.   It is the responsibility of the inmate to provide documentation indicating ownership of the confiscated items to their Correctional Counselor.

**C.** Evidence: Contraband, such as narcotics and weapons which are to be retained for evidence in prosecutable cases, will be stored in the evidence section of the Captain's Office during non-business hours; however, during normal working hours, evidence will be turned over to the Special Investigative Services (SIS) Office for retention by the Special Investigating Agent (SIA). All contraband held as evidence will be coordinated through the SIA.

**6.** **LIMITATIONS ON PERSONAL PROPERTY - MEDICAL TRANSFERS:** Inmates shall be allowed to retain those legal materials specifically needed with respect to ongoing litigation. Questions as to the need for such materials may be referred to the local Legal Counsel. If an inmate claims the need to take what is considered an excessive amount of legal materials, staff shall contact the local Legal Counsel to determine if the inmate has any pending court litigation or a hearing set to occur during the inmate's expected absence from the institution that would justify taking these legal materials. All personal property not accompanying the inmate shall be stored in Receiving & Discharge (R&D) in an area designated by the Supervisory Correctional Systems Specialist.

If the inmate is expected to return to this institution, R&D staff shall advise the inmate that property not allowed in the medical facility may be held or sent to a destination of the inmate's choice at the inmate's expense. Where lack of space prevents retention of the inmate's property, the institution shall pay postage costs connected with mailing the inmate's property to a destination of the inmate's choice. If the inmate refuses to provide a mailing address for forwarding the property, the property is to be disposed of through approved methods, including destruction of the property.

**7.** **HOBBY CRAFTS**: Only approved hobby craft items may be maintained in the housing units. Completed hobby craft items will be packaged under the supervision of recreation staff and mailed at the inmate's expense. Hobby craft items should be scanned, x-rayed, and inspected prior to the delivery to the Post Office.

**8.** **INMATES TRANSFERRED FROM OTHER INSTITUTIONS**: Personal property which was authorized at another institution, but is not authorized at this facility, will be mailed at the inmate's expense or the property will be disposed of through approved methods. If an inmate refuses to provide an address for return of the property, as well as the necessary postage to mail the unauthorized property home, it will be considered abandoned property and procedures regarding abandoned property will be applied.

**9.** **AUTHORIZED STORAGE AREAS**: Property will not be stored in the Unit Officer's station or in the Lieutenants' Office except in temporary emergency situations. When an inmate leaves on Writ, is admitted to an outside hospital facility, or placed on Disciplinary Segregation status, staff will place the inmate's property in the proper secured storage area where there is no inmate access.

**A.** The R&D property room is designated as the property storage room for inmates due to arrive, on Writ status, at the local hospital, on escape status, or death. In cases of inmate death, escape, or admission to a hospital, personal property will be inventoried prior to delivery to R&D for storage until it can be disposed of properly.

**B.**   Upon an inmate being sanctioned to DS, the inmate's personal property will be inventoried on an Inmate Personal Property form and forwarded to C Unit as soon as possible.   The inmate's personal property will be reviewed with the inmate.   This form is to be signed and contain the printed name of the officer securing the property.   The officer securing the property will be responsible for ensuring accountability and storage of the property.   Once the inmate has completed the sanctioned DS, the property will be reviewed again by staff and the inmate and annotated on the form, with a signature by both the staff member and the inmate.

**C.**   The Lieutenant's Office is responsible for storing and disposing of confiscated property.   Property received through R&D, on transfer will be handled by Correctional Systems Department.

**D.**   If an inmate's personal property has been confiscated, the inmate must establish ownership to his Correctional Counselor.   In those cases when the inmate chooses to mail the item at their own expense, their Correctional Counselor shall pick up the property from the confiscated property locker, prepare it for mailing, and transport it to the mailroom (ownership must first be established).   Inmates shall first establish ownership of an item confiscated prior to indicating whether they want the item donated to the institution or mailed home.   If ownership cannot be established, the item will be destroyed as procedures mandate.

---

**DISTRIBUTION:**

Historical File
Directives Libraries
Correctional Programs, NCR
Local AFGE

# APPROVED PROPERTY LIST FOR ADX GENERAL POPULATION, J-UNIT (A RANGE), K-UNIT

**Part 1 - INSTITUTION ISSUE (in addition to personally owned items) - Clothing must be moved with any inmate transferring from one unit to another. Laundry will provide a bed roll for inmates moving from one unit to another**

| | | | | |
|---|---|---|---|---|
| 1 | Adapter, TV (for headphones, if needed) | | 4 | Sheets, Bed |
| 2 | Blanket (wool) or (Limit 2 thicker non-wool) | | 1 | Shoes, Velcro/Lace-up (pair) |
| 1 | Box, Cardboard (3'x1'x1', for legal paperwork only) | | 1 | Shower Curtain |
| 10 | Envelopes (pre-stamped with return address) | | 1 | Shower Mat |
| 1 | Cup (brown plastic) | | 5 | Socks (pair) |
| 1 | Fork/Spoon Combo (plastic) | | 1 | Television/Radio Unit |
| 1 | Ice Bucket | | 4 | Towels |
| 1 | Gloves (pair, white, full-fingered, winter only) | | 1 | Trash Can |
| 1 | Headphone Cord Extension | | 5 | Undershorts (boxer) |
| 1 | Knit Hat | | 5 | Undershirt |
| 2 | Laundry Bag | | 4 | Wash Cloth |
| 3 | Library Book | | 1 | Winter Coat (winter only, kept in unit, not in cell) |
| 1 | Mattress (excess with signed medical slip only) | | | |
| 1 | Pillow | | | |
| 2 | Pillow Cover | | | |

**Part 2 - PUBLICATIONS, CORRESPONDENCE & PAPERWORK –**

8    Book (leisure, religious, reference, etc.) (See note at end of attachment for cover policy.  Personal legal books are not included in this limit, but counted instead as part of the three (3) cubic feet limit of legal papers.  Approved and current Education courses are also exempt from this limit.)
3    Newspaper (NO date limitation)
3    Magazine (NO date limitation.  See note at end of attachment for nude or sexually explicit materials)
20   Personal Letter
1    Cubic Foot Personal Papers (example: receipts, property forms, etc.)
3    Cubic Feet Legal Papers. (No excess unless approved by the Institution Attorney.)
60   Stamp, Postage (First class or various denominations, not to exceed value of 60 first class stamps)

**Part 3 - COMMISSARY PERISHABLES - Refer to the Current Commissary List (Retention limits are equal to commissary purchase limits).**
Incoming inmates (returns or transfers) will also be restricted to these limits.

**Part 4 - RELIGIOUS ARTICLES - Religious medallions must be non-metallic. New arrivals permitted non-metallic only.**

| | | | | |
|---|---|---|---|---|
| 2 | Head Gear, Religious (Native-American Bandanna, Rastafarian Crown, Islamic Kufi or Jewish Yarmulke) | | 1 | Prayer Beads |
| 1 | Medallion, Religious (see note above for material) | | 2 | Prayer Oil (2 or 1 ounce) |
| 8 | Pamphlet/Brochure, Religious (in addition to books outlined in Part 2) | | 1 | Prayer Rug |

**Part 5 - PERSONAL CLOTHING (In addition to institution issue)**

| | | | | |
|---|---|---|---|---|
| 1 | Athletic Supporter | | 2 | Shoelaces (pair, 54" or less) |
| 1 | Cap, Baseball (white/grey only, no logo) | | 1 | Shower Cap |
| 1 | Gloves (workout ) | | 3 | Socks (pair, white only) |
| 5 | Handkerchief (white only) | | 1 | Sweat Band |
| 1 | Handkerchief (non-white from commissary) | | 2 | Sweat Pants (white/grey only) |
| 2 | Shorts (gym, white/grey only) | | 2 | Sweat Shirt (white/grey only) |
| 1 | Shoes, Shower (pair) | | 3 | Thermals (sets, white/grey only) |
| 2 | Shoes, Tennis (pair, predominately white/black only) | | 5 | Undershorts (white, boxer-type) |
| 3 | Long Sleeve Shirts (grey/white) | | 3 | Undershirts (crew type, white/grey only) |
| | | | 3 | Undershirts (tank type, white/grey only) |

**Part 6 - MISCELLANEOUS PERSONAL PROPERTY**

| | | | | |
|---|---|---|---|---|
| 1 | Address Book | | 1 | Cup, Drink (institution issue or personal) |
| 1 | Aftershave | | 1 | Cup, Shaker or Quart |
| 1 | Bowl (plastic) | | 1 | Cup, Insulated (less than 24 ounces) |
| 1 | Calendar or Date Book (no metal or hard binding, current year only - prior years count as personal papers under part 2) | | 1 | Dental Picks (pack) |
| | | | 1 | Dentures (set) |
| | | | 1 | Denture Bath |
| 1 | Conditioner, Hair | | 1 | Denture Brush |
| 1 | Comb (plastic) | | 1 | Denture Cream |
| 1 | Cotton Swabs (pack) | | 2 | Deodorant |

## APPROVED PROPERTY LIST FOR ADX GENERAL POPULATION, J-UNIT (A RANGE), K-UNIT

| | | | | |
|---|---|---|---|---|
| 1 | Earplugs (pair) | 2 | Soap (bar or liquid) |
| 50 | Envelope | 1 | Soap Dish |
| 1 | Eyeglasses (no metal, includes prescription | 1 | Spoon (plastic) |
| | sunglasses.  See note at end.) | 1 | Sun Block (lotion) |
| 1 | Eyeglass Case (no metal) | 1 | Toothbrush |
| 1 | Hairbrush (plastic) | 2 | Toothpaste |
| 1 | Hair Pomade/Gel | 1 | Watch (plastic with Velcro band) |
| 1 | Headset (over the ear or ear bud type) | 1 | Wedding band (plain, no stones) |
| 1 | Kleenex (pack) | 2 | Writing Pad |
| 10 | Lotion Packet (body) | | |
| 1 | Lotion (body) | | |
| 1 | Mouthwash | | |
| 4 | Pencil (writing) | | |
| 2 | Pen (black/blue ink, no metal refill) | | |
| 25 | Photo (**12 per mailing**, loose, 8"x10" or less, no | | |
| | polaroid or nude/sexually explicit) | | |
| 1 | Photo Album (full, photos less than 8"x10") | | |
| 1 | Plaque Rinse | | |
| 1 | Powder, Bath | | |
| 2 | Shampoo | | |
| 2 | Shaving Cream | | |

## Part 7 - HOBBY CRAFT - (See section 4, paragraph E of this supplement)

| | | | | |
|---|---|---|---|---|
| 15 | Beads, Pony (package, 6mm x 9mm) | 1 | Eraser, Art (gum) |
| 1 | Crochet Hook (h-hook, plastic) | 6 | Paint Brush, Watercolor |
| 1 | Crochet Hook (I-hook, plastic) | 12 | Paper Stump, Gray, various sizes |
| 1 | Crochet Needle (3", plastic) | 84 | Pastels (drawing pencils or sticks) |
| 1 | Drawing Board (24" x 30") | 60 | Pencil (colored, drawing) |
| 3 | Drawing Pad (50 sheets) | 36 | Watercolors, Dry Cake |
| 3 | Drawing Paper (of each color, loose sheets) | 30 | Yarn (skeins; no dark blue, black, or red) |

**HARDCOVER BOOKS:** Personally owned hardcover books <u>currently</u> in possession of the inmate <u>are authorized</u>, including those received in incoming property for inmate transfers. Subsequent books will be received in soft cover form <u>only</u> pursuant to the Institution Supplement on Incoming Publications.

**MEDICATIONS / MEDICAL SUPPLIES / EYEGLASSES:** Approved items issued by and verified with the Health Services Department only.  Excess or expired prescription medications are to be given to the Pharmacist for final determination and plainly noted on the BP-383 as such.  Eyeglasses will be handled in accordance with section 4, paragraph J of this supplement.

**NUDE / SEXUALLY EXPLICIT PUBLICATIONS:** Publications of this nature are not permitted; Questionable publications should be referred to the ISM, Assistant ISM, or if after normal hours, the Shift Lieutenant

**PROPERTY RESTRICTION:** All inmates placed on a "property restriction" sanction shall be permitted only those personal hygiene items necessary to maintain proper hygiene standards: 1 toothbrush, 1 tooth paste, 1 soap, 1 shampoo.   Other items will be issued only at the discretion of the Shift Lieutenant.

**SEWING KITS / CLOTHING REPAIRS:** Sewing kits are not authorized for possession or institution issue.   The ADX laundry may make repairs (machine stitching only, no patches or alterations) to personal sweat pants, sweat shirts, gym shorts, thermal underwear and T-shirts if possible.   Personal socks and hats cannot be repaired by the Laundry Department.   Laundry staff will make the determination whether or not clothing items are repairable

# APPROVED PROPERTY LIST FOR ADX CONTROL UNIT

**Part 1 - INSTITUTION ISSUE (in addition to personally owned items) - Clothing must be moved with any inmate transferring from one unit to another.   Laundry will provide a bed roll for inmates moving from one unit to another.**

| | | | |
|---|---|---|---|
| 1 | Adapter, TV (for headphones, if needed) | 1 | Pillow |
| 3 | Blanket (wool or limit 2 thicker non-wool) | 2 | Pillow Cover |
| 1 | Box, Cardboard (3'x1'x1', for legal paperwork only) | 4 | Sheets, Bed |
| 10 | Envelopes (pre-stamped with return address) | 1 | Shoes, Velcro/Lace-up (pair) |
| 1 | Cup (brown plastic) | 1 | Shower Curtain |
| 1 | Fork/Spoon Combo (plastic) | 5 | Socks (pair) |
| 1 | Ice Bucket | 1 | Television/Radio Unit |
| 1 | Gloves (pair, white, full-fingered, winter only) | 4 | Towels |
| 1 | Headphone Cord Extension | 1 | Trash Can |
| 1 | Knit Hat | 5 | Undershorts (boxer) |
| 2 | Laundry Bag | 5 | Undershirt |
| 3 | Library Book | 4 | Wash Cloth |
| 1 | Mattress (excess with signed medical slip only) | 1 | Winter Coat (winter only, kept in unit, not in cell) |

## Part 2 - PUBLICATIONS, CORRESPONDENCE & PAPERWORK

| | |
|---|---|
| 8 | Book (leisure, religious, reference, etc.) Personal legal books are not included in this limit, but counted instead as part of the three (3) cubic feet limit of legal papers.   Approved and current Education courses are also exempt from this limit.) |
| 3 | Newspaper (NO date limitation) |
| 3 | Magazine (NO date limitation.   See note at end of attachment for nude or sexually explicit materials) |
| 20 | Personal Letters |
| 1 | Cubic Foot Personal Papers (example: receipts, property forms, etc.) |
| 3 | Cubic Feet of Legal Papers. (No excess unless approved by the Institution Attorney.) |
| 60 | Stamps, Postage (First class or various denominations, not to exceed value of 60 first class stamps) |

**Part 3 - COMMISSARY PERISHABLES**      Refer to the Current Commissary List (Retention limits are equal to commissary purchase limits).
(Must be in original packaging to retain)

**Part 4 - RELIGIOUS ARTICLES - Religious medallions must be non-metallic. New arrivals permitted non-metallic only.**

| | |
|---|---|
| 2 | Head Gear, Religious (Native-American Bandanna, Rastafarian Crown, Islamic Kufi or Jewish Yarmulke) |
| 1 | Medallion, Religious (see note above for material |
| 8 | Pamphlet/Brochure, Religious (in addition to books outlined in Part 2) |
| 1 | Prayer Beads |
| 2 | Prayer Oil (2 or 1 ounce) |
| 1 | Prayer Rug |

## Part 5 - PERSONAL CLOTHING (In addition to institution issue)-

| | | | |
|---|---|---|---|
| 1 | Athletic Supporter | 1 | Shower Cap |
| 1 | Cap, Baseball (white/grey only, no logo) | 3 | Socks (pair, white only) |
| 1 | Gloves (workout ) | 1 | Sweat Band |
| 5 | Handkerchief (white only) | 2 | Sweat Pants (white/grey only) |
| 1 | Handkerchief (non-white from commissary) | 2 | Sweat Shirt (white/grey only) |
| 2 | Shorts (gym, white/grey only) | 3 | Thermals (sets, white/grey only) |
| 1 | Shoes, Shower (pair) | 5 | Undershorts (white, boxer-type) |
| 2 | Shoes, Tennis (pair, predominately white/black only) | 3 | Undershirts (crew type, white/grey only) |
| 3 | Long Sleeve Shirts (grey/white) | 3 | Undershirts (tank type, white/grey only) |
| 2 | Shoelaces (pair, 54" or less) | | |

## Part 6 - MISCELLANEOUS PERSONAL PROPERTY -

| | | | |
|---|---|---|---|
| 1 | Address Book | 1 | Headset (over the ear or ear bud type) |
| 1 | Aftershave | 1 | Kleenex (pack) |
| 1 | Bowl (plastic) | 10 | Lotion Packet (body) |
| 1 | Calendar or Date Book (no metal or hard binding, | 1 | Lotion (body) |
| | current year only - prior years count as personal papers | 1 | Mouthwash |
| | under part 2) | 4 | Pencil (writing) |
| 1 | Conditioner, Hair | 2 | Pen (black/blue ink, no metal refill) |
| 1 | Comb (plastic) | 25 | Photo (12 per mailing, loose, 8"x10" or less, |
| 1 | Cotton Swabs (pack) | | no polaroid or nude/sexually explicit) |
| 1 | Cup, Drink (institution issue or personal) | 1 | Photo Album (full, photos less than 8"x10") |
| 1 | Cup, Shaker or Quart | 1 | Plaque Rinse |
| 1 | Cup, Insulated (less than 24 ounces) | 1 | Powder, Bath |

---

FLM 5580.08B                    Inmate Personal Property                    Attachment 2
Page 1 of 2

## APPROVED PROPERTY LIST FOR ADX CONTROL UNIT

| | |
|---|---|
| 1 | Dental Picks (pack) |
| 1 | Dentures (set) |
| 1 | Denture Bath |
| 1 | Denture Brush |
| 1 | Denture Cream |
| 2 | Deodorant |
| 1 | Earplugs (pair) |
| 50 | Envelope |
| 1 | Eyeglasses (no metal, includes prescription sunglasses.  See note at end.) |
| 1 | Eyeglass Case (no metal) |
| 1 | Hairbrush (plastic) |
| 1 | Hair Pomade/Gel |

| | |
|---|---|
| 2 | Shampoo |
| 2 | Shaving Cream |
| 2 | Soap (bar or liquid) |
| 1 | Soap Dish |
| 1 | Spoon (plastic) |
| 1 | Sun Block (lotion) |
| 1 | Toothbrush |
| 2 | Toothpaste |
| 1 | Watch (plastic with Velcro band) |
| 1 | Wedding band (plain, no stones) |
| 2 | Writing Pad |

**Part 7 - HOBBY CRAFT - (hobby craft is only authorized on DS for GP inmates) - See section 4, paragraph E of this supplement**

| | |
|---|---|
| 15 | Beads, Pony (package, 6mm x 9mm) |
| 1 | Crochet Hook (h-hook, plastic) |
| 1 | Crochet Hook (I-hook, plastic) |
| 1 | Crochet Needle (3", plastic) |
| 1 | Drawing Board (24" x 30") |
| 3 | Drawing Pad (50 sheets) |
| 3 | Drawing Paper (of each color, loose sheets) |

| | |
|---|---|
| 1 | Eraser, Art (gum) |
| 6 | Paint Brush, Watercolor |
| 12 | Paper Stump, Gray, various sizes |
| 84 | Pastels (drawing pencils or sticks) |
| 60 | Pencil (colored, drawing) |
| 36 | Watercolors, Dry Cake |
| 30 | Yarn (skeins; no dark blue, black, or red) |

**HARDCOVER BOOKS:** Personally owned hardcover books currently in possession of the inmate are authorized, including those received in incoming property for inmate transfers. Subsequent books will be received in soft cover form only pursuant to the Institution Supplement on Incoming Publications.

**MEDICATIONS / MEDICAL SUPPLIES / EYEGLASSES:** Approved items issued by and verified with the Health Services Department only.   Excess or expired prescription medications are to be given to the Pharmacist for final determination and plainly noted on the BP-383 as such.   Eyeglasses will be handled in accordance with section 4, paragraph J of this supplement.

**NUDE / SEXUALLY EXPLICIT PUBLICATIONS:** Publications of this nature are not permitted; Questionable publications should be referred to the ISM, Assistant ISM, or if after normal hours, the Shift Lieutenant.

**PROPERTY RESTRICTION:** All inmates placed on a "property restriction" sanction shall be permitted only those personal hygiene items necessary to maintain proper hygiene standards: 1 toothbrush, 1 toothpaste, 1 soap, 1 shampoo.   Other items will be issued only at the discretion of the Shift Lieutenant.

**SEWING KITS / CLOTHING REPAIRS:** Sewing kits are not authorized for possession or institution issue.   The ADX laundry may make repairs (machine stitching only, no patches or alterations) to personal sweat pants, sweat shirts, gym shorts, thermal underwear and T-shirts if possible.   Personal socks and hats cannot be repaired by the Laundry Department.   Laundry staff will make the determination whether or not clothing items are repairable

**Part 1 - INSTITUTION ISSUE (in addition to personally owned items) - Clothing must be moved with any inmate transferring from one unit to another.   Laundry will provide a bed roll for inmates moving from one unit to another.**

# APPROVED PROPERTY LIST FOR ADX SPECIAL SECURITY UNIT (H-UNIT) AND J-UNIT (B-RANGE)

| | | | |
|---|---|---|---|
| 1 | Adapter, TV (for headphones, if needed) | 1 | Pillow |
| 3 | Blanket (wool or limit 2 thicker non-wool) | 2 | Pillow Cover |
| 1 | Box, Cardboard (3'x1'x1', for legal paperwork only) | 4 | Sheets, Bed |
| 10 | Envelopes (pre-stamped with return address) | 1 | Shoes, Velcro/Lace-up (pair) |
| 1 | Cup (brown plastic) | 1 | Shower Curtain |
| 1 | Fork/Spoon Combo (plastic) | 5 | Socks (pair) |
| 1 | Ice Bucket | 1 | Television/Radio Unit |
| 1 | Gloves (pair, white, full-fingered, winter only) | 4 | Towels |
| 1 | Headphone Cord Extension | 1 | Trash Can |
| 1 | Knit Hat | 5 | Undershorts (boxer) |
| 2 | Laundry Bag | 5 | Undershirt |
| 3 | Library Book | 4 | Wash Cloth |
| 1 | Mattress (excess with signed medical slip only) | 1 | Winter Coat (winter only, kept in unit, not in cell) |

## Part 2 - PUBLICATIONS, CORRESPONDENCE & PAPERWORK

| | |
|---|---|
| 8 | Book (leisure, religious, reference, etc.) Personal legal books are not included in this limit, but counted instead as part of the three (3) cubic feet limit of legal papers.  Approved and current Education courses are also exempt from this limit.) |
| 3 | Newspaper (NO date limitation) |
| 3 | Magazine (NO date limitation.  See note at end of attachment for nude or sexually explicit materials) |
| 20 | Personal Letters |
| 1 | Cubic Foot Personal Papers (example: receipts, property forms, etc.) |
| 3 | Cubic Feet Legal Papers. (No excess unless approved by the Institution Attorney.) |
| 60 | Stamp, Postage (First class or various denominations, not to exceed value of 60 first class stamps) |

## Part 3 - COMMISSARY PERISHABLES   Refer to the current ADX Special Security Unit Commissary List.
(Retention limits equal to commissary purchase limits). (Must be in original packaging to retain)

## Part 4 - RELIGIOUS ARTICLES - Religious medallions must be non-metallic. New arrivals permitted non-metallic only.

| | |
|---|---|
| 2 | Head Gear, Religious (Native-American Bandanna, Rastafarian Crown, Islamic Kufi or Jewish Yarmulke) |
| 1 | Medallion, Religious (see note above for material |
| 8 | Pamphlet/Brochure, Religious (in addition to books outlined in Part 2) |
| 1 | Prayer Beads |
| 2 | Prayer Oil (2 or 1 ounce) |
| 1 | Prayer Rug |

## Part 5 - PERSONAL CLOTHING (In addition to institution issue) -

| | | | |
|---|---|---|---|
| 1 | Athletic Supporter | 1 | Shower Cap |
| 1 | Cap, Baseball (white/grey only, no logo) | 3 | Socks (pair, white only) |
| 2 | Gloves (workout) | 1 | Sweat Band |
| 5 | Handkerchief (white only) | 2 | Sweat Pants (white/grey only) |
| 1 | Handkerchief (non-white from commissary) | 2 | Sweat Shirt (white/grey only) |
| 2 | Shorts (gym, white/grey only) | 3 | Thermals (sets, white/grey only) |
| 1 | Shoes, Shower (pair) | 5 | Undershorts (white, boxer-type) |
| 2 | Shoes, Tennis (pair, predominately white/black only) | 3 | Undershirts (crew type, white/grey only) |
| 3 | Long Sleeve Shirts (grey/white) | 3 | Undershirts (tank type, white/grey only) |
| 2 | Shoelaces (pair, 54" or less) | | |

## Part 6 - MISCELLANEOUS PERSONAL PROPERTY -

| | | | |
|---|---|---|---|
| 1 | Address Book | 1 | Headset (over the ear or ear bud type) |
| 1 | Aftershave | 1 | Kleenex (pack) |
| 1 | Bowl (plastic) | 10 | Lotion Packet (body) |
| 1 | Calendar or Date Book (no metal or hard binding, | 1 | Lotion (body) |
| | current year only - prior years count as personal papers under | 1 | Mouthwash |
| | part 2) | 4 | Pencil (writing) |
| 1 | Conditioner, Hair | 2 | Pen (black/blue ink, no metal refill) |
| 1 | Comb (plastic) | 25 | Photo (12 per mailing, loose, 8"x10" or less, no |
| 1 | Cotton Swabs (pack) | | polaroid or nude/sexually explicit) |
| 1 | Cup, Drink (institution issue or personal) | 1 | Photo Album (full, photos less than 8"x10") |
| 1 | Cup, Shaker or Quart | 1 | Plaque Rinse |

# APPROVED PROPERTY LIST FOR ADX SPECIAL SECURITY UNIT (H-UNIT) AND J-UNIT (B-RANGE)

| | | | | |
|---|---|---|---|---|
| 1 | Cup, Insulated (less than 24 ounces) | | 1 | Powder, Bath |
| 1 | Dental Picks (pack) | | 2 | Shampoo |
| 1 | Dentures (set) | | 2 | Shaving Cream |
| 1 | Denture Bath | | 2 | Soap (bar or liquid) |
| 1 | Denture Brush | | 1 | Soap Dish |
| 1 | Denture Cream | | 1 | Spoon (plastic) |
| 2 | Deodorant | | 1 | Sun Block (lotion) |
| 1 | Earplugs (pair) | | 1 | Toothbrush |
| 50 | Envelope | | 2 | Toothpaste |
| 1 | Eyeglasses (no metal, includes prescription sunglasses.  See note at end.) | | 1 | Watch (plastic with Velcro band) |
| | | | 1 | Wedding band (plain, no stones) |
| 1 | Eyeglass Case (no metal) | | 2 | Writing Pad |
| 1 | Hairbrush (plastic) | | | |
| 1 | Hair Pomade/Gel | | | |

**Part 7 - HOBBY CRAFT - See section 4, paragraph E of this supplement**

| | | | | |
|---|---|---|---|---|
| 15 | Beads, Pony (package, 6mm x 9mm) | | 1 | Eraser, Art (gum) |
| 1 | Crochet Hook (h-hook, plastic) | | 6 | Paint Brush, Watercolor |
| 1 | Crochet Hook (I-hook, plastic) | | 12 | Paper Stump, Gray, various sizes |
| 1 | Crochet Needle (3", plastic) | | 84 | Pastels (drawing pencils or sticks) |
| 1 | Drawing Board (24" x 30") | | 60 | Pencil (colored, drawing) |
| 3 | Drawing Pad (50 sheets) | | 36 | Watercolors, Dry Cake |
| 3 | Drawing Paper (of each color, loose sheets) | | 30 | Yarn (skeins; no dark blue, black, or red) |

**HARDCOVER BOOKS:** Personally owned hardcover books <u>currently</u> in possession of the inmate <u>are authorized</u>, including those received in incoming property for inmate transfers. Subsequent books will be received in soft cover form <u>only</u> pursuant to the Institution Supplement on Incoming Publications.

**MEDICATIONS / MEDICAL SUPPLIES / EYEGLASSES:** Approved items issued by and verified with the Health Services Department only.   Excess or expired prescription medications are to be given to the Pharmacist for final determination and plainly noted on the BP-383 as such.   Eyeglasses will be handled in accordance with section 4, paragraph J of this supplement.

**NUDE / SEXUALLY EXPLICIT PUBLICATIONS:** Publications of this nature are not permitted, Questionable publications should be referred to the ISM, Assistant ISM, or if after normal hours, the Shift Lieutenant.

**PROPERTY RESTRICTION:** All inmates placed on a "property restriction" sanction shall be permitted only those personal hygiene items necessary to maintain proper hygiene standards: 1 toothbrush, 1 toothpaste, 1 soap, 1 shampoo.   Other items will be issued only at the discretion of the Shift Lieutenant.

**SEWING KITS / CLOTHING REPAIRS:** Sewing kits are not authorized for possession or institution issue.   The ADX laundry may make repairs (machine stitching only, no patches or alterations) to personal sweat pants, sweat shirts, gym shorts, thermal underwear and T-shirts if possible.   Personal socks and hats cannot be repaired by the Laundry Department.   Laundry staff will make the determination whether or not clothing items are repairable.

# APPROVED PROPERTY LIST FOR ADX DISCIPLINARY SEGREGATION

**Part 1 - INSTITUTION ISSUE (in addition to personally owned items)**

| | | | | |
|---|---|---|---|---|
| 2 | Blanket (wool or limit 2 thicker non-wool) | | 1 | Pillow |
| 1 | Cup (brown plastic) | | 2 | Pillow Cover |
| 1 | Fork/Spoon Combo (plastic) | | 4 | Sheets, Bed |
| 1 | Ice Bucket | | 1 | Shoes, Deck (pair) |
| 2 | Laundry Bag | | 1 | Shower Curtain |
| 1 | Mattress (excess with signed medical slip only) | | 4 | Socks (pair) |
| 3 | Pencil | | 2 | Towels |
| 2 | Wash Cloth | | 4 | Undershorts (boxer) |
| | | | 4 | Undershirt |

**Part 2 - PUBLICATIONS, CORRESPONDENCE & PAPERWORK**

2   Book (leisure, religious, reference, etc.) Personal legal books are not included in this limit, but counted instead as part of the three (3) cubic feet limit of legal papers.   Approved and <u>current</u> Education courses are also exempt from this limit.)
2   Newspaper, or Magazine (NO date limitation.   2 Total)
10   Personal Letters
1   Cubic Feet Legal Papers. (Active case only upon verification of unit team.)
20   Stamp, Postage (First class or various denominations, not to exceed value of 60 first class stamps)

**Part 3 - COMMISSARY PERISHABLES-**   (Refer to the Current ADX Commissary List) (Retention limit equal to purchase limit).
Must be in original packaging to retain.

**Inmates sanctioned to DS are prohibited from commissary items with the exception of over the counter medication.**

**Part 4 - RELIGIOUS ARTICLES - Religious medallions must be non-metallic. New arrivals permitted non-metallic only.**

2   Head Gear, Religious (Native-American Bandanna, Rastafarian Crown, Islamic Kufi or Jewish Yarmulke)
1   Medallion, Religious (Non-Metallic, not to exceed $100)
8   Pamphlet/Brochure, Religious (in addition to books outlined in Part 2)
1   Prayer Beads
2   Prayer Oil (2 or 1 ounce)
1   Prayer Rug

**Part 5 - PERSONAL CLOTHING (In addition to institution issue) –**

1   Shoes, Shower (pair)
1   Shoes, Tennis (pair, predominately white/black only)
1   Prescription Glasses (No sunglasses)
1   Wedding Band (Plain, No stones)
1   Watch

**Part 6 - MISCELLANEOUS PERSONAL PROPERTY -**

| | | | | |
|---|---|---|---|---|
| 1 | Address Book | | 1 | Hair Pomade/Gel |
| 1 | Aftershave | | 1 | Headset (ear bud type) |
| 1 | Conditioner, Hair | | 1 | Kleenex |
| 1 | Afro Pick(plastic) | | 1 | Lotion (body) |
| 1 | Cotton Swabs (pack) | | 1 | Mouthwash |
| 1 | Cup, Drink (institution issue or personal) | | 20 | Photo (12 per mailing, loose, 8"x10" or less, no polaroid or |
| 1 | Cup, Shaker or Quart | | | |
| 1 | Cup, Insulated (less than 24 ounces) | | | nude/sexually explicit) |
| 1 | Dental Picks (pack) | | 1 | Plaque Rinse |
| 1 | Dentures (set) | | 1 | Powder, Bath |
| 1 | Denture Bath | | 1 | Shampoo |
| 1 | Denture Brush | | 1 | Shaving Cream |
| 1 | Denture Cream | | 2 | Soap (bar or liquid) |
| 1 | Deodorant | | 1 | Soap Dish |
| 1 | Ear Plugs | | 1 | Toothbrush |
| | | | 1 | Toothpaste |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-02516-RBJ-KMT

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA

      Defendants.

---

## DECLARATION OF PAULA TRUJILLO

---

I, Paula Trujillo, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge

and information made known to me from official records reasonably relied upon by me in the

course of my employment, hereby make the following declaration relating to the above entitled

matter.

    1.     I am employed by the United States Department of Justice, Federal Bureau of

Prisons (Bureau) as a Paralegal Specialist at the Federal Correctional Complex in Florence,

Colorado, (FCC Florence).  I have been employed by the Bureau, in positions of increasing

responsibility, since September 2002.

2.     As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of federal inmates, administrative tort claims, information maintained in the SENTRY[1] database, and inmate central files.  All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

3.     I am familiar with the administrative tort claim process created by the Federal Tort Claims Act.  *See* 28 C.F.R. §§ 543.30 - 543.32.

4.     The Bureau has an administrative tort claim process for inmate claims for money damages for personal injury or death and/or damage to or loss of property, which is codified at 28 C.F.R. § 543.30 *et seq.*  The claim is filed with the regional office in the region where the claim occurred.  28 C.F.R. § 543.31(c).  Each claim, if properly filed, is assigned a filing date and claim number.  *See* 28 C.F.R. § 543.32(a).  The claim is referred to the appropriate institution or office for investigation.  *See* 28 C.F.R. § 543.32(c).  Once the investigation is complete, the Regional Counsel or his or her designee will render a decision.  *See* 28 C.F.R. § 543.32(d).  If dissatisfied with the Regional Counsel's decision, the inmate may request that the Regional Counsel reconsider the claim, and file additional evidence in support of the request for reconsideration. *See* 28 C.F.R. § 543.32(g).  If the inmate is dissatisfied with the final agency action, he or she may file suit in the appropriate U.S. District Court.  *Id.*

5.     An inmate has not administratively exhausted his tort claim until he has properly filed his claim, and received a denial or settlement offer.  If he has not received a response from the Regional Counsel within six months after the date his claim was filed, he may assume the

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

claim is denied and may proceed to file a lawsuit in the appropriate U.S. District Court. *See* 28 C.F.R. § 543.32(i).

6.     The Bureau maintains information related to administrative tort claims in a system called Content Manager. One of the many functions of the Content Manager database is to track administrative tort claims and requests for reconsideration, and it allows one to complete a computerized search of claims filed by a specific inmate.

7.     Each claim is logged into Content Manager at the regional office where the claim originated. The claim receives a unique claim number upon initial entry, which follows the claim throughout the entire process.

8.     I am familiar with the plaintiff in this litigation, inmate Khalfan Mohamed, (Plaintiff), Register Number 44623-054. Plaintiff was convicted of multiple terrorism-related offenses in the Southern District of New York. *See* Att. 1 SENTRY Public Information Profile at 2. On October 18, 2001, he was sentenced to imprisonment for life. *Id.*

9.     I am aware of the allegations raised by Plaintiff in his Second Amended Complaint.

10.     I have reviewed Content Manager for information identifying the number and types of administrative tort claims filed by Applicant. The review of Content Manager indicates that Plaintiff filed two administrative tort claims related to the allegations in his Complaint. On March 23, 2019, Plaintiff filed a personal injury claim alleging excessive use of force and negligent medical treatment following the use of force. *See* Att. 2, Tort Claim Number TRT-NCR-2019-04561. That claim was denied on January 26, 2021. See Att. 3, Tort Claim Number TRT-NCR-2019-04561 Denial Letter. That claim did not include any allegations of negligent supervision. *See* Att. 2.

11.     On March 23, 2019, Plaintiff also filed a personal property claim alleging staff confiscated commissary and religious items from his cell and never returned them. *See* Att. 4, Tort Claim Number TRT-NCR-2019-04559.  That claim was denied on August 15, 2019.  See Att. 5, Tort Claim Number TRT-NCR-2019-04559 Denial Letter.

12.     The claims described above are the only administrative tort claims filed by Plaintiff related to his Complaint.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 22nd day of July 2021, in Florence, Colorado.

Paula Trujillo
Paralegal Specialist
FCC Florence, Colorado
Federal Bureau of Prisons

**Enclosures**

Att. 1 SENTRY Public Information Profile

Att. 2 Tort Claim Number TRT-NCR-2019-04561

Att. 3 Tort Claim Number TRT-NCR-2019-04561 Denial Letter

Att. 4 Tort Claim Number TRT-NCR-2019-04559

Att. 5 Tort Claim Number TRT-NCR-2019-04559 Denial Letter

ATTACHMENT 1

```
FLMCG          *        PUBLIC INFORMATION      *
PAGE 001        *          INMATE DATA          *    11:23:58
                         AS OF 01-04-2021

REGNO..: 44623-054 NAME: MOHAMED, KHALFAN KHAMIS

                  RESP OF: FLM
                  PHONE..: 719-784-9464   FAX: 719-784-5290
                                          RACE/SEX...: BLACK / MALE
                                          AGE:  47
PROJ REL MT: LIFE                         PAR ELIG DT: N/A
PROJ REL DT: LIFE                         PAR HEAR DT:
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

```
FLMGG             *      PUBLIC INFORMATION       *     03-04-2021
PAGE 002          *        INMATE DATA            *      11:23:58
                           AS OF 01-04-2021


REGNO..: 44623-054 NAME: MOHAMED, KHALFAN KHAMIS

                   RESP OF: FLM
                   PHONE..: 719-784-9464    FAX: 719-784-5290
THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  LIFE


----------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER...................: S(7)98CR01023-08(LBS
JUDGE...........................: SAND
DATE SENTENCED/PROBATION IMPOSED: 10-18-2001
DATE COMMITTED..................: 11-19-2001
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $2,300.00       $00.00          $00.00       $00.00

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $33,816,561.75

-----------------------CURRENT OBLIGATION NO: 010 ---------------------------
OFFENSE CODE....:  161     18:1114 HOMICIDE, US OFFCL
OFF/CHG: 18:2332(B)-CONS TO MURD;18:1114,1116&1117-CONS TO MURDER
         18:2332A(A)(1)&A(3)-CONS TO USE WPNS OF MASS DEST;18:844(N)-
         CONS TO DAM OR DESTROY US PROP;18:844(F)(1),F(3)&2-BOMB US
         EMBASSY;18:2332A(A)(1)&(A)(3)-USE & ATMPT USE OF WPNS OF MASS
         DEST;18:930(C),1111&2-MURD;18:1111,1114,1116&2-MURD/ATMPT MURD

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.: LIFE
 TERM OF SUPERVISION............:     5 YEARS
 DATE OF OFFENSE................: 08-07-1998








 G0002       MORE PAGES TO FOLLOW . . .
```

```
FLMCS                        PUBLIC INFORMATION
PAGE 003        *               INMATE DATA              *       11:23:58
                            AS OF 01-04-2021


REGNO..: 44623-054 NAME: MOHAMED, KHALFAN KHAMIS


                    RESP OF: FLM
                    PHONE..: 719-784-9464   FAX: 719-784-5290
-------------------------CURRENT OBLIGATION NO: 020 -------------------------
OFFENSE CODE....:  117    18:831,832 EXPLOSIVES
OFF/CHG: 18:844(H)(1),844(H)(2)&2-USING AND CARRYING AN EXPLOSIVE
         DURING COMMISSION OF A FELONY


 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   10 YEARS
 TERM OF SUPERVISION............:    3 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS
 DATE OF OFFENSE................: 05-08-2000


-------------------------CURRENT OBLIGATION NO: 030 -------------------------
OFFENSE CODE....:  130    18:924(C) FIREARMS LAWS
OFF/CHG: 18:924(C)&2-USING AND CARRYING A DANGEROUS DEVICE DURING THE
         BOMBING OF THE US EMBASSY IN DAR ES SALAAM, TANZANIA


 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   30 YEARS
 TERM OF SUPERVISION............:    5 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS
 DATE OF OFFENSE................: 08-07-1998


-------------------------CURRENT COMPUTATION NO: 010 -------------------------

COMPUTATION 010 WAS LAST UPDATED ON 11-25-2008 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 01-14-2009 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020, 010 030








G0002       MORE PAGES TO FOLLOW . . .
```

```
FLMSG                      PUBLIC INFORMATION                  03/13/2023
PAGE 004 OF 004 *              INMATE DATA              *      11:23:58
                             AS OF 01-04-2021


REGNO..: 44623-054 NAME: MOHAMED, KHALFAN KHAMIS

                      RESP OF: FLM
                      PHONE..: 719-784-9464    FAX: 719-784-5290
DATE COMPUTATION BEGAN..........: 10-18-2001
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............: LIFE
TOTAL TERM IN EFFECT CONVERTED..: LIFE
AGGREGATED TERM OF SUPERVISION..:    5 YEARS
EARLIEST DATE OF OFFENSE........: 08-07-1998

JAIL CREDIT.....................:  FROM DATE     THRU DATE
                                   10-05-1999   10-17-2001

TOTAL PRIOR CREDIT TIME.........: 744
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 0
TOTAL GCT EARNED................: 0
STATUTORY RELEASE DATE PROJECTED: N/A
ELDERLY OFFENDER TWO THIRDS DATE: N/A
EXPIRATION FULL TERM DATE.......: LIFE
TIME SERVED.....................:    21 YEARS      3 MONTHS


PROJECTED SATISFACTION DATE.....: N/A
PROJECTED SATISFACTION METHOD...: LIFE
```

```
S0055        NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE
```

ATTACHMENT 2

Appellate Case: 22-1453   Document: 010110841953   Date Filed: 04/24/2023   Page: 133

**CLAIM FOR DAMAGE, INJURY, OR DEATH**

INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

OMB NO. 1105-0008
EXPIRES 3-31-91

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| To: The Regional Director, Federal Bureau of Prisons, North Central Regional Office Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492. | Khalfan Khamis Mohamed, Reg#44623-054. U.S. Penitentiary max, P.O Box 8500 Florence, CO 81226-8500 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| □ MILITARY ☑ CIVILIAN N/A | 7-25-1973 | | 8-23-2018, C-unit, ADx Floor | Approx 12:30 P.M |

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.) I was severly beaten, punched, kicked by large number of officers/prison guards in retaliation for my hunger strike. The beatings took place when I was already restrained and handcuffed and while I was weak in hunger strike.
Over the course of the beating my ankle was fractured and my other limbs were aggressively twisted in attempt to break them and I received braces in my entire upper body. My face, head, hands and legs all were swollen. Eventually I had to be put in leg cast and on wheel chair for more than 2 months.
Over the next several months I was given neglegent medical treatments, this includes the delay examination on my injuries and delay of diagnoses. CONTINUE.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See Instructions on reverse side.)

N/A

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT. Severly fractured ankle and in severe pain's on my right leg especially when standing and walking, also inability to walk normally and total inability of excersizing.
The pain on my ankle and my right wrist, prevents me, up to this day to pray normally while my wrist, is producing pains while writing= CONTINUE

**11. WITNESSES**

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|
| Mr. A. Ossagie | N/A. |

**12. (See instructions on reverse) AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| N/A | 2,000,000. Two millions dollars | N/A | 2,000,000 Two millions dollars |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| Mohamed | N/A | April 8, 2019 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-108
Previous editions not usable.

NSN 7540-00-634-4046

RECEIVED

APR 23 2019

LEGAL NORTH CENTRAL REGIONAL OFFICE

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

TRT-NCR-2019-04561

8. BASIS OF CLAM (CONTINUES)

diagnoses, refusal to provide treatment, pain medication and even an ice bag, accept on one occation.

I still cant walk normally today, 7+ mohns after I was attacked and I may never walk poperly again. At the same time, I still have reguler pain on my ankle, wrists, back and on my jaws.

The staff intentionally broke my bones and then refused me proper medical treatment.

10                              PERSONAL INJURY - CONTINUES

writing and I cant write continuesly at a single seating as I used to do before I was attacked. I have to stop in every few minutes.

Also I still have pains on other parts of my body including on my Jaws, back and my left wrist.

Also till this day I have imotional and mental distress including me fear of being beaten again and being killed, as the officers had told me that they will kill me... I have dreams and stange night mare of beeing attacked ...etc.

**PRIVACY ACT NOTICE**

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following:  5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

**INSTRUCTIONS**

Complete all items - Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in Item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden,

to Director, Torts Branch
Civil Division
U.S. Department of Justice
Washington, DC  20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC  20503

**INSURANCE COVERAGE**

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes. If yes, give name and address of insurance company (*Number, street, city, State, and Zip Code*) and policy number.   ☐ No

| 16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | 17. If deductible, state amount |
|---|---|
| NONE | NONE |

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim?  (*It is necessary that you ascertain these facts*)

NONE

19. Do you carry public liability and property damage insurance?  ☐ Yes. If yes, give name and address of insurance carrier (*Number, street, city, State, and Zip Code*)   ☐ No

SF 95 (Rev. 7-85) BACK

* U.S. GOVERNMENT PRINTING OFFICE  1989 0 - 240-698 (41)

App.288

Appellate Case: 22-1453   Document: 010110826877   Date Filed: 03/15/2023   Page: 136

ATTACHMENT 3



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

---

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS  66101*

January 26, 2021

Khalfan Khamis Mohamed, #44623-054
United States Penitentiary Administrative Maximum - ADX
P.O. Box 8500
Florence, CO  81226

RE:  Tort Claim TRT-NCR-2019-04561
Amount of Claim:  $2,000,000.00

Certified Mail Receipt No:  ⁷⁰₁⁸ ⁰³⁶⁰ ⁰⁰⁰² ²⁰⁸⁰ ⁷⁵⁸⁵

Dear Claimant:

Your above referenced tort claim has been considered for administrative review pursuant to 28 C.F.R. § 0.172, <u>Authority: Federal Tort Claims</u> and 28 C.F.R. Part 14, <u>Administrative Claims under Federal Tort Claims Act</u>.  Investigation of your claim did not reveal that you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.

As a result of this investigation, your claim is denied.  This memorandum serves as a notification of final denial under 28 C.F.R. § 14.9, <u>Final Denial of Claim</u>.  If you are dissatisfied with our agency's action, you may file suit in an appropriate U.S. District Court no later than 6 months after the date of mailing of this notification.

Sincerely,


Richard M. Winter
Regional Counsel

Appellate Case: 22-1453   Document: 010110826877   Date Filed: 03/15/2023   Page: 138

ATTACHMENT 4

Appellate Case: 22-1453   Document: 010110749630   Date Filed: 10/17/2022   Page: 139

**CLAIM FOR DAMAGE, INJURY, OR DEATH**

INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

OMB NO. 1105-0008
EXPIRES 3-31-91

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| TO: The Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8TH Floor, 400 State Avenue, Kansas City, Kansas 66101-2492. | Khalfan Khamis Mohamed, Reg # 44623-054. US-Penitentiary max, P.O.Box 8500 Florence, CO 81226-8500. |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY ☑ CIVILIAN | 7.25.1975 | | 8.23.2018 | Approx. 12:30 P.m |

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.) One and half approx. of Religious manuscripts ( 3 Large manuscripts + small ones ), Journals, ( in 12-notebooks ) personal notes (summary of about 120-150 books) and other personal notes, compiled over the last 16-17 years (from 2001-2018), also personal clothes, differ commissary items, and 9-Large personal books, Confiscated by staff in c-unit, Cell 108, on 8-23-18 and the staff didn't allow me to confirm the validity of inventory form as soon as possible, as required by policy, nor did they allow me to identify the missing paper works and property when the few returned property returned to me on October 3, 2018. That was the first day. So the unreadable inventory form. The staff negligence in not allowing me to review my property after the Inventory and by ~~not allowing me to identify~~ intentionally miss treating my property CONTINUE

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side). My lost property included 3- large religious manuscripts and several small ones, the originals and their carbon-copies, also 12-notebooks of journals (Dec. 2001- August 22, 2018) also the personal notes which was summary from up to 150 differ books/articles. Also 9-books, clothes, commiss.de all are lost. Location is c-unit Cell where were confiscated.

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT. The Loosing my property has caused me a mental and immotional pains, suffering, anxiety and depression, because I compiled those papers over the last 17-years and they are irreplaceble.

| 11. | WITNESSES |
|---|---|
| **NAME** | **ADDRESS (Number, street, city, State, and Zip Code)** |
| | N/A |

**12. (See instructions on reverse)   AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| $2,000,000 Two millions dollars | N/A | N/A | $2,000,000 Two millions dollars |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| mohamed | N/A | 4.15.2019. |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-108
Previous editions not usable.

NSN 7540-00-634-4046

RECEIVED

APR 23 2019

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

TRT-NCR-2019-04559

LEGAL NORTH CENTRAL REGIONAL OFFICE

App.292

8- BASIS OF CLAIM (CONTINUES)

my property and by refusal of the appropriate staff to give me a chance in his presence to go through the property so I could identify the existing and missing property and by even refusing me to go through the inventory form and to sign it while the few property that was left referred to me in October 3, 2008, by all these, my property is intentionally lost.

I also allege here that my central file doesn't have ~~of~~ a complete record of the inventory form.

The staff who confiscated my property on 8.23.2018 /and, or, others also confiscated all of my receipts and invoices that prove my ownership of my books, commissory items, clothes ..etc. These all was intentionally done so to deprive me any right to claim my expensive property.

### PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the Information requested in the letter to which this Notice is attached.

A. *Authority:* The requested Information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The Information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

---

### INSTRUCTIONS

Complete all items - Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in Item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in Item 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) in support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) in support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) in support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.

---

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden,

to Director, Torts Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530

and to the,
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC 20503

---

### INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance?  ☑ Yes, if yes, give name and address of insurance company (Number, street, city, State, and Zip Code) and policy number.  ☐ No

| 16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | 17. If deductible, state amount |
|---|---|
| NONE | N ONE |

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? (It is necessary that you ascertain these facts)

NONE

19. Do you carry public liability and property damage insurance?  ☐ Yes, if yes, give name and address of insurance carrier (Number, street, city, State, and Zip Code)  ☐ No

SF 95 (Rev. 7-85) BACK

ATTACHMENT 5



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

---

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS  66101*

August 15, 2019

Khalfan Khamis Mohamed, #44623-054
United States Penitentiary - ADX
P.O. Box 8500
Florence, CO  81226

RE:   Tort Claim TRT-NCR-2019-04559
       Amount Claimed:  $2,000,000.00

Dear Claimant:

Your above referenced tort claim has been considered for administrative review pursuant to 31 USC § 3723, <u>Small Claims for Property Damage or Loss</u>.  An investigation of your claim revealed that you did not suffer any property loss or damage as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.

As a result of this investigation, your claim is denied.  You may request, in writing, that the Bureau of Prisons reconsider your claim.  The request for reconsideration must be submitted to the Regional Counsel for the North Central Regional Office within three months of the date of the decision letter.  You should include additional evidence of the damage or loss to support your request for reconsideration.  There is no review available by the United States District Court for claims decided pursuant to 31 U.S.C. § 3723.

Sincerely,

Richard M. Winter
Regional Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-02516-RBJ-KMT

KHALFAN KHAMIS MOHAMED,

     Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
MURTON and
ARMIHO,

     Defendants.

---

ORDER

---

     Plaintiff Khalfan Khamis Mohamed, an inmate at the United States Penitentiary Florence

ADMAX (ADX Florence), filed his original complaint in this case on August 20, 2020.  ECF

No. 1.  In a second amended complaint, he alleges that Bureau of Prisons (BOP) officials beat

him, confiscated his property, and denied him timely medical attention for the injuries sustained

in the beating.  *See* ECF No. 64.  He asserted ten claims against eight BOP officials in both their

individual and official capacities: (1) Eighth Amendment excessive force claims against

defendants Brush, Miller, Espinoza (Claims 1, 3, and 5); (2) Eighth Amendment failure-to-

intervene claims against defendants Armijo, Murton, and Osagie (Claims 2, 4, and 6); (3) Eighth

Amendment deliberate indifference claims against defendants Jones, Huddleston, and Osagie

(Claims 8, 9, and 10); and (4) a First Amendment claim against defendant Brush.  *See id.*  All

1

claims against the BOP officers were raised pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In addition, Mr. Mohamed asserted five claims against the United States under the Federal Tort Claims Act (FTCA): (1) three claims of battery (Claims 11, 12, and 13); (2) negligent supervision (Claim 14); and (3) negligent performance (Claim 15).

The case was eventually assigned to this Court. The Court referred the pending motions to dismiss to Magistrate Judge Kathleen M. Tafoya for a recommendation. Upon her retirement, the case was reassigned to Magistrate Judge Nina Y. Wang as the referral judge. *See* ECF Nos. 12, 13, 102. In the first motion to dismiss defendants seek dismissal of all claims against the individual plaintiffs (claims 1–10) and the claim of negligent performance (claim 14). They argued that (1) Plaintiff's excessive-force, failure-to-intervene, and First Amendment claims lack a *Bivens* remedy; (2) certain individual defendants are entitled to qualified immunity; (3) all of Plaintiff's official-capacity claims fail to state a claim; and (4) the FTCA claim for negligent supervision fails to state a claim and fails because plaintiff did not exhaust his administrative remedies. ECF No. 71 at p. 1. In their second motion to dismiss, defendants sought to dismiss claim 15 for failure to file a certificate of review as required by Colorado law. ECF No. 81 at p. 1. Plaintiff responded, ECF Nos. 83, 88, and then defendants replied, ECF Nos. 89, 90.

On February 22, 2022, Magistrate Judge Wang issued a 79-page recommendation on the motions to dismiss. ECF No. 103. She recommended that this Court deny the first motion with respect to the Eighth Amendment claims. *Id.* at 78. However, she recommended that the Court grant the first motion with respect to the First Amendment claim (claim seven) and the FTCA claim (claim fourteen), and she recommended this Court grant the second motion (fifteenth claim) in its entirety. *Id.* Defendants filed a timely objection to the portions of Magistrate Judge

2

Wang's recommendation that recommended denying their motion to dismiss.  ECF No. 116.

Plaintiff responded and asked this Court to adopt the recommendation in its entirety.  ECF No.

118.

## I.      STANDARD OF REVIEW

The district court "must determine de novo any part of the magistrate judge's disposition

that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  An objection is sufficiently

specific if it "focus[es] the district court's attention on the factual and legal issues that are truly

in dispute."  *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  In the

absence of a timely and specific objection, "the district court may review a magistrate's report

under any standard it deems appropriate."  *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir.

1991).

## II.     CONCLUSIONS

Because defendants have filed timely objections to the magistrate judge's

recommendation on the Eighth Amendment claims, the Court has conducted a de novo review of

those claims.[1]  It has done so by reviewing the motion to dismiss, the response, the

---

[1] The parties agree with the magistrate judge's recommendations to dismiss plaintiff's seventh,
fourteenth, and fifteenth claims.  Plaintiff's seventh claim seeks a *Bivens* remedy for BOP officials
allegedly taking and destroying "(1) [plaintiff's] daily journals or diaries, comprising 12 notebooks with
entries from 2001 through August 2018; (2) three manuscripts written by plaintiff, which included (a) a
900-page unfinished manuscript about peace and tolerance between the religions of Islam, Christianity,
and Judaism; (b) a 500-page manuscript of the Qur'an translated by Plaintiff into Swahili, Plaintiff's
native language; and (c) a 450-page manuscript about slavery throughout history; [and] (3) Plaintiff's
notes about 'important books that [he had] read previously;'"  ECF No. 103 at p. 6 (citing ECF No. 64 at
¶¶ 88–94).  I do not downplay the mental and emotional impact of the sudden and irrecoverable loss of
one's life work.  In my opinion, needlessly and unjustifiably destroying 20 years of work would be, in the
colloquial sense, cruel.  But I agree with and adopt the magistrate judge's recommendation dismissing
this claim for lack of a *Bivens* remedy.  I also agree with and adopt the magistrate judge's
recommendation about claims fourteen and fifteen.

recommendation, both parties' objections, and miscellaneous other documents in the electronic file.

## A. *Bivens* and Excessive Force

Denying defendants' motion to dismiss the Eighth Amendment excessive force claims, as Magistrate Judge Wang recommended, would imply a *Bivens* remedy in a context where no Supreme Court nor Tenth Circuit case is directly on point. As the magistrate judge correctly noted, extending *Bivens* is a "disfavored judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–57 (2017); *see also* ECF No. 13 at p. 17 (citing *Abbasi*). But extending *Bivens* is not prohibited; the Supreme Court has articulated two questions a court must ask to determine whether extending *Bivens* is proper. First, a court must determine whether the claim arises in a new context, which broadly encompasses any claims "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (internal quotations omitted). If so, a court must then determine whether "there are special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (internal quotations omitted). In resolving these two questions, a court must be mindful of whether an alternative remedy exists that could protect the constitutional interests at stake such that implying a damages remedy under *Bivens* may interfere with the powers of Congress. *See Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 860–61 (10th Cir. 2016).

The magistrate judge recommended extending *Bivens* to the current case. Her two-step analysis was thoughtful and thorough. At step one, she found "no meaningful difference between the deliberate indifference claim raised in *Carlson* [*v. Green*, 446 U.S. 14 (1980), which provided a *Bivens* remedy for failure to provide adequate medical treatment under the Eighth Amendment,] and Mr. Mohamed's excessive force claims." ECF No. 103 at p. 30. She

4

therefore concluded that plaintiff's claim does not present a new context for *Bivens*.  At step two, the magistrate judge found no special factors counseling against extending a *Bivens* remedy.  The Tenth Circuit has directed that, to be considered an "alternative remedy" for the *Bivens* analysis, a potential remedy must provide "more than nothing."  *Big Cats*, 843 F.3d at 863.  Guided by this Tenth Circuit direction, the magistrate judge found that neither the BOP's administrative grievance program nor equitable remedies provide "alternative remedies" because neither would redress plaintiff's past injuries.  ECF No. 103 at pp. 31–33.  The magistrate judge also found the FTCA was not an alternative remedy because it is "crystal clear that Congress intended the FTCA and Bivens to serve as parallel and complementary sources of liability."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).  Finally, the magistrate judge was unconvinced that providing a remedy for constitutionally excessive uses of force would interfere with BOP operations.  ECF No. 103 at pp. 33–35.  As plaintiff pointed out in his reply, defendants' cited cases in which a court refused to second-guess BOP decisions were markedly different than plaintiff's situation.  *See* ECF No. 118 at p. 3 (explaining that in one of defendants' cited cases, *Whitley v. Albers*, 475 U.S. 312 (1986), the court declined to question the BOP's forceful response to a deadly and dangerous riot/hostage situation).

In their objection, defendants imply that Magistrate Judge Wang improperly extended *Bivens* based on Tenth Circuit rather than Supreme Court precedent.  *See* ECF No. 116 at pp. 4–6.  I disagree.  Magistrate Judge Wang applied the same test defendants articulate: "whether plaintiff's claims are different from *Bivens*, *Carlson*, and *Davis* [*v. Passman*, 442 U.S. 228 (1979)]."  ECF No. 116 at p. 5.  The magistrate judge concluded that plaintiff's claims do not meaningfully differ from those three cases.  ECF No. 103 at p. 30.  I found her analysis persuasive.

5

Defendants' two arguments unaddressed by the magistrate judge do not persuade me to depart from her recommendation. First, defendants argue that Congress, in passing the Prison Litigation Reform Act of 1996, chose not to extend *Carlson*'s cause of action to other prisoner mistreatment, and that this decision weighs against extending *Bivens* to plaintiff's cause of action. I disagree. As stated above, *Carlson* encompasses Eighth Amendment excessive force claims. Congress's decision not to create a new cause of action was made with the understanding that such a cause of action already existed under *Bivens* and *Carlson*. Its decision not to "create" a cause of action that already existed is not properly understood as a rejection of that well-established cause of action.

Second, defendants attempt to distinguish *Carlson* by claiming that it extended *Bivens* based on *in*action of prison officials, while this case deals with action of BOP officials. ECF No. 116 at p. 6. The action/inaction distinction is unpersuasive. It would result in a situation where "[t]he very essence of civil liberty," *Carlson*, 442 U.S. at 242 (quotation omitted), permits suits against a BOP official who refused to treat a plaintiff's broken arm but forbids suits against a BOP official who maliciously and intentionally broke the plaintiff's arm. I reach the same conclusion drawn by Magistrate Judge Wang: there is no meaningful difference between plaintiff's Eighth Amendment Excessive Force claim and *Bivens* remedies already recognized by the Supreme Court.[2]

---

[2] This Court reached a similar conclusion in *Smith v. Trujillo*, No. 120-CV-00877-RBJ-NYW, 2021 WL 1608829 (D. Colo. Apr. 26, 2021) (unpublished). In adopting Magistrate Judge Wang's recommendation that a plaintiff's Eighth Amendment excessive force claim was not meaningfully different from other situations in which a *Bivens* remedy had been implied, I emphasized that "[t]he Eighth Amendment protects against the imposition of cruel and usual punishment on a prisoner. That the cruel and unusual punishment takes the form of an allegedly brutal assault by a correctional officer on an inmate rather than another form of punishment should make no difference in the inmate's right to seek redress." *Id.* at *2.

6

### B. *Bivens* **and Failure to Intervene**

Magistrate Judge Wang recommended declining to dismiss plaintiff's failure-to-intervene claims for lack of a *Bivens* remedy. She found that these claims do not present a new *Bivens* context, and that no special factors counsel against recognizing a *Bivens* claim. ECF No. 103 at pp. 35–40. Defendants object to the magistrate judge's reliance on *Farmer v. Brennan*, 511 U.S. 825 (1994). Defendants argue that Supreme Court in *Farmer* did not recognize a failure-to-intervene *Bivens* remedy, and that *Farmer* sheds no light on the similarity between plaintiff's claim and *Carlson*, which did recognize a *Bivens* remedy.

I find Magistrate Judge Wang's analysis compelling. She recognized *Farmer*'s ambiguity: although it did not explicitly recognize a new *Bivens* remedy, it did find that failure to protect a prisoner from other prisoners could violate the Eighth Amendment — and it did so in the context of a failure-to-protect *Bivens* action. *Farmer*, 511 U.S. at 830. It is thus unclear whether *Farmer* recognized a failure-to-protect *Bivens* claim. Magistrate Judge Wang resolved this ambiguity by asking how other courts had interpreted *Farmer* and concluded that other courts had read *Farmer* in conjunction with *Carlson* for the narrow proposition that failure-to-protect claims do not present a new *Bivens* context. She then cited numerous cases for the proposition that "[a] failure to intervene claim is essentially the same as a failure to protect claim," which is what plaintiff alleges here. ECF No. 103 at p. 38 (quoting, *inter alia*, *Meskauskas v. Cowan*, No. 18-cv-1446-DWD, 2021 WL 2075863, at *4 (S.D. Ill. May 24, 2021)).[3]

---

[3] Defendants submit that the same "special factors" counseling against extending *Bivens* in the excessive force context apply in the failure-to-intervene context. ECF No. 116 at p. 15. I reject this contention for the reasons stated above.

### C. **Qualified Immunity: Deliberate Indifference**

Defendants argue that defendants Jones, Huddleston, and Osagie are entitled to qualified immunity on plaintiff's deliberate indifference claims. ECF No. 71 at p. 12. "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To avoid application of qualified immunity, a plaintiff must (1) allege facts that, if true, would establish that the defendant violated a constitutional right, and (2) show that the constitutional right was clearly established at the time it was violated. *See id.* at 232. Qualified immunity's clearly-established prong ensures that "every reasonable official" has received "fair warning" before being held liable. *Tolan v. Cotton*, 572 U.S. 650, 56 (2014).

Plaintiff claims that defendants Jones, Huddleston, and Osagie violated his Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) ("A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment."). Constitutional liability based on deliberate indifference to medical needs requires a plaintiff satisfy both objective and subjective components of the deliberate-indifference test. The objective component is met if the constitutional deprivation was "sufficiently serious." *Mata*, 427 F.3d at 751 (citing *Farmer*, 511 U.S. at 834). A plaintiff can satisfy this part of the test by showing that the untreated medical need (1) actually resulted in substantial harm, (2) had been diagnosed as needing medical treatment, or (3) was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *see also Vigil v. Laurence*, 524 F. Supp. 3d 1120, 1128 (D. Colo. 2021). The subjective component is met if a

prison official "knows of and disregards an excessive risk to inmate health or safety." *Sealock*, 218 F.3d at 1209 (quoting Farmer, 511 U.S. at 837).

The magistrate judge found that the complaint alleged facts that would satisfy the deliberate-indifference test's objective component. Plaintiff's complaint alleges that he needed medical treatment for injuries to his ankle, wrist, jaw — injuries sustained during his alleged beatings — as well as for "excruciating pain" that prevented him from walking, sleeping, and even praying. ECF No. 64 at ¶¶ 137–42. When plaintiff saw defendants Jones, Huddleston, and Osagie, the complaint alleges, the defendants saw his injuries — including his ankle swollen to the size of an orange, *id.* at ¶ 149 — and listened to plaintiff's description of his pain and need for medical treatment. Based on these allegations, the magistrate judge concluded that plaintiff has alleged "sufficiently serious" deprivations based on an "obvious" need for medical treatment. ECF No. 103 at p. 49.

Defendants object that the magistrate judge dealt with three injuries together instead of separately assessing whether plaintiff's ankle, wrist, jaw, and pain were independently "serious." ECF No. 116 at pp. 18–19. I find the magistrate judge's approach proper. Plaintiff's pain, which defendants concede was sufficiently serious, connected all of his injuries. His pain was allegedly so excruciating that he could not sleep, walk, or pray. His ankle, wrist, and jaw injuries all contributed to this objectively serious pain. Because all injuries manifested in an objectively serious condition requiring medical attention, I find the objective component of the deliberate indifference test met for all plaintiff's injuries. *See id.* at p. 49 n.14 (declining to separately address the wrist and jaw injuries because defendants concede that plaintiff's pain was sufficiently serious).

9

The magistrate judge also found that the complaint alleged facts that would satisfy the deliberate-indifference test's subjective component. *Id.* at 51–54. Plaintiff's complaint alleges that all three defendants refused to treat his needs in an effort to pressure him to end, or in retaliation for, his hunger strike. ECF No. 64 at ¶¶ 133, 136, 141, 146. The magistrate judge found this justification a "non-medical factor" and further found, based on other district court opinions, that a treatment decision significantly influenced by non-medical factors satisfies the subjective prong of the deliberate indifference standard. ECF No. 103 at pp. 51–54. Defendants respond that declining to treat pain until the conclusion of a hunger strike could have been a legitimate medical decision. ECF No. 116 at p. 22. Maybe. But at this stage the Court views the allegations in the light most favorable to the plaintiff and affords his pro se papers a liberal construction. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). I agree with the magistrate judge that plaintiff's complaint satisfies both steps of the deliberate-indifference test.

Finally, I agree with the magistrate judge that the law was clearly established. *See* ECF No. 103 at 57–58 (quoting, *inter alia*, *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020)) ("[W]hen [an inmate] has obvious and serious medical needs, ignoring those needs necessarily violates the [inmate's] constitutional rights."); *Patterson v. Santini*, No. 11-cv-01899-RM-KLM, 2016 WL 11642452, at *5 (D. Colo. Nov. 28, 2016) (unpublished) ("[In 2012] it was clearly established that a prison official's decision to ignore a prisoner's repeated complaints of severe pain, or requests for medical treatment, meet this [unconstitutional] threshold."); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1190 (10th Cir. 2014) ("A medical professional may not ignore an inmate's complaints of severe pain and then escape liability because later-discovered facts about the actual cause and ultimate duration of the inmate's pain,

10

while serious enough to give rise to an Eighth Amendment claim, do not precisely correspond with the facts of previous Tenth Circuit cases.").

### D.  Qualified Immunity: Failure to Intervene

The magistrate judge also recommended denying defendant Osagie qualified immunity on plaintiff's Eighth Amendment failure-to-intervene claim.  Defendants object to this recommendation.  ECF No. 116 at p. 16.  They contend that no allegations support the inference that defendant Osagie observed or had reason to know of a constitutional violation, therefore defendant Osagie could not have personally participated in the alleged constitutional violation. *Id.*  I disagree.  Plaintiff alleges that Defendant Osagie "witnessed the beatings against [him] and chose not to stop them."  ECF No. 64 at ¶ 76.  He further alleges that the officers beating him intentionally obscured his view so that he could not see who was beating him, but that he heard defendant Osagie's distinctive voice and accent "very close" to his cell. *Id.*  He called out to defendant Osagie, telling him that he was not resisting but was being beaten nonetheless. *Id.* at ¶ 77–78.  These allegations support the inference that defendant Osagie either observed or knew of the constitutional violation.  Defendants' argument that defendant Osagie did not violate clearly established law was based on their claim that defendant Osagie did not personally observe the beatings.  I reject defendants' contention for the reasons articulated in the magistrate judge's recommendation. *See* ECF No. 103 at pp. 45–46.

### E.  Official Capacity Claims

Defendants contend that, because plaintiff has not sufficiently stated Eighth Amendment claims against defendants Jones, Huddleston, and Osagie, the claims against those defendants in their official capacities must be dismissed.  ECF Nos. 71 at p. 17, 116 at p. 24.  The magistrate judge noted that, "[b]eyond this bare statement," defendants "offer[ed] no arguments" for

dismissing the official-capacity claims.  ECF No. 103 at p. 59.  Accordingly, she recommended denying defendants' motion to dismiss the official capacity claims.[4]

Even were I to flesh out defendants' bare-bones argument, I would not dismiss plaintiff's official capacity claims on a 12(b)(6) motion.  While it is true that plaintiff cannot seek monetary damages in official-capacity claims, his complaint explicitly denies seeking such relief.  ECF No. 64 at p. 3 n.3 ("I am only seeking compensatory relief on individual defendants on [sic] their individual capacities.").  For his official capacity claims, plaintiff requests an injunction ordering defendants Jones, Huddleston, and Osagie (essentially meaning the Bureau of Prisons) to "arrange immediately for [plaintiff] to be examined by an expert in broken bones," and to follow the expert's medical recommendation, "including surgery."  *Id.* at p. 30.

Defendants' strongest objection, had they made it, might have been that plaintiff mis-locates the Court's authority to issue the injunctions he seeks.  Plaintiff claims to "use *Bivens*" for his injunctive-relief requests.  ECF No. 64 at p. 3 n.3.  But *Bivens* cannot provide such relief.  *Bivens*, by definition, facilitates claims against officials only in their individual capacities, but injunctive relief requires an official-capacity suit.  *See Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir.2001).  This error is not fatal to plaintiff's complaint.  The Tenth Circuit has explained that a court's power to enjoin BOP officials is a function of its equitable jurisdiction and Congress's recent waivers of sovereign immunity.  *See Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232–33 (10th Cir. 2005).  In doing so, the Tenth Circuit noted that "[s]ome courts have characterized constitutional claims to enjoin federal officials as *Bivens* claims."  *Id.* at 1231.  If

---

[4] The magistrate judge also responded to defendants' footnote in which they correctly claimed that plaintiff may not seek money damages for his official-capacity claims.  *See* ECF No. 71 at p. 17 n.13. The magistrate judge liberally construed plaintiff's pro se complaint and found that he did not seek money damages for his official capacity claims.  ECF No. 103 p. 59 at n.19.

12

federal judges had considered claims like plaintiff's to be *Bivens* claims, then plaintiff could be forgiven for doing the same.  Construing plaintiff's complaint "liberally" and holding it "to a less stringent standard than those drafted by attorneys," *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir.2007), I find that he has stated official-capacity claims for injunctive relief.

### III.    ORDER

1. For the foregoing reasons, after de novo review, the recommendation of the magistrate judge, ECF No. 103, is ACCEPTED AND ADOPTED.

2. Defendants' first partial motion to dismiss, ECF No. 71, is GRANTED IN PART AND DENIED IN PART.  It is granted as to plaintiff's seventh and fourteenth claims — those claims are DISMISSED without prejudice.

3. Defendants' second partial motion to dismiss, ECF No. 81, is GRANTED.  Plaintiff's fifteenth claim is DISMISSED.

4. Plaintiff's claims One, Two, Three, Four, Five, Six, Eight, Nine, Ten, Eleven, Twelve, and Thirteen REMAIN.

DATED this 18th day of May, 2022.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge

13

**App.309**

| 05/20/2022 | 122 | CERTIFICATE of Service by Mail by Clerk of Court re 121 Minute Order, to Khalfan Khamis Mohamed #44623–054, and Case Manager of Khamis Mohamed #44623–054, FLORENCE ADMAX, U.S. PENITENTIARY, Inmate Mail/Parcels, PO BOX 8500, FLORENCE, CO 81226. Text Only Entry. (alave, ) (Entered: 05/20/2022) |
| --- | --- | --- |
| 05/24/2022 | 123 | MOTION for Extension of Time to File Answer or Otherwise Respond re 64 Amended Complaint by Defendants Armijo, Brush, Espinoza, Huddleston, Jones, Miller, Murton, Osagie, USA. (Lake, Jennifer) (Entered: 05/24/2022) |
| 05/24/2022 | 124 | MEMORANDUM regarding 123 MOTION for Extension of Time to File Answer or Otherwise Respond re 64 Amended Complaint filed by Espinoza, Miller, Huddleston, USA, Murton, Armijo, Osagie, Jones, Brush. Motion 123 is referred to Magistrate Judge Nina Y. Wang, by Judge R. Brooke Jackson on 5/24/2022. Text Only Entry (rbjsec.) (Entered: 05/24/2022) |
| 05/25/2022 | 125 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 05/25/2022. It is ORDERED that: Defendants' Motion for Extension of Time to Answer Second Amended Complaint 123 is GRANTED; Defendants shall answer Plaintiff's Second Amended Complaint 64 on or before June 22, 2022; and A copy of this Minute Order shall be sent to: Khalfan Khamis Mohamed, #44623–054, Florence ADMAX United States Penitentiary, Inmate Mail/Parcels, P.O. Box 8500, Florence, CO 81226. (alave, ) (Entered: 05/26/2022) |
| 05/26/2022 | 126 | CERTIFICATE of Service by Mail by Clerk of Court re 125 Order on Motion for Extension of Time to Answer or Otherwise Respond, to Khalfan Khamis Mohamed, #44623–054, FLORENCE ADMAX, U.S. PENITENTIARY, Inmate Mail/Parcels, PO BOX 8500, FLORENCE, CO 81226. Text Only Entry. (alave, ) (Entered: 05/26/2022) |
| 06/13/2022 | 127 | PAYMENT RECEIVED from Khalfan Khamis Mohamed in the amount of $ 10.00; Receipt Number cox103534; Monthly Payment. (sphil, ) (Entered: 06/15/2022) |
| 06/15/2022 | 128 | MOTION for Reconsideration re 120 Order,,, Terminate Motions,,, Set/Clear Flags,, by Defendants Armijo, Brush, Espinoza, Huddleston, Jones, Miller, Murton, Osagie, USA. (Lake, Jennifer) (Entered: 06/15/2022) |
| 06/16/2022 | 129 | MOTION for Extension of Time to File Answer or Otherwise Respond re 64 Amended Complaint *Pending Resolution of Motion for Reconsideration* by Defendants Armijo, Brush, Espinoza, Huddleston, Jones, Miller, Murton, Osagie, USA. (Lake, Jennifer) (Entered: 06/16/2022) |
| 06/21/2022 | 130 | ORDER REFERRING MOTION: 129 MOTION for Extension of Time to File Answer or Otherwise Respond referred to Magistrate Judge Nina Y. Wang by Judge R. Brooke Jackson on 6/21/22. Text Only Entry (jdyne, ) (Entered: 06/21/2022) |
| 06/21/2022 | 131 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 06/21/2022. It is ORDERED that: Defendants' Motion to Extend Deadline to Answer and Vacate Status Conference Pending Resolution of Motion for Reconsideration 129 is GRANTED in part; Defendants shall answer Plaintiff's Second Amended Complaint 64 on or before August 2, 2022; The Status Conference currently set for July 28, 2022 is RESET for September 28, 2022 at 10:30 a.m. in Courtroom A–502, 5th Floor, Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado; Plaintiff's case manager shall use the following dial–in information at the designated time to ensure that Plaintiff can participate in the Status Conference: 888–363–4749; Access Code: 5738976#; and A copy of this Minute Order shall be sent to: Khalfan Khamis Mohamed, #44623–054, Florence ADMAX United States Penitentiary, Inmate Mail/Parcels, P.O. Box 8500, Florence, CO 81226. (alave, ) (Entered: 06/22/2022) |
| 06/21/2022 | 132 | CERTIFICATE of Service by Mail by Clerk of Court re 131 Order on Motion for Extension of Time to Answer or Otherwise Respond, to Khalfan Khamis Mohamed, #44623–054, Florence ADMAX United States Penitentiary, Inmate Mail/Parcels, P.O. Box 8500, Florence, CO 81226. (alave, ) (Entered: 06/22/2022) |
| 07/01/2022 | 133 | MOTION for his Third Amended Complaint – Amending his Seventh Claim by Plaintiff Khalfan Khamis Mohamed. (sphil, ) (Entered: 07/01/2022) |
| 07/01/2022 | 134 | Plaintiff's RESPONSE to 128 MOTION for Reconsideration filed by Plaintiff Khalfan Khamis Mohamed. (sphil, ) (Entered: 07/01/2022) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-02516-RBJ-MDB

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA,

      Defendants.

---

**NOTICE OF SUPPLEMENTAL AUTHORITY CONCERNING
MOTION FOR RECONSIDERATION (ECF NO. 128)**

---

      Defendants submit this Notice of Supplemental Authority in support of their pending

Motion for Reconsideration, ECF No. 128, and to alert this Court to *Silva v. United States*, No.

21-1008, 2022 WL 3023684 (10th Cir., Aug. 1, 2022), which held that there is no *Bivens* remedy

for an excessive force claim brought by a federal prisoner.

      Respectfully submitted on this 3rd day of August, 2022.

                        COLE FINEGAN
                        United States Attorney

                        s/ *Jennifer R. Lake*
                        Jennifer R. Lake
                        Assistant United States Attorney
                        United States Attorney's Office

1

1801 California Street, Suite1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: jennifer.lake@usdoj.gov
Counsel for Defendants

2

**App.312**

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on August 3, 2022, I served the foregoing document, including copies of any unpublished decisions cited therein, on the following non-CM/ECF participant in the manner indicated:

Khalfan Khamis Mohamed (U.S. mail)
Reg. No. 44623-054
ADX – Florence
P.O. Box 8500
Florence, CO 81226

s/ *Joann Stark*
Joann Stark
United States Attorney's Office

IN THE UNITED STATES DISTRICT COUR
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-02516-RBJ-MDB

KHALFAN KHAMIS MOHAMED,

     Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA,

     Defendants.

---

## ORDER ON MOTION FOR RECONSIDERATIION

This matter is before the Court on defendants' motion to reconsider the order at ECF No. 120 in light of intervening Supreme Court precedent, *Egbert v. Boule*, 142 S. Ct. 1793 (2022). Defendants' motion is denied.

### FACTS

Plaintiff Khalfan Khamis Mohamed, an inmate at the United States Penitentiary Florence ADMAX (ADX Florence), filed suit against eight BOP officials pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the officers beat him, confiscated his property, and denied him timely medical attention for injuries

1

sustained in the beating in violation of the Eighth Amendment, the First Amendment, and the Federal Tort Claims Act (FTCA). *See* ECF Nos. 1, 64.

After reviewing defendants' first and second motions to dismiss, then-Magistrate Judge Nina Y. Wang issued a 79-page recommendation, which I accepted and adopted on May 18, 2022. *See* ECF No. 103; ECF No. 120. Accordingly, I granted defendants' motions to dismiss as to plaintiff's First Amendment claim (claim 7) and as to the FTCA claims of negligent supervision and performance (claims 14 and 15), denied defendants' motion to dismiss as to the FTCA battery claims (claims 11 through 13), and—the genesis of this motion—denied defendants' motions to dismiss as to the Eighth Amendment claims (claims 1 through 6 and 8 through 10). *See* ECF No. 120 at 13.

In finding that a *Bivens* remedy was available for claims 1 through 6, I reasoned that there was "no meaningful difference" between the Eighth Amendment excessive force and failure-to-intervene claims at issue here and the Eighth Amendment deliberate indifference claim for which the Supreme Court provided a *Bivens* remedy in *Carlson v. Green*, 446 U.S. 14 (1980). *See id*. at 4. Furthermore, I reasoned, even if the excessive force and failure-to-intervene claims presented a new context, there were "no special factors counseling against extending a *Bivens* remedy." *Id*. at 5.

On June 8, 2022, the Supreme Court issued its decision in *Egbert v. Boule*, which addressed two questions: (1) whether a cause of action exists under *Bivens* "for First Amendment retaliation claims," and (2) whether a cause of action exists under *Bivens* for Fourth Amendment claims "against federal officers engaged in immigration-related functions." *See* U.S. Supreme Court, Grant of Petition for Certiorari, November 5, 2021,

https://www.supremecourt.gov/docket/docketfiles/html/qp/21-00147qp.pdf.  The majority in

*Egbert* declined to provide a *Bivens* remedy in those two enumerated contexts.

 Defendants here move to reconsider the denial of their motion to dismiss counts 1

through 6, arguing that *Egbert* forecloses the analysis on which I relied in finding that a *Bivens*

remedy should be implied for plaintiff's Eighth Amendment excessive force and failure-to-

intervene claims.  *See* ECF No. 128 at 1.  I have considered each of defendants' arguments that

*Egbert* compels dismissal of plaintiff's claims 1 through 6, and I disagree.


## STANDARD OF REVIEW

 Defendants file this motion under Rule 59(e) of the Federal Rules of Civil Procedure,

which provides for a "motion to alter or amend [the] judgment" under certain circumstances.

However, "a motion for reconsideration is an extreme remedy to be granted in rare

circumstances."  *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir. 1995).  "The

decision to grant reconsideration is committed to the sound discretion of the district court."  *Id.*

In exercising that discretion, "courts consider whether there has been an intervening change in

the [controlling] law, new evidence, or the need to correct clear error or to prevent manifest

injustice."  *See id.*; *see also Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir.

2000) (clarifying that any intervening change in the law is not sufficient to warrant

reconsideration; the intervening change must be in law that controls on the instant facts).  A

motion to reconsider is not to be used to "reargue issues by rehashing facts and arguments

already addressed or available, yet neglected, in the original proceeding."  *Jaffrey v. Portercare

Adventist Health Sys.*, No. 15-CV-02297-NYW, 2017 WL 3437986, at *2 (D. Colo. Aug. 10,

2017).

## ANALYSIS

In deciding whether to imply a *Bivens* remedy for plaintiff's excessive force and failure-to- intervene claims, courts apply the two-part analysis set forth in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Under the framework set forth in *Abbasi*, a court must first determine whether the claim arises in a materially different context than *Bivens*, *Davis*, and *Carlson*—the cases representing the three general contexts in which a *Bivens* remedy has been recognized. *See* 137 S. Ct. at 1859-60. If the circumstances at issue present "meaningful differences" from those established contexts, the court must assess whether any special factors counsel hesitation in implying a remedy. *See id*.

The Supreme Court preserved this analytical framework in *Egbert*. *See* 142 S. Ct. at 1803. By contrast, defendants contort the statement in *Egbert* that the two-step inquiry "often resolves to a single question" into the proposition that courts should jettison that framework and merely ask whether there is "any reason to think that Congress might be better equipped to create a damages remedy." *See* ECF No. 128 at 3. This approach is incorrect. While the Tenth Circuit noted in *Silva v. United States* that the statement in *Egbert* could be read as casting doubt on the "existing two-step *Bivens* framework," it declined to "address or resolve any tension" between *Egbert* and *Abbasi* or *Hernandez* because doing so was "not necessary to dispose of the appeal before [the Court]." 45 F.4th 1134, 1139 n. 4 (10th Cir. 2022).

Respectfully, I conclude that any apparent tension is illusory, and the fact that the two-step inquiry will "often resolve" to a single step does not permit courts to assume that the single question will constitute a legitimate *Bivens* analysis in all cases. The frequency with which the two steps collapse into one simply reflects the limited contexts in which *Bivens* has been

4

recognized (meaning that the first step of the *Abbasi* framework is rarely dispositive).  It is not a license to omit that step altogether.  *See* 137 S. Ct. at 1859-60.

Here, defendants' proposed omission of the first step of the *Abbasi* framework is particularly inappropriate, because this case presents one of the situations in which the claims at issue do not materially differ from established *Bivens* cases.  Because Mr. Mohamed's claims do not present new contexts, the inquiry that defendants stress (which branch should be responsible for fashioning new remedies) need not be reached.  However, for the sake of completeness I will address each of defendant's arguments—roughly categorized according to the prong of the *Abbasi* framework implicated.  I conclude that *Egbert* does not foreclose a remedy for the Eighth Amendment violations Mr. Mohamed has alleged, and it does not compel reconsideration of the order denying dismissal of those claims.

## I.   NEW CONTEXT.

### A.   Similarities to *Bivens*.

Defendants argue that the case here must constitute a new context because its factual parallels to *Bivens* resemble those present in *Egbert*, and the Court in *Egbert* ultimately held that a *Bivens* remedy was not available.  *See* ECF No. 128 at 5.  Defendants emphasize that the Court characterized the claim in *Egbert* as only "superficially" similar to *Bivens* when both involved Fourth Amendment claims against officers for conduct occurring on private property.  *Id*.  Based on that characterization, they argue that the claim here cannot be similar enough to *Carlson* to merit a *Bivens* remedy when "the *only* similarities" between plaintiff's claims and those in *Carlson* are that all "arise under the Eighth Amendment."  *See id*. (emphasis in original).  This argument is logically unsound and unpersuasive for several reasons.

As an initial matter, the underlying premise of their argument mischaracterizes the inquiry.  Under the correct standard, a *Bivens* remedy is available when the facts at issue do not meaningfully differ from those of at least one established *Bivens* case.  By contrast, defendants would invert the rule and require plaintiff to establish not only that the facts in his putative suit are similar to those in *Bivens*, but also that those similarities are of a particular and ephemeral flavor that the Supreme Court would find persuasive.  *See* ECF No. 128 at 5 (reasoning that because "the Supreme Court found this type of similarity [claims arising under the same Constitutional provision] unpersuasive in *Egbert*," the claims here and in *Carlson* under the Eighth Amendment against correctional officers in federal prisons would likewise be inadequate to suggest that a remedy is available).

While in most situations a case that is "not meaningfully different" from another case will share factual similarities, the "last four decades of intervening case law"—to which defendants urge fealty—contain no requirement that a claim present a certain number of factual parallels or similarities of a certain profundity for *Bivens* to apply.  *See id.*  The proper inquiry is instead to assess whether there are meaningful differences.  *See Abbasi*, 137 S. Ct. at 1859-60.

Moreover, defendants ignore that the reason the Court found that *Egbert* presented a new *Bivens* context was not that the factual parallels were inadequate or unpersuasive; it was that the border context and the associated national security implications represented an added factual *difference* that pervaded the entire factual scenario.  *See Egbert*, 142 S. Ct. at 1820 (citing *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020)).   In *Hernandez*, the Court declined to recognize a *Bivens* action related to conduct occurring at the United States/Mexico border, because "regulating the conduct of agents at the border unquestionably has national security implications" and imposes a "risk of undermining border security" that counsels against

6

**App.319**

extending *Bivens* there.  *See Egbert*, 142 S. Ct. at 1820.  In *Egbert*, the Court reasoned, the same

reasoning "applie[d] with full force," given that the disputed conduct occurred feet from the

United States/Canada border.  *See id*.

To the extent that the similarities between *Bivens* and *Egbert* in the constitutional right

implicated and the characteristics of the parties involved were "superficial," it was because—

given the gravity of the national security interests at stake in the latter but not the former—the

border context was so intertwined with the nature of the conduct and the consequences of

affording a damages remedy in *Egbert* that it pervaded the factual scenario.  *See id*.  The

outcome of *Egbert* is therefore an illustration of the principle recognized in *Abbasi*—that the

presence of certain "special factors" can bleed into the first step of the analysis and constitute a

meaningful difference.  *See Abbasi*, 137 S. Ct. at 1849 (2017) (providing examples of differences

that "might" be meaningful, including "the rank of the officers involved; the constitutional right

at issue; the generality or specificity of the official action; *…or the presence of potential special*

*factors that previous* Bivens *cases did not consider*") (emphasis added).  Still, as the *Abbasi*

Court emphasized, some differences remain "so trivial that they will not suffice to create a new

*Bivens* context." *Id*. at 1865.  *Egbert* does not alter or undermine that the inquiry is whether a

given factual difference is meaningful, not whether the factual parallels are "persuasive."

Although as Justice Sotomayor recognized in her concurrence, *Egbert*'s rejection of a

*Bivens* remedy for that plaintiff's First and Fourth Amendment claims "will make it harder for

plaintiffs to bring a successful *Bivens* claim," the lower courts "should not read [*Egbert*] to

render Bivens a dead letter."  142 S. Ct. at 1823.  The specificity of the questions presented in

*Egbert* is illustrative.  The Court there ruled narrowly that *Bivens* does not extend to Fourth

Amendment claims against federal officers "engaged in immigration-related functions" or to

7

**App.320**

claims under the First Amendment (which has not previously been vindicated by *Bivens*). It does not follow from *Egbert*'s recognition of the pervasive effects of the immigration context on a Fourth Amendment claim that future cases arising under the Fourth Amendment cannot be found "not meaningfully different" from *Bivens*.

Therefore, defendants' argument to extend the same logic to *Bivens* cases arising under the Eighth Amendment is without merit. *Egbert* does not vitiate the preceding decades of precedent. Here, the sole factor that distinguished *Egbert* from *Bivens* is not present. *Egbert* does not compel the conclusion (or even persuasively suggest) that this case is meaningfully different from *Carlson* and *Farmer*.

### B.   "Conventionality" of claim.

Defendants also argue that then-Magistrate Judge Wang's recommendation and my order improperly relied on the "conventionality" of excessive force claims to conclude that the claims did not present a new context. *See* ECF No. 128 at 6. "If a claim is common or conventional," they argue, that fact should weigh *against* rather than in favor of *Bivens* relief. *See id.* (quoting *Egbert*, 142 S. Ct. at 1808) (The fact "that [First Amendment] retaliation claims are common, and therefore more likely to impose a significant expansion of Government liability, counsels against permitting Bivens relief.") (internal quotations omitted).

This argument is flawed. It mischaracterizes Judge Wang's reasoning by equating conventionality with commonality. In fact, Judge Wang's order referenced the conventionality of Mr. Mohamed's excessive force claim only in noting that *Abbasi* does not preclude "run-of-the-mill challenges to 'standard law enforcement operations' that fall well within *Bivens* itself." *See* ECF No. 103 at 29 (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019). This statement on its face is uncontroversial because if a claim falls within *Bivens*, it is irrelevant

8

whether it is common or uncommon.  However, her underlying reasoning, as I understood it, was that a "run-of-the-mill" claim is less likely to fall outside the established purview of *Bivens* than a novel claim, because claims for damages "based on individualized mistreatment by rank-and-file federal officers" are "exactly what *Bivens* was meant to address;" and there is "substantial judicial guidance regarding the unconstitutionality of excessive force" in those standard contexts. ECF No. 103 at 29-30 (citing *Reid v. United States*, 825 F. App'x 442, 444 (9th Cir. 2020) (unpublished)); *see also Ullery v. Bradley*, 949 F.3d 1282, 1290 (10th Cir. 2020) (defining cruel and unusual punishment under the Eighth Amendment).

Similarly, I noted that Eighth Amendment excessive force claims under *Bivens* are "well-established" in concluding that "Congress's decision not to create a new cause of action was made with the understanding that such a cause of action already existed," rather than with the intent to abrogate that remedy.  Both Judge Wang's reasoning and mine are consistent with the *Abbasi* court's instruction that courts consider "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted" and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" when determining whether a given set of facts meaningfully differs from *Bivens* precedent.  *See Egbert*, 142 S. Ct. at 1814.

As discussed above, the *Abbasi* inquiry is left intact after *Egbert*.  *See id*.  Therefore, it was proper for Judge Wang to consider the availability of precedent to guide judicial decision-making and for me to consider the extent to which Congress understood that "such a cause of action already existed under *Bivens*" (which in turn suggests that affording a *Bivens* remedy would be to promote the legislative mandate rather than to aggrandize the judiciary).  The order did not, as defendants suggest, rely on an assumption that a claim commonly brought necessarily represents an established *Bivens* context.  Rather, it found that there were no meaningful

differences from *Bivens* cases and no indication of separate factors suggesting that the judiciary would be ill-equipped to adjudicate the claims or would encroach into Congress's sphere in permitting a *Bivens* suit here.

The extent to which a claim is "well-established" only incidentally corresponds with the frequency with which the claim is brought (its commonality). Therefore, both the assertions that the order here is based on the commonality of plaintiff's claim and that it is *per se* improper to consider the conventionality of a claim are incorrect. This argument to reconsider is not persuasive.

### C.     Harms would otherwise be unredressed.

Defendants argue that the "final basis" for the conclusion that plaintiff's claims do not present a new context "was a finding that refusing to extend *Bivens* here 'would result in a situation in which the very essence of civil liberty permits suits against a BOP official who refused to treat a broken arm but forbids suits against a BOP official who maliciously and intentionally broke the plaintiff's arm.'" *See* ECF No. 128 at 7 (quoting ECF No. 120 at 6). Defendants assert that the court in *Egbert* held that "it is not the function of the judiciary 'to decide whether existing remedies should be augmented by the creation of a new judicial remedy,'" which implies that they believe the Court here engaged in that purportedly inappropriate function rather than the typical *Abbasi* analysis. *See* ECF No. 128 at 7-8.

First, *Egbert* says that a court should *ask* "whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." 142 S. Ct. at 1804. It does not say definitively that it is *not* the role of the court to do so. *Egbert* does imply that the answer to this question will often be no, but defendants mischaracterize its meaning to suggest that *Egbert* stripped courts of all discretion.

10

**App.323**

Second, this language from *Egbert* is not controlling here because it applies only to a court's decision to recognize *Bivens* in a new context, while the context here is not meaningfully different from previous cases.  Moreover, even if the order here did "creat[e] a new judicial remedy" by extending *Bivens*, the limitation on courts' authority to augment a remedial scheme applies only if Congress intended that scheme to be complete without a *Bivens* remedy.  *See Egbert*, S. Ct. at 1804 ("So long as Congress or the Executive has created a remedial process *that it finds sufficient* to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy.") (emphasis added).

The question of whether Congress "finds" a given set of remedies to comprise a complete and exclusive scheme without *Bivens* requires courts to assess Congress's legislative intent.  In that inquiry, it is relevant to consider whether Congress believed *Bivens* already applied in this context (and therefore would not require duplicative enumeration), and whether attributing to the legislature an intent to exclude *Bivens* in a disputed context would create absurd results.  *See, e.g.*, *United States v. Est. of Romani*, 523 U.S. 517, 535 (1998) (noting that the fact that Congress rejected certain proposed provisions that would have amended the Tax Lien Act provided "no support" for the proposition that Congress rejected the underlying substance of those proposals, because Congress might have "thought the existing law already [reflected that content]"); *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1827 (2020) (recognizing the canon against absurdity as a "longstanding canon of statutory interpretation" that "tells courts to avoid construing a statute in a way that would lead to absurd consequences" and applying the canon to construe the language of Title VII of the Civil Rights Act of 1964).

Here, Judge Wang's and my attention to the absurdity of allowing a *Bivens* suit against an officer who failed to treat a prisoner's broken arm but not against an officer who maliciously

broke a prisoner's arm was not a naked attempt to usurp the legislative role and "superimpos[e]" a Bivens remedy in a new context; it was an attempt to effectuate the congressional will by considering what interpretation of the existing remedial scheme would avoid absurd or inconsistent results—which Congress presumably would have wanted. *See Bostock*, 140 S. Ct. at 1827; ECF No. 120 at 6. The absurdity that would be produced by denying a *Bivens* remedy in the latter context suggests that Congress did not intend to exclude *Bivens* and did not believe that the remedial scheme without *Bivens* was sufficient to "secure an adequate level of deterrence." *See Egbert*, S. Ct. at 1804.

The Magistrate Judge's recommendations and my order denying dismissal did not rely on the fact that Mr. Mohamed's harms would go unredressed without *Bivens* for the impermissible purpose that defendants suggest but rather to assist in the inquiry into congressional intent that *Egbert* impliedly requires. *See id*. Therefore, this argument does not warrant reconsideration.

## II.     SPECIAL FACTORS.

### A.     Existing administrative grievance program.

Defendants argue next that *Egbert*'s "directive to focus solely on whether there is a safeguard in place to prevent constitutional harms from recurring contradicts the Tenth Circuit caselaw on which the Court relied" and warrants reconsideration of the Court's conclusion that the BOP's Administrative Remedy Process is not an alternative process.  ECF No. 128 at 9.

*Egbert* instructs courts that "the question whether a given remedy is adequate is a legislative determination that must be left to Congress."  *Egbert*, 142 S. Ct. at 1807.  This arguably conflicts to some extent with the Tenth Circuit caselaw requiring that alternative remedies "must be more than nothing."  *See Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 863 (10th Cir. 2016).  However, *Egbert* does not represent a blanket prohibition on using or referencing the adequacy of the remedy in a *Bivens* analysis.  While courts are not to supplant a legislative determination that a remedial scheme is complete and sufficient without *Bivens*, the conclusion that the legislature *does* find the existing scheme complete and sufficient without *Bivens* is a threshold determination that requires courts to consider facts probative of the legislature's subjective intent.  *See Egbert*, 142 S. Ct. at 1807; *see also Abbasi*, 137 S. Ct. at 1858 (reiterating that courts should "ask whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy").

The fact that a remedial scheme is extremely extensive or extremely limited could be one such indicator of legislative intent.  An utterly empty "remedial process" providing no actual relief, for example, would tend to suggest that Congress did not intend it to be a freestanding and exclusive remedy for constitutional violations, even if its inadequacy cannot on its face justify

13

**App.326**

affording *Bivens* relief.  That analysis does not represent the court's encroaching on Congress's "calibration" of an appropriate remedy, as *Egbert* prohibits; it represents the court's seeking to accurately define the boundaries of the remedy Congress thought was appropriate in the first instance.

Where courts have "warrant to doubt" that the purported alternative remedial scheme "secured adequate deterrence and afforded [claimants] an alternative remedy," *Egbert* implies that a court would be justified in finding that the alternative scheme does not foreclose *Bivens* relief.  *See* 142 S. Ct. at 1807 (finding that *Bivens* relief was unavailable and relying on the fact that there, as in *Hernandez v. Mesa*, 140 S. Ct. at 749, and *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001), the Court had "no warrant to doubt" that the remedial scheme secured adequate deterrence).  Although the Supreme Court did not have "warrant to doubt" in *Hernandez*, *Malesko*, and *Egbert* that Congress considered the alternative remedies complete and adequate to secure deterrence of constitutional violations, there is such warrant to doubt here.

In *Hernandez*, the Court found that Congress had empowered Executive Branch officials to compensate non-U.S.-citizens for injuries suffered outside the United States under at least four different provisions of the Foreign Claims Act, and those "alternative avenues for compensation" served the same function as would damages actions against the officers.  *See* 140 S. Ct. at 749. Here, by contrast, defendants fail to identify what remedy Mr. Mohamed could obtain through the prison grievance system.  *See* ECF No. 103 (citing ECF No. 71 at 7).  Nor does it appear that the administrative grievance process provides any possible "avenue for compensation."  *See id*. Although, after *Egbert*, the fact that a remedial process does not provide monetary compensation is not dispositive as to its adequacy, it may constitute one factor creating "warrant to doubt" that the scheme is plenary.  *Cf. Egbert*, 142 S. Ct. at 1807.

14

**App.327**

Defendants argue that *Malesko* stands for the proposition that the BOP administrative grievance program is "an alternative process that *is* available to redress past constitutional violations suffered by federal prisoners." ECF No. 128 at 9 (emphasis in original). This is not correct. The Court in *Malesko* found that "*Bivens* relief was unavailable because federal prisoners could, among other options, file grievances through an 'Administrative Remedy Program.'" *Egbert*, 142 S. Ct. at 1806 (citing 534 U.S. at 74). There could remain sound reason to doubt that Congress thought the administrative grievance process *alone* would be sufficient to deter official misconduct even if in *Malesko* the administrative remedy program augmented with multiple other forms of relief was presumed to be adequate. *Cf.* 534 U.S. at 74.

Likewise, the fact that the Court in *Egbert* found it plausible that Congress considered the Department of Homeland Security's disciplinary process an adequate deterrent does not compel the same finding here regarding the BOP's grievance process. *Egbert* represents the lower extreme of alternative remedies that the Court has concluded Congress would find adequate. *See* 8 U.S.C.A. § 1103(a)(2); 8 C.F.R. § 287.10 (a, b) (describing that complaints about misconduct by border patrol agents are filed with the Secretary of the Department of Homeland Security and investigated by the Department of Homeland Security or delegated to the Department of Justice); *see also Egbert* 142 S. Ct. at 1822 (J. Sotomayor, concurring) (criticizing this purported remedy as "a threadbare disciplinary review process expressly conferring no substantive rights").

I need not criticize the BOP's review process as far as it goes. Complaints filed against prison guards can move outside the purview of the regional prison systems and reach the General Counsel of the Bureau of Prisons on the second level of appeals. *See* P1330.18, Federal Regulations from 28 C.F.R. 542.10-19. However, complaints do not receive an independent review outside the Bureau of Prisons, and there is no internal avenue to seek monetary

15

**App.328**

compensation.  That might be deemed adequate in some contexts, but it makes no sense when, as the previous example illustrated, those remedies are available to the inmate against the person who mistreats his broken arm but not against the person whose application of excessive force broke it.

Even if the administrative grievance process in *Egbert* were intended to be a complete remedial scheme, I do not infer that intent here.  There is *more* reason to think Congress would take a minimalistic approach to remedies in a national security border context than in domestic circumstances of prisoner abuse, so there is little reason to think that Congress would implement a more draconian remedial scheme here than in *Egbert*.  And in *Egbert*, complaints about misconduct by Border Patrol agents were received and managed by the Secretary of DHS, not by the direct supervisors of the agents.

This is not the "elaborate remedial system that ha[d] been constructed step by step, with careful attention to conflicting policy considerations" to which the Supreme Court looked in *Bush v. Lucas*, 462 U.S. 367, 388, (1983).  This is not even *Egbert*'s alternative "regulatory scheme," in which the executive Department conducted centralized investigations and imposed sanctions for misconduct.  Defendants' argument that the BOP grievance process forecloses *Bivens* relief here is not persuasive.

### B.   Potential "harmful and inappropriate" consequences.

Defendants argue that "the threat of personal liability could impede the proper functioning of BOP facilities by causing officials to alter their behavior and judgment to avoid individual liability," and that "extending *Bivens*" to Mr. Mohamed's claims would wreak havoc on BOP operations because "officers' desire[s] to avoid liability may cause them to hesitate in their response to disobedient behavior."  ECF No. 128 at 10.

This argument proves too much.  It is not a rationale against recognizing a *Bivens* remedy in these circumstances; it is an argument against *Bivens* itself.  The Court has never drawn "artificial distinctions between line-level officers of the 83 different federal law enforcement agencies with authority to make arrests and provide police protection."  *See* 142 S. Ct. at 1815 (J. Sotomayor, concurring) (citing Dept. of Justice, C. Brooks, Federal Law Enforcement Officers, 2016—Statistical Tables (NCJ 251922, Oct. 2019), https://bjs.ojp.gov/content/pub/pdf/fleo16st.pdf.).  To conclude that it would be inappropriate to place line-level BOP guards under the threat of personal liability for fear of "imped[ing] the proper functioning of BOP facilities" would subvert the entire architecture of *Bivens* by implying that *no* officer can properly be subjected to personal liability.  Moreover, causing defendants to "alter their behavior and judgment to avoid individual liability" is not a flaw in this application of *Bivens* but rather its essential *purpose*.  *See Egbert*, 142 S. Ct. at 1798 ("*Bivens* is concerned solely with deterring the unconstitutional acts of individual officers.") (internal quotations omitted).

The importance of preserving order in federal prisons, while unquestionably compelling, does not carry with it a "clear and strong connection to national security" or represent a function "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry."  *Compare Hernandez*, 140 S. Ct. at 744.  Evaluating and enforcing the boundaries of the Constitution is a paradigmatic judicial function, and the fact that the context here is a federal prison facility does not immunize those officers from scrutiny.  Relatedly, defendants' concern that the fear of liability may cause prison guards to "hesitate in their response to disobedient behavior" rings hollow.  ECF No. 128 at 10.  It is odd to argue that *Bivens* liability on a failure to intervene claim would be "harmful and inappropriate" because it

17

might create a dire situation in which an officer hesitates to intervene.  These arguments against recognizing *Bivens* here do not compel reconsideration.

Finally, defendants argue that the court's permitting a *Bivens* suit here represents a "judicial intrusion" into the legislative sphere, in contravention of established principles of separation of powers.  *See* ECF No. 128 at 12.  It is true that "when a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis."  *Abbasi*, 137 S. Ct. at 1857.  But defendants fail to recognize that retracting constitutional protections merely because the violator is a federal official represents an abdication of the judicial role, and "whittling down the number of claims that remain viable" despite Congress having "recognized and relied on the *Bivens* remedy in creating and amending other remedies" does not respect separation of powers principles but rather nullifies them.  *See Egbert*, 142 S. Ct. at 1823 (J. Sotomayor, concurring).  The court has inquired into the congressional intent for the remedial scheme and attempted in good faith to animate that legislative intent.  Defendants' proposal that the court do otherwise does not warrant reconsideration.

### ORDER

For the reasons above, reconsideration of the order denying dismissal is neither compelled nor persuasively supported by *Egbert*.  Defendants' motion to reconsider is DENIED.

DATED this 24th day of October, 2022.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02516-RBJ-NYW

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA,

      Defendants.

---

**NOTICE OF APPEAL**

---

      Defendants appeal to the United States Court of Appeals for the Tenth Circuit from the

orders entered on May 18, 2022, and October 24, 2022, denying Defendants' motion to dismiss,

and denying their motion for reconsideration.  ECF Nos. 120, 150.

      Respectfully submitted this 22nd day of December, 2022.

                      COLE FINEGAN
                      United States Attorney

                      *s/ Jennifer R. Lake*
                      Jennifer R. Lake
                      Assistant United States Attorney
                      1801 California Street, Suite 1600
                      Denver, CO  80202
                      (303) 454-0100

(303) 454-0407 fax
jennifer.lake@usdoj.gov

Counsel for Defendants

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on December 22, 2022, I served the foregoing document on the following non-CM/ECF participant in the manner indicated:

Khalfan Kharmis Mohamed (U.S. mail)
Reg. No. 44623-054
ADX – Florence
P.O. Box 8500
Florence, CO  81226

*s/ Jennifer Lake*
Jennifer Lake
United States Attorney's Office

**App.335**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March, 2023, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. The appendix will be served on counsel by that system.

I further certify that I will cause one paper copy to be delivered to the Court by Federal Express within five business days of notice that the Court has accepted the brief for filing.

s/s Lowell V. Sturgill Jr.
Lowell V. Sturgill Jr.
Counsel for Appellee
